Exhibit 11

# 2 CFR PART 200, APPENDIX XI

---

# COMPLIANCE SUPPLEMENT ADDENDUM

---

NOTE: Auditors must use this 2020 Addendum and the 2020
Compliance Supplement together.



## December 2020

**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF MANAGEMENT AND BUDGET**

**EXHIBIT 11 - 1**

**SCOPE**

This addendum supplements the 2020 OMB 2 CFR 200 Part 200, Appendix XI Compliance Supplement (Supplement) to provide additional guidance for programs with expenditures of COVID-19 awards that the auditor determines are major programs in audits performed under 2 CFR 200 Subpart F. Note: The guidance contained in this addendum applies to program-specific audits under the provisions of 2 CFR Part 200, Subpart F, section 200.501(c) and section 200.507, whether or not a program-specific audit guide is available.

The COVID-19 awards are funded under the following Acts:

• Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Pub. L. 116-123)

• Families First Coronavirus Response Act (Pub. L. 116-127)

• Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. 116-136)

• Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139)

This addendum is effective for audits of fiscal years beginning after June 30, 2019. It must be used in conjunction with other parts and appendices of the 2020 Compliance Supplement published in August 2020 in determining the appropriate audit procedures to support the auditor's opinion on compliance for each major program with expenditures of COVID-19 awards.

**Contents of Addendum**

This addendum to the August 2020 Supplement modifies the following parts of that Supplement as indicated:

• An addendum-specific table of contents that includes the fourteen COVID-19 funded programs and one new non COVID-19 program highlighted in yellow**.**

• A supplementary Part 2 matrix (covering parts 4 and 5) shows (1) eight new COVID-19 funded programs, (2) six pre-existing program supplements (and CFDA numbers) to which COVID-19 funding and compliance requirements have been added, and (3) one new non-COVID-19 program. New programs and existing programs with COVID-19 requirements are shown in the matrix and are listed below in the Part 4 discussion.

• Part 3 coverage of new cross-cutting provisions in the following area: L. Reporting – for the review of subrecipient reporting requirement under the Federal Funding Accountability and Transparency Act (FFATA). (Part 3 portions of the August 2020 Supplement that have not changed are not repeated in this addendum.)

• Part 4 coverage of new or existing programs with new compliance requirements as a result of COVID-19 funding (see below). Note: 20.218 is not a COVID program but is a new program.

**EXHIBIT 11 - 2**

Program coverage in Part 4 is provided for the following:

**USDA**

CFDA 10.001 Programs Impacted by COVID Waivers

**HUD**

CFDA 14.862 Indian Community Development Block Grant Program

**Department of Justice**

CFDA 16.034 Coronavirus Emergency Supplemental Funding

**Department of Transportation**

CFDA 20.218 Motor Carrier Safety Assistance Program

**Treasury**

CFDA 21.019 Coronavirus Relief Fund

**FCC**

CFDA 32.006 COVID-19 Telehealth Program

**Department of Education**

CFDA 84.425 ESF Education Stabilization Fund Under the Coronavirus Aid, Relief, and Economic Security Act

CFDA 84.425 HEERF Education Stabilization Fund Under the Coronavirus Aid, Relief, and Economic Security Act Higher Education Emergency Relief Fund

**Department of Health and Human Services**

CFDA 93.153 Coordinated Services and Access to Research for Women, Infants, Children, and Youth (Ryan White HIV/AIDS Program Part D Women, Infants, Children, and Youth WICY Program)

CFDA 93.461 COVID-19 Testing for the Uninsured

CFDA 93.498 Provider Relief Fund

CFDA 93.914 HIV Emergency Relief Project Grants (Ryan White HIV/AIDS Program Part A)

**EXHIBIT 11 - 3**

CFDA 93.917 HIV Care Formula Grants (Ryan White HIV/AIDS Program Part B)

CFDA 93.918 Grants to Provide Outpatient Early Intervention Services with Respect to HIV Disease (Ryan White HIV/AIDS Program Part C)

- An update to Part 5 showing information relating to COVID-19 considerations for the Student Financial Assistance cluster.

- An update to Part 8, Appendix 7 related to audit due dates and treatment of donated personal protective equipment.

**EXHIBIT 11 - 4**

# ADDENDUM TABLE OF CONTENTS

| Title | Page |
|---|---|
| **PART 1 – SCOPE** | 1-1 |
| **PART 2 – MATRIX OF COMPLIANCE REQUIREMENTS** | 2-1 |
| **PART 3 – COMPLIANCE REQUIREMENTS** | |
| L. Reporting | 3-L |
| **PART 4 – AGENCY PROGRAM REQUIREMENTS** | |
| **10    United States Department of Agriculture (USDA)** | |
| 10.001 Programs Impacted by COVID Waivers **(new)** | 4-10.001 |
| **14    Department of Housing and Urban Development (HUD)** | |
| 14.862 Indian Community Development Block Grant Program | 4-14.862 |
| **16    Department of Justice (DOJ)** | |
| 16.034 Coronavirus Emergency Supplemental Funding **(new)** | 4-16.034 |
| **20    Department of Transportation (DOT)** | |
| 20.218 FMCSA Cluster **(new)** | 4-20.218 |
| **21    Department of the Treasury** | |
| 21.019 Coronavirus Relief Fund **(new)** | 4-21.019 |
| **32    Federal Communications Commission (FCC)** | |
| 32.006 COVID-19 Telehealth Program **(new)** | 4-32.006 |
| **84    Department of Education (ED)** | |
| 84.425 ESF - Education Stabilization Fund Under the Coronavirus Aid, Relief, And Economic Security Act **(new)** | 4-84.425-ESF |
| 84.425 HEERF Education Stabilization Fund Under the Coronavirus Aid, Relief, And Economic Security Act Higher Education Emergency Relief Fund **(new)** | 4-84.425-HEERF |
| **93    Department of Health and Human Services (HHS)** | |
| 93.153 Coordinated Services and Access to Research for Women, Infants, Children, and Youth (Ryan White HIV/AIDS Program Part D Women, Infants, Children, and Youth (WICY) Program) | 4-93.153 |
| 93.461 COVID-19 Testing for the Uninsured **(new)** | 4-93.461 |
| 93.498 Provider Relief Fund **(new)** | 4-93.498 |
| 93.914 HIV Emergency Relief Project Grants (Ryan White HIV/AIDS Program Part A) | 4-93.914 |
| 93.917 HIV Care Formula Grants (Ryan White HIV/AIDS Program Part B) | 4-93.917 |
| 93.918 Grants to Provide Outpatient Early Intervention Services with Respect to HIV Disease Ryan White HIV/AIDS Program Part C) | 4-93.918 |
| **PART 5 – CLUSTER OF PROGRAMS** | |
| Student Financial Assistance | 5-3-1 |
| **PART 8 – APPENDICES** | |
| VII    Other Audit Advisories | 8-VII |

Note: 20.218 is not a COVID-19 program but is a new program and is shown with yellow highlight.

**EXHIBIT 11 - 5**

## PART 2 – MATRIX OF COMPLIANCE REQUIREMENTS

**INTRODUCTION – 2020 ADDENDUM**

This part identifies the compliance requirements that the federal government has determined are subject to audit for the programs included in this Supplement. Because Part 4 (Agency Program Requirements) and Part 5 (Clusters of Programs) do not include guidance for all types of compliance requirements that pertain to the program (see introduction to Part 4 for additional information), the auditor must use this Part 2 to identify the types of compliance requirements that have been identified as subject to the audit. Note that comparable information is included in each program/cluster in parts 4 and 5 of the Supplement. The box for each type of compliance requirement either contains a Y (for "Yes" if the type of compliance requirement is subject to audit for the program) or N (for "No" if the requirement is not subject to audit for the program).

Even though a Y indicates that the compliance requirement is subject to audit, it may not apply to a particular non-federal entity, either because that entity does not have activity subject to that type of compliance requirement or the activity could not have a direct and material effect on a major program. For example, even though Equipment and Real Property Management may be identified as being subject to audit for a particular program, it would not apply to a non-federal entity that did not acquire or dispose of equipment or real property. Similarly, a Y may be included to identify Procurement and Suspension and Debarment as subject to audit; however, the audit would not be expected to address this type of compliance requirement if the non-federal entity charges only small amounts of purchases to a major program. The auditor should exercise professional judgment when determining which compliance requirements marked as Y needs to be tested at a particular non-federal entity.

When a Y is present on the matrix and the auditor determines that the requirement should be tested at a non-federal entity, the auditor must use Part 3, Compliance Requirements, and Part 4 (or 5), if applicable, in planning and performing the tests of compliance. For example, if a program entry in the matrix includes a Y in the Program Income column, Part 3 provides a general description of the compliance requirement. Part 3 also provides the audit objective and the suggested audit procedures for testing program income. Part 4 (or 5) may also include specific information on program income requirements pertaining to the program, such as restrictions on how program income may be used. Part 6, Internal Control, includes general information concerning internal control.

When a compliance requirement is shown in the matrix as N, it has been identified by the federal government as not being subject to audit. Auditors are not expected to test requirements that have been noted with an N.  However, the auditor is not prohibited from expanding audit procedures if the terms of a grant award document specify that the additional compliance requirements are material to the administration of the program or if the auditor is aware of additional information that would lead the auditor to believe there are increased risks of fraud, waste, or abuse of federal program funds.

**EXHIBIT 11 - 6**

**Legend to Matrix**

*Legend:* Y - Yes, this type of compliance requirement is subject to audit for the federal program; N - No, this type of compliance requirement is not subject to audit for the federal program.

Any new programs are shown with "new" in the requirement cell and in bold.

Requirements D and K are reserved and therefore not shown in this chart.

Note that 10.001 is COVID-19 specific guidance which applies to multiple USDA programs. This guidance does not break out instructions by each requirement designation; therefore, the cells in the table below are left blank and we show that this is intentional by stating "no matrix."

Two additional changes are shown in this table. The first change is the correction for the cross-cutting section, 20.000 (highlighted in orange), which was deleted in its entirety as a requirement in the 2020 Compliance Supplement. For the following program page numbers, the reference to 20.000 should have been deleted and should be disregarded: 20.205-5, 20.319-5, 20.500-5, 20.509-3, 20.513-5, and 20.527-3. For 14.238-3 and 14.256-5, 20.000 should read 20.001 (Wage Determination).

The second change is the addition of 20.218.

| Requirement | A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Number | Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment Real Property Management | Matching, Level of Effort, Earmarking | Period of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| **10.001 (new - no matrix)** | | | | | | | | | | | | |
| 14.862 | Y | Y | Y | N | Y | N | N | Y | N | Y | N | Y |
| **16.034 (new)** | **Y** | **Y** | **N** | **N** | **Y** | **N** | **N** | **Y** | **Y** | **Y** | **Y** | **N** |
| 20.000 DELETED | | | | | | | | | | | | |
| **20.218 (new)** | **Y** | **Y** | **N** | **N** | **Y** | **Y** | **Y** | **N** | **Y** | **Y** | **N** | **N** |
| **21.019 (new)** | **Y** | **Y** | **N** | **N** | **N** | **N** | **Y** | **N** | **N** | **Y** | **Y** | **N** |
| **32.006 (new)** | **Y** | **Y** | **N** | **Y** | **N** | **N** | **Y** | **N** | **N** | **Y** | **N** | **Y** |
| **84.425 ESF (new)** | **Y** | **Y** | **Y** | **N** | **Y** | **Y** | **N** | **N** | **N** | **Y** | **Y** | **N** |
| **84.425 HEERF (new)** | **Y** | **Y** | **N** | **N** | **N** | **Y** | **Y** | **Y** | **N** | **Y** | **N** | **N** |
| 93.153 | Y | Y | Y | N | N | N | N | Y | Y | Y | N | N |
| **93.461 (new)** | **Y** | **Y** | **N** | **Y** | **N** | **N** | **N** | **N** | **N** | **N** | **N** | **N** |
| **93.498 (new)** | **Y** | **Y** | **N** | **N** | **N** | **N** | **N** | **N** | **Y** | **N** | **N** | **N** |
| 93.914 | Y | Y | Y | Y | N | N | N | N | Y | N | Y | N |
| 93.917 | Y | Y | Y | Y | N | Y | N | N | Y | N | Y | N |
| 93.918 | Y | Y | Y | N | N | N | Y | Y | Y | Y | N | N |

**EXHIBIT 11 - 7**

| Requirement | A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Program Number** | Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment Real Property Management | Matching, Level of Effort, Earmarking | Period of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Part 5.3, SFA **(additional COVID-19 directive)** | Y | N | Y | Y | N | Y | N | N | N | Y | N | Y |

**EXHIBIT 11 - 8**

## 2020 Compliance Supplement Addendum

## L. REPORTING

The following subsection is in addition to the current compliance requirements for reporting in the 2020 Compliance Supplement published in August 2020.

**Compliance Requirements**

**Federal Funding Accountability and Transparency Act**

Under the requirements of the Federal Funding Accountability and Transparency Act (Pub. L. No. 109-282) (Transparency Act) that are codified in 2 CFR Part 170, recipients (i.e., direct recipients) of grants or cooperative agreements who make first tier subawards of $25,000 or more are required to register in the Federal Funding Accountability and Transparency Act Subaward Reporting System (FSRS) and report subaward data through FSRS. Information input to FSRS is available at USASpending.gov as the publicly available website for viewing this information (https://www.usaspending.gov/search).

For all COVID-19 programs included in the addendum, with the exception of the Coronavirus Relief Fund, in which the reporting type of compliance requirement is marked as a Y in the Part 2 Matrix of Compliance Requirements indicating it is subject to audit, auditors must test the compliance with the reporting requirements of 2 CFR Part 170 using the guidance in this section when the auditor determines reporting to be direct and material and the recipient makes first tier awards.

In addition, for audits of fiscal year ends after September 30, 2020, the requirement in the previous paragraph is extended to all selected major programs, regardless of whether COVID-19 funding is involved. That is, for all major programs in which the Part 2 matrix is marked as Y for the reporting type of compliance requirement, auditors must test compliance with the reporting requirements of 2 CFR Part 170 using the guidance in this section when the auditor determines reporting to be direct and material and the recipient makes first tier subawards. This testing is in addition to other financial, performance, or special reporting requirements that may be identified in parts 3 (section 3.L), 4, and 5. This requirement also extends to major programs not included in the 2020 *Compliance Supplement* when the auditors determine reporting to be direct and material and the recipient makes first-tier subawards.

*Federal Funding Accountability and Transparency Act*

Aspects of the Transparency Act, as amended by Section 6202(a) of the Government Funding Transparency Act of 2008 (Pub. L. No. 111-252), that relate to subaward reporting (1) under grants and cooperative agreements were implemented in OMB in 2 CFR Part 170 and (2) under contracts, by the regulatory agencies responsible for the Federal Acquisition Regulation (FAR at 5 FR 39414 et seq., July 8, 2010). The requirements pertain to recipients (i.e., direct recipients) of grants or cooperative agreements who make first tier subawards and contractors (i.e., prime contractors) that award first-tier subcontracts. There are limited exceptions as specified in 2 CFR Part 170 and the FAR. The guidance at 2 CFR Part 170 currently applies only to federal financial

**EXHIBIT 11 - 9**

assistance awards in the form of grants and cooperative agreements (e.g., it does not apply to loans made by a federal agency to a recipient), however the subaward reporting requirement applies to all types of first tier subawards under a grant or cooperative agreement.

As provided in 2 CFR Part 170 and FAR Subpart 4.14, respectively, federal agencies are required to include the award term specified in Appendix A to 2 CFR Part 170 or the contract clause in FAR 52.204-10, Reporting Executive Compensation and First-Tier Subcontract Awards, as applicable, in awards subject to the Transparency Act.

Consistent with the OMB guidance

- 2 CFR Part 170 defines "subaward" as a legal instrument to provide support for the performance of any portion of the substantive project or program for which a recipient received a grant or cooperative agreement award and that is awarded to an eligible subrecipient. The term does not include procurement of property and services needed to carry out the project or program. A subaward may be provided through any legal agreement, including an agreement that the recipient considers a contract.

- FAR 52.204-10(a) defines "first-tier subcontract" to mean a subcontract awarded directly by a contractor to  acquire supplies or services (including construction) for performance of a prime contract, but excludes the contractor's supplier agreements with vendors, such as long-term arrangements for materials or supplies that benefit multiple contracts or the costs of which would normally be applied to a contractor's general and administrative expenses or indirect cost.

While 2 CFR Part 170 and the FAR implement several distinct Transparency Act reporting requirements, including reporting of executive compensation, the Supplement addresses only the following requirements: (1) recipient reporting of each first-tier subaward or subaward amendment that results in an obligation of $25,000 or more in federal funds; and (2) contractor reporting of each first-tier subcontract award of $25,000 or more in federal funds (this requirement was phased in based on the value of the new prime contract as specified below under "Effective Date of Reporting Requirements").

*Reporting Site*

Grant and cooperative agreement recipients and contractors are required to register in the FSRS and report subaward data through FSRS. To do so, they will first be required to register in the System for Award Management (SAM) (previously Central Contractor Registration (CCR)) (if they have not done so previously for another purpose (e.g., submission of applications through Grants.gov)) and actively maintain that registration. Prime contractors have previously been required to register in CCR/SAM. Information input to FSRS is available at USASpending.gov as the publicly available website for viewing this information (https://www.usaspending.gov/search).

**EXHIBIT 11 - 10**

*Key Data Elements*

Compliance testing of the Transparency Act reporting requirements must include the following key data elements about the first tier subrecipients and subawards under grants and cooperative agreements.

| Subaward Data Element | Definition |
|---|---|
| Subaward Date | Represents the period (by month and year) for subawards made against that Federal Award Identification Number (FAIN). |
| Subawardee DUNS # | The subawardee organization's nine-digit Data Universal Numbering System (DUNS) number. |
| Amount of Subaward | The net dollar amount of federal funds awarded to the subawardee including modifications. |
| Subaward Obligation/Action Date | Date the subaward agreement was signed. |
| Date of Report Submission | Date the recipient entered the action/obligation into FSRS. |
| Subaward Number | Subaward number or other identifying number assigned by the prime awardee organization to facilitate the tracking of its subawards. |

**Source of Governing Requirements**

Reporting requirements are contained in the following documents:

a.      Program legislation

b.      Transparency Act, implementing requirements in 2 CFR Part 170 and the FAR, and the previously listed OMB guidance documents

c.      Federal awarding agency regulations

d.      The terms and conditions of the award

**Audit Objectives**

1.      Obtain an understanding of internal control, assess risk, and test internal control as required by 2 CFR 200.514 (c).

2.      Determine whether required reports for federal awards include activity of the reporting period, are supported by applicable accounting or performance records, and are fairly presented in accordance with governing requirements.

**Suggested Audit Procedures – Internal Control**

1.       Perform procedures to obtain an understanding of internal control sufficient to plan the audit to support a low assessed level of control risk for the program.

2.      Plan the testing of internal control to support a low assessed level of control risk for reporting and perform the testing of internal control as planned. If internal control over some or all of the compliance requirements is likely to be ineffective, see the alternative procedures in 2 CFR 200.514 (c)(3), including reporting a significant deficiency or

**EXHIBIT 11 - 11**

material weakness in accordance with 2 CFR section 200.516, assessing the control risk at the maximum and considering whether additional compliance tests and reporting are required because of ineffective internal control.

3.    Consider the results of the testing of internal control in assessing the risk of noncompliance. Use this as the basis for determining the nature, timing, and extent (e.g., number of transactions to be selected) of substantive tests of compliance.

**Suggested Audit Procedures – Compliance**

*Special Reports for FFATA*

1.    Gain an understanding of the recipient's methodology used to identify which, if any, awards were subject to the Transparency Act based on inclusion of the award term, the assignment by the federal awarding agency of a new FAIN, the effective date of the reporting requirement, and whether the entity passed funds through to first tier subrecipients.

2.    Select a sample of first tier subawards. Obtain related subaward agreements/amendments/modifications and determine if the subaward/subcontract was subject to reporting under the Transparency Act based on (a) the date of the award and (b) the amount of the obligating action for subawards or face value of the first-tier subcontracts (inclusive of modifications).

      If the subaward/subcontract was subject to reporting under the Transparency Act:

      a.    Using the FAIN find the award in FSRS.

            FSRS is the portal where the recipient enters the award information; it is only accessible by the recipient. Therefore, in order for recipients to demonstrate that information has been properly input, they should coordinate with the auditor regarding the auditor's review of the information, physically or virtually (e.g., by logging into its FSRS account either in the auditor's presence or remotely using technology such as screensharing, screenshot evidence, etc., so that the auditor is able to find the awards in the system as required in this procedure).

      b.    Compare the award information accessed in step 2.a to the subaward/subcontract documents maintained by the recipient to assess if—

            (1)    applicable subaward obligations /modifications have been reported,

            (2)    the key data elements (see above) were accurately reported and are supported by the source documentation, and

            (3)    the action was reported in FSRS no later than the last day of the month *following* the month in which the subaward/subaward amendment

**EXHIBIT 11 - 12**

obligation was made or the subcontract award/subcontract modification was made.

c.    The auditor must provide the following information for non-compliance finding(s) as the results of step 2.b.

(a)    The non-federal entity did not report the subaward information

(b)     The non-federal entity did not report the subaward information timely

(c)    The non-federal entity reported incorrect amount

(d)    The non-federal entity did not report all the key data elements

The following format is recommended to report non-compliance findings and included in the audit report. Data is included for illustration purpose only.

| Transactions Tested | Subaward not reported | Report not timely | Subaward amount incorrect | Subaward missing key elements |
|---|---|---|---|---|
| 25 | W2 | 10 | 13 | 0 |
| Dollar Amount of Tested Transactions | Subaward not reported | Report not timely | Subaward amount incorrect | Subaward missing key elements |
| $5,000,000 | $200,000 | $4,000,000 | $800,000 | $0 |

**EXHIBIT 11 - 13**

## U.S. DEPARTMENT OF AGRICULTURE

## FOOD AND NUTRITION SERVICE PROGRAMS

**CFDA 10.551 SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM (SNAP) – Note (1)**

**CFDA 10.553 SCHOOL BREAKFAST PROGRAM (SBP)**

**CFDA 10.555 NATIONAL SCHOOL LUNCH PROGRAM (NSLP)**

**CFDA 10.557 SPECIAL SUPPLEMENTAL NUTRITION PROGRAM FOR WOMEN, INFANT, AND CHILDREN (WIC)**

**CFDA 10.558 CHILD AND ADULT CARE FOOD PROGRAM**

**CFDA 10.559 SUMMER FOOD SERVICE PROGRAM (SFSP)**

**CFDA 10.572 FARMER'S MARKET NUTRITION PROGRAM (FMNP) – Note (2)**

**Notes**
(1)     The Pandemic Electronic Benefit Transfer (EBT) is associated with CFDA 10.551.
(2)     FMNP is not included in the Compliance Supplement. However, FMNP is listed in this Addendum due to COVID-related waivers and flexibilities impacting FMNP.

**The programs listed above are impacted by the COVID-19 waivers.**

Pursuant to the Families First Coronavirus Response Act (the Act) (Pub. L. No. 116-127), and in light of the exceptional circumstances of this public health emergency, the Food and Nutrition Service (FNS) is granting several waivers for the aforementioned programs to ease program operations at the state and local levels and minimize the potential exposure to the novel coronavirus (COVID-19).

To view a complete portfolio of waivers, their descriptions, and states electing or requesting to implement these waivers, please go to https://www.fns.usda.gov/disaster/pandemic/covid-19. Each individual waiver contains a link to view the full description along with each state approved to implement the waiver. In addition, copies of individual state waivers are available at the links for each state.

For auditing purposes during this public health emergency, it is recommended that the audit community obtain the list of waivers from the audited state agency and local agency and adapt the audit test steps to reflect these flexibilities. Each waiver offered has reporting requirements that must be adhered to by the state agency. For example, pursuant to section 2202(d) of the Act, each state that elects to be subject to a waiver under section 2202(a)(b)(c) must submit a report to the secretary not later than one year after the date such state received the waiver. The report must include: (1) a summary of the use of this waiver by the state agency and local program operators; and (2) a description of whether and how this waiver resulted in improved services to program

participants. Although there is no requirement for auditors to test reporting requirements for waivers applied by the state agency, auditors should be aware of this reporting requirement for each waiver exercised by the state agency. Documentation must be maintained by the state agency summarizing the use of each waiver and how each waiver improved its services to program participants.

In addition, the 2020 Compliance Supplement for the FNS programs listed in this addendum contain the procedures that auditors would normally follow during customary program operations. Due to COVID-19 and the subsequent closures, as in the case of the public schools, FNS would expect instances when it is not possible to perform certain audit steps as written in the Compliance Supplement. Such instances should be documented by the auditors.

Questions regarding this Addendum should be directed to FNS's Office of Financial Management, Office of Internal Controls, Audits and Investigations at jon.garcia@usda.gov.

**EXHIBIT 11 - 15**

### DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

### CFDA 14.862 INDIAN COMMUNITY DEVELOPMENT BLOCK GRANT PROGRAM

### I. PROGRAM OBJECTIVES

The primary objective of the Indian Community Development Block Grant (CDBG) program is the development of viable Indian and Alaskan Native communities, including decent housing, a suitable living environment, and expanded economic opportunities, principally for persons of low and moderate income. Indian CDBG assistance may not be used to reduce substantially the amount of local financial support for community development activities below the level of support prior to the availability of the assistance (24 CFR section 1003.2).

### II. PROGRAM PROCEDURES

Two types of grants are eligible under the Indian CDBG (ICDBG) program. Single-purpose grants provide funds for one or more single purpose projects which consist of an activity or set of activities designed to meet a specific community development need. This type of grant is awarded through competition with other single-purpose projects. Imminent threat grants alleviate an imminent threat to public health or safety that requires immediate resolution. This type of grant is awarded only after a HUD area office determines that such conditions exist and that funds are available for such grants (24 CFR section 1003.100). If the imminent threat grant was awarded pursuant to the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. No. 116-136), please note the "Special Provisions for ICDBG-CARES Imminent Threat Grants" below.

**Source of Governing Requirements**

Implementing regulations are published at 24 CFR Part 1003.

**Availability of Other Program Information**

Additional information about the Indian CDBG program is available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/public_indian_housing.

### III. COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors**

**EXHIBIT 11 - 16**

are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | N | Y | N | N | Y | N | Y | N | Y |

### A.      Activities Allowed or Unallowed

*Indian CDBG* – Funds (including program income generated by activities carried out with grant funds) may only be used for the following activities:  (1) the acquisition of real property; (2) the acquisition, construction, reconstruction, or installation of public works, facilities, and sites, or other improvements; (3) code enforcement in deteriorated or deteriorating areas; (4) clearance, demolition, removal, and rehabilitation of buildings and improvements; (5) special projects for removal of material and architectural barriers that restrict accessibility by elderly and handicapped individuals; (6) payments to housing owners for losses of rental income incurred in temporarily holding housing for the relocated; (7) disposition of real property acquired under this program; (8) provision of public services (subject to limitations contained in regulations and to certain HUD determinations); (9) payment of the non-federal share for a grant program that is part of the assisted activities; (10) payment to complete a Title 1 Federal Urban Renewal project; (11) relocation assistance; (12) planning activities; (13) administrative costs; (14) acquisition, construction, reconstruction, rehabilitation, or installation of commercial or industrial buildings; (15) assistance to community-based development organizations; (16) activities related to energy use; (17) assistance to private, for-profit business, when appropriate to carry out an economic development project; (18) substantial reconstruction of housing owned and occupied by low- and moderate-income persons (subject to certain HUD determinations); (19) direct assistance to facilitate and expand homeownership; (20) technical assistance to public or private entities for capacity building (exempt from planning/administration cap); (21) housing counseling and housing activity delivery costs under Indian CDBG; (22) assistance to colleges and universities to carry out eligible activities; and (23) assistance to public and private entities (including for-profits) to assist microenterprises (24 CFR sections 1003.201–1003.206).

**B.**      **Allowable Costs/Cost Principles**

1.      All items of cost listed in 2 CFR Part 200, Subpart E, that require prior federal agency approval are allowable without prior approval, except for the following:

   a.      Depreciation methods for fixed assets shall not be changed without the approval of the federal cognizant agency.

   b.      Costs of housing (e.g., depreciation, maintenance, utilities, furnishings, rent), housing allowances, and personal living expenses (goods or services for personal use), regardless of whether reported as taxable income to the employees, require prior HUD approval.

   c.      Organization costs require prior HUD approval.

2.      Fines, penalties, damages, and other settlements are unallowable.

3.      No person providing consultant services in an employer-employee type of relationship may receive more than a reasonable rate of compensation. Such compensation must not exceed the equivalent of the daily rate paid for Level IV of the Executive Schedule (currently $161,900). The Executive Pay Schedule may be obtained at https://www.opm.gov/policy-data-over sight/pay-leave/salaries-wages (24 CFR section 1003.501(b)).

**C.**      **Cash Management**

The auditor should refer to Part III for the basic compliance requirement information and 2 CFR section 200.305 (24 CFR section 1003.501).

**F.**      **Equipment and Real Property Management**

1.      For equipment purchased with Indian CDBG funds, the requirements of 24 CFR section 85.32 or 2 CFR section 200.313 apply with the exception that when the equipment is sold, the proceeds are considered program income (24 CFR section 1003.501(a)(6)).

2.      Except for awards to faith-based organizations, the real property requirements in 2 CFR Part 200 do not apply. Generally, when real property that was acquired or improved using Indian CDBG program funds in excess of $25,000 is disposed of, the Indian CDBG program must be reimbursed for its fair share of the current market value of the property. If disposition occurs after program closeout, the proceeds shall be used for allowable activities and meeting the primary objective of the program (24 CFR section 1003.504).

**EXHIBIT 11 - 18**

**I.      Procurement and Suspension and Debarment**

1.      For the ICDBG program, HUD has determined that funds used are subject to section 7(b) of the Indian Self-Determination and Education Assistance Act (24 CFR section 1003.510), which means, to the greatest extent feasible, a recipient is to give preference in the award of contracts to Indian organizations and Indian-owned economic enterprises. Auditors should be familiar with these preference in contracting procedures set forth in 24 CFR section 1003.510(d) that, among other things, require recipients to:

   a.      Advertise for bids or proposals limited to qualified Indian organizations and Indian-owned enterprises; or

   b.      Use a two-stage preference procedure, as follows:

      (1)      *Stage 1.* Invite or otherwise solicit Indian-owned economic enterprises to submit a statement of intent to respond to a bid announcement or request for proposals limited to Indian-owned firms.

      (2)      *Stage 2.* If responses are received from more than one Indian enterprise found to be qualified, advertise for bids or proposals limited to Indian organizations and Indian-owned economic enterprises; or

   c.      Develop, subject to Area ONAP one-time approval, the grantee's own method of providing preference.

2.      Procurements that are within the dollar limitations established for small purchases under 2 CFR section 200.320 need not follow the formal bid or proposal procedures of 24 CFR section 1003.510(d) since these procurements are governed by the small purchase procedures of 2 CFR section 200.320. However, a recipient's small purchase procurement shall, to the greatest extent feasible, provide Indian preference in the award of contracts (24 CFR section 1003.510(d)(3)).

**L.      Reporting**

   **1.      Financial Reporting**

      a.      *SF-270, Request for Advance or Reimbursement* – Not Applicable

      b.      *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

      c.      *SF-425, Federal Financial Report* – Applicable

**EXHIBIT 11 - 19**

2.      **Performance Reporting**

*HUD 60002, Section 3 Summary Report, Economic Opportunities for Low- and Very Low-Income Persons (OMB No. 2529-0043)* – For each Indian CDBG that involves development, operating, or modernization assistance, the prime recipient must submit Form HUD 60002 information using the automated Section 3 Performance Evaluation and Registry System (SPEARS) (24 CFR sections 135.3(a), 135.5, and 135.90).

Information on the automated system is available at https://www.hud.gov/program_offices/fair_housing_equal_opp/section3/section3/spears. The system was launched on August 24, 2015. The due date for submission of 2013 and 2014 reports was extended to December 15, 2015. SPEARS pre-populates Form HUD 60002 with recipient name and address along with disbursement data for program funding covered by Section 3. Users have the flexibility of selecting the 12-month reporting period, typically to coincide with their respective fiscal cycle.

*Key Line Items* – The following line items contain critical information:

1.      Number of new hires that meet the definition of a Section 3 resident

2.      Total dollar amount of construction contracts awarded during the reporting period

3.      Dollar amount of construction contracts awarded to Section 3 businesses during the reporting period

4.      Number of Section 3 businesses receiving the construction contracts

5.      Total dollar amount of non-construction contracts awarded during the reporting period

6.      Dollar amount of non-construction contracts awarded to Section 3 businesses during the reporting period

7.      Number of Section 3 businesses receiving the non-construction contracts

3.      **Special Reporting**

Not Applicable

N.      **Special Tests and Provisions**

**Environmental Review**

**Compliance Requirements** Program regulations provide that the responsible entity tribe will assume responsibilities for environmental review and decision making under the

requirements of 24 CFR part 58. An environmental review must be prepared for each project or activity. Funds may not be committed to a grant activity or project before the completion of the environmental review and approval of the Request for Release of Funds (RROF) and environmental certification. If the responsible entity tribe determines that it met a criterion specified in the regulations that would qualify the project as exempt or qualify the project for certain categorical exclusions, the RROF and environmental certification requirements do not apply (24 CFR sections 58.34 and 58.35, 24 CFR section 1003.605).

**Audit Objectives** Determine whether (1) the required environmental reviews have been performed and (2) program funds were not obligated or expended prior to completion of the environmental review process.

**Suggested Audit Procedures**

Select a sample of projects for which expenditures were made and verify that:

*Environmental Reviews*

a.      Environmental determinations were made for each project or activity.

b.      Environmental determinations were supported by an environmental review, including supporting documentation for each applicable law and authority.

c.      For any project where an RROF and environmental certification was not submitted, the environmental review includes a written determination that the project or activity is exempt under a criterion of 24 CFR section 58.34 or is categorically excluded under a criterion of 24 CFR section 58.35(b), and meets the conditions specified for such exemption or categorical exclusion, with supporting documentation.

*Requests for Release of Funds*

a.      Examine HUD's approval of the RROF and environmental certification and note receipt dates.

b.      Review the expenditure and related records and determine the dates the funds were obligated or expended.

c.      Determine that funds were obligated or expended subsequent to RROF and environmental certification approval by HUD.

Additional information on environmental review requirements can be found at https://www.hudexchange.info/programs/environmental-review/.

**EXHIBIT 11 - 21**

**Special Provisions for ICDBG-CARES Imminent Threat Grants**

1.      **General**

On March 27, 2020, the CARES Act was signed into law. The Act provides for up to $100,000,000 in ICDBG Imminent Threat funding to prevent, prepare for, and respond to coronavirus, for emergencies that constitute imminent threats to health and safety. This funding was provided in the form of grants to eligible Indian tribes and must be used to prevent, prepare for, and respond to the COVID-19. This funding must be used in accordance with the applicable requirements of the CARES Act, Title I of the Housing and Community Development Act of 1974, as amended (42 USC 5103 et seq.), the ICDBG implementing regulations at 24 CFR Part 1003, and the ICDBG-CARES Implementation Notice, PIH Notice 2020-11 issued May 15, 2020.

In addition, under the CARES Act, Congress authorized HUD to waive or specify alternative requirements for any statute or regulation (except for requirements related to fair housing, nondiscrimination, labor standards, and the environment) that HUD administers to expedite or facilitate the use of ICDBG-CARES grant funds to prevent, prepare for, and respond to COVID-19.

On April 10, 2020, HUD issued PIH Notice 2020-05 with waivers and alternative requirements authorized by the CARES Act. That Notice was superseded by PIH Notice 2020-13 issued on July 2, 2020. PIH Notice 2020-13 describes in detail the various updated waivers and alternative requirements that have been issued thus far with respect to ICDBG-CARES grants and fiscal year (FY) 2019/2020 ICDBG grants repurposed to address COVID-19.

**AUDITOR BE ADVISED**: Before auditing an ICDBG-CARES grant recipient, auditors are strongly advised to review the ICDBG-CARES Implementation Notice, PIH Notice 2020-11, and PIH Notice 2020-13, particularly Section 14 of PIH Notice 2020-13 addressing the waivers and alternative requirements affecting ICDBG IT program with respect to ICDBG-CARES grants and FY 2020 ICDBG grants.

The following section identifies allowability considerations for the ICDBG program, followed by a summary of waivers and alternative requirements affecting the ICDBG program considered important by HUD. Because the COVID-19 pandemic was ongoing at the time this Compliance Supplement addendum was finalized, the auditor should make best efforts to identify and consider updates and revisions of PIH Notice 2020-11 or PIH Notice 2020-13 for ICDBG-CARES funding that were in place at the time of the audit. This can be done by visiting at COVID-19 Recovery Programs site of ONAP's website, CodeTalk, https://www.hud.gov/codetalk.

2.      **Activities Allowed or Unallowed**

The CARES Act requires ICDBG-CARES grants to be used to prevent, prepare for, and respond to COVID-19.

To comply with this requirement, ICDBG-CARES grantees must ensure that all activities, projects, and programs being proposed can be tied to at least one of the following three eligible purposes:

- **Activities, Projects, or Programs to Prevent COVID-19**

- **Activities, Projects, or Programs to Prepare for COVID-19**

- **Activities, Projects, or Programs to Respond to COVID-19**

ICDBG-CARES grant funds may also be used to cover or reimburse allowable costs paid with non-federal funds by the ICDBG-CARES grantee, provided the funds were used to prevent, prepare for, or respond to COVID-19. This includes covering or reimbursing allowable costs incurred back to the date the Indian tribe began preparing for COVID-19, which may be prior to the date of enactment of the CARES Act, but in no event earlier than January 21, 2020.

The auditor should consider the following:

- **Prepare for**: ICDBG-CARES grant funds may be used prior to a local, service area, or regional coronavirus outbreak. This includes, but is not limited to, activities designed to develop processes and procedures to help keep people healthy, and other activities designed to reduce the risk of exposure to COVID-19 and avoid or slow the spread of the disease.

- **Prevent**: ICDBG-CARES grant funds may be used during a COVID-19 local, service area, or regional coronavirus outbreak. This includes, but is not limited to, activities designed to prevent the initial or further spread of the virus to the tribal community.

- **Respond to**: Once COVID-19 has spread in the community, examples of how ICDBG-CARES grantees may choose to respond to COVID-19 may include using ICDBG-CARES grant funds to care for those who have become infected and to limit the exposure and spread of the virus, providing emergency rent payments and other public services to families that cannot pay rent, carrying out activities to reduce severe overcrowding, preventing homelessness to ensure families are stably housed, and much more. Funds may continue to be used after the local, service area, or regional coronavirus outbreak on any continuing expenses incurred due to the spread of COVID-19.

**EXHIBIT 11 - 23**

These descriptions are designed to provide general guidance and are not intended to limit the range of eligible ICDBG-CARES grant activities that can be carried out. Provided a grantee can reasonably tie their ICDBG-CARES activities back to one or more eligible purposes, HUD will accept the classification.

Ineligible Activities include:

- Activities, projects, or programs that are not reasonably tied to preparing for, preventing, and responding to COVID-19 are ineligible under the ICDBG-CARES program.

- Unless waived or modified by HUD, as provided in PIH Notice 2020-13 and any similar waiver notice issued in the future, ineligible activities described in 24 CFR section 1003.207 continue to be ineligible (e.g., buildings or portions thereof used for the general conduct of government, political activities, general government expenses).

**3.      Waivers and Alternative Requirements Applicable Only to ICDBG-CARES Funding**

The following waivers and alternative requirements apply only to ICDBG-CARES grants (the new ICDBG funding provided under the CARES Act), FY 2020 ICDBG funds (both Single Purpose Grants and Imminent Threat Grants) appropriated under the Further Consolidated Appropriations Act of 2020 (Pub. L. No. 116–94), and FY 2019 ICDBG funds appropriated under the FY 2019 Consolidated Appropriations Act (Pub. L. No. 116-6). With respect to the FY 2019 and FY 2020 ICDBG funds, application of these waivers is permitted only on funding reprogramed to address COVID-19.

These waivers and alternative requirements do not apply to ICDBG funds appropriated in any other prior year.

**a.      Removal of Public Services 15 Percent Cap Under FY 2019 and FY 2020 ICDBG Grants**

**Statutory Authority**: Section 105 of HCD Act

**Regulatory Authority**: 24 CFR section 1003.201(e); FY 2019/2020 ICDBG NOFA

**Description**: Section 105 of the HCD Act and the ICDBG implementing regulation at 24 CFR section 1003.201(e) authorize the use of ICDBG funds to carry out public services activities, but provide that the amount of ICDBG funds used for public services shall not exceed 15 percent of the respective ICDBG grant. Congress lifted the 15 percent cap on public services funded under the ICDBG Imminent

**EXHIBIT 11 - 24**

Threat funding appropriated under the CARES Act and for FY 2019 and FY 2020 ICDBG funding in recognition of the great and immediate need for public services to help address and prepare for the impact of COVID-19 in tribal communities.

Accordingly, HUD has waived Section 105 of the HCD Act, 24 CFR section 1003.201(e), and language in the definition of the term "public services" in the FY 2019/2020 ICDBG NOFA to the extent necessary to remove the 15 percent cap on FY 2019/2020 ICDBG funding (both Single Purpose and Imminent Threat grants), to align with ICDBG Imminent Threat funding provided under the CARES Act.

ICDBG grantees that have been awarded FY 2019/2020 ICDBG funds must still comply with the provisions of 24 CFR section 1003.305 if they are seeking to amend their grants to carry out additional public services or other activities to prevent, prepare for, or respond to COVID-19.

b. **Rental Assistance, Utility Assistance, Food, Clothing, and Other Emergency Assistance**

**Statutory Authority**: Section 105 of the HCD Act.

**Regulatory Authority**: 24 CFR section 1003.207(b)(4)

**Description**: Section 105(a)(8) authorizes the use of ICDBG funds for a variety of public services. Under the implementing regulation at 24 CFR section 1003.207(b)(4), the general rule is that ICDBG funds may not be used for income payments. For purposes of the ICDBG program, income payments mean a series of subsistence-type grant payments made to an individual or family for items such as food, clothing, housing (rent or mortgage), or utilities, but excludes emergency payments made over a period of up to three months to the provider of such items or services on behalf of an individual or family.

COVID-19 is having a substantial negative impact on Native American families' ability to work, earn an income, pay their rent or mortgage, access or pay for food and clothing, and access many other essential services. Many tribes and tribally designated housing entities (TDHEs) have reported to HUD that they shut down and community members are sheltering in place. To help tribal communities address these challenges, HUD has waived Section 105(a)(8) and 24 CFR section 1003.207(b)(4) to the extent necessary to establish the following alternative requirement:

(1)   ICDBG grant funds may be used to provide emergency payments for low and moderate income individuals or families impacted by COVID-19 for items such as food, medicine, clothing, and other necessities, as well as rental assistance and utility payment

assistance, without regard for the three-month limitation in 24 CFR section 1003.207(b)(4), but for a period not to exceed six months unless further expanded by HUD at a later date.

At the time of the issuance of PIH Notice 2020-13, emergency mortgage assistance was limited to no more than three months under 24 CFR section 1003.207(b)(4). HUD may have provided additional waiver relief for ICDBG-funded mortgage assistance at a later date as the COVID-19 pandemic progressed.

As noted above the auditor is advised to check for any additional waiver relief at the "COVID-19 Recovery Programs" site of HUD's CodeTalk website prior to addressing any issues related to the duration of assistance under this waiver.

(2)     These emergency payments must be used to either cover costs incurred directly by the ICDBG grantee in cases where the ICDBG grantee is providing this assistance, or made directly to a third party provider of such items or services on behalf of an individual or family, and may not be paid directly to an individual or family in the form of income payments, debit cards, or similar direct income payments. ICDBG grantees may establish lines of credit with third party providers (e.g., grocery stores) on behalf of specific beneficiary families, provided all expenses can be properly documented and all ICDBG-CARES funds used for this purpose are expended on eligible activities. In all cases, ICDBG grantees must ensure that proper documentation is maintained to ensure that all costs incurred are eligible.

ICDBG grantees using this alternative requirement must document, in its policies and procedures, how they will determine the amount of assistance to be provided is necessary and reasonable.

c.     **Purchase of Equipment**

**Regulatory Authority**: 24 CFR sections 1003.207(b)(1) and 1003.201(c)(1)(ii)

**Description**: The purchase of equipment with ICDBG funds is generally ineligible under 24 CFR section 1003.207(b)(1), with some exceptions.

Given the immediate need for medical and personal protective equipment, and other related equipment needed to help prevent, prepare for, and respond to the COVID-19 pandemic in tribal communities, HUD has waived 24 CFR section 1003.207(b)(1) and authorized the use of ICDBG funds for the purchase of equipment necessary to prevent,

**EXHIBIT 11 - 26**

prepare for, and respond to the COVID-19. Equipment must be used for authorized program purposes, and any proceeds from the disposition of equipment will be considered ICDBG-CARES program income.

The auditor should check whether HUD issued further guidance on the disposition of program income after grant closeout. ICDBG grantees must ensure that ICDBG funds are used to supplement other federal sources of funding for this purpose, including funding provided by the Indian Health Service, and should not be used to supplant such funding.

d.    **Operating Expenses for Public Facilities**

**Regulatory Authority**: 24 CFR section 1003.207(b)(2)

**Description**: 24 CFR section 1003.207(b)(2) provides that expenses associated with repairing, operating, or maintaining public facilities, improvements, and services are generally ineligible, with some exceptions.

Indian tribes may find the need to use ICDBG funds to fund a variety of public facilities, including constructing facilities for testing, diagnosis, or treatment, rehabilitating existing facilities to establish infectious disease treatment clinics, acquiring and converting hotels, motels, or similar facilities to expand capacity of hospitals to accommodate isolation of patients during recovery, and more. These facilities will likely need to be operated and maintained for the duration of the COVID-19 pandemic. Accordingly, HUD has waved 24 CFR section 1003.207(b)(2) to the extent necessary to allow the use of ICDBG funds to pay for such operating and maintenance expenses of any public facility, to the extent it is used for COVID-19-related purposes. In incurring such costs, ICDBG grantees may not use this waiver to pay for associated staffing costs of such public facilities. ICDBG grantees must also ensure that ICDBG funds are used to supplement other federal sources of funding for this purpose, including funding provided by the Indian Health Service, and should not be used to supplant such funding.

e.    **New Housing Construction by Tribes**

**Statutory Authority**: Section 105 of the HCD Act

**Regulatory Authority**: 24 CFR section 1003.207(b)(3)

**Description**: 24 CFR section 1003.207(b)(3) generally prohibits the use of ICDBG funds for new housing construction, with some exceptions. ICDBG may be used for new housing construction if provided as last resort housing under 24 CFR Part 42, or when carried out by a Community-Based Development Organization (CBDO).

As HUD found in its 2017 Native American Housing Needs Study, severe overcrowding and substandard housing is a major challenge in Indian Country. These conditions increase risks of infection amongst low- and moderate-income Native American families. Indian tribes may find the need to construct temporary or permanent new housing to help prevent, prepare for, and respond to COVID-19, and may find it necessary to do so without having to carry out such activities through a CBDO. Accordingly, HUD has waived and modified Section 105 of the HCD Act and 24 CFR 1003.207(b)(3) to the extent necessary to provide for the following alternative requirement: Indian tribes and tribal organizations may use ICDBG funds to carry out new housing construction when such construction is carried out to reduce overcrowding, or to otherwise prevent, prepare for, or respond to COVID-19.

Such new housing construction must meet applicable federal accessibility requirements, including requirements under Section 504 of the Rehabilitation Act and 24 CFR Part 8.

## DEPARTMENT OF JUSTICE

**CFDA 16.034 CORONAVIRUS EMERGENCY SUPPLEMENTAL FUNDING**

## I.       PROGRAM OBJECTIVES

The Coronavirus Emergency Supplemental Funding (CESF) program provides funding to assist eligible states, units of local government, and federally recognized tribal governments in preventing, preparing for, and responding to the coronavirus. Allowable projects and purchases include, but are not limited to, overtime, equipment (including law enforcement and medical personal protective equipment), hiring, supplies (such as gloves, masks, sanitizer), training, travel expenses (particularly related to the distribution of resources to the most impacted areas), and addressing the medical needs of inmates in state, local, and tribal prisons, jails, and detention centers.

## II.      PROGRAM PROCEDURES

States, US territories, the District of Columbia, units of local government, and federally recognized tribal governments that were identified as eligible for funding under the Fiscal Year (FY) 2019 state and local Edward Byrne Memorial Justice Assistance Grant (JAG) program are eligible to apply under the Coronavirus Emergency Supplemental Funding (CESF) program solicitation.

NOTE: Only the state administering agency (SAA) that applied for FY 2019 JAG funding for a state/territory may apply for the state allocation of CESF funding.

In general, CESF allocations were calculated by proportionally increasing the allocations available under the FY 2019 JAG program to align with the CESF appropriation amount. The JAG-specific provision requiring "disparate jurisdictions" to choose a single fiscal agent to apply on behalf of each of the disparate jurisdictions does not apply to the CESF program. Instead, each "disparate" unit of local government under FY 2019 JAG (including those that were identified as "zero-county disparates") will be eligible for a direct award under CESF. In order to ensure that zero-county disparates receive funding under CESF, the portion of funds for units of local government that were eligible to receive less than $10,000 under FY 2019 JAG (an amount that is added to state awards under JAG) was divided equally among the zero-county disparates.

**Source of Governing Requirements**

The CESF program is authorized by Division B of HR 748, Pub. L. No. 116-136 (Emergency Appropriations for Coronavirus Health Response and Agency Operations); 28 USC 530C.

**EXHIBIT 11 - 29**

**Availability of Other Program Information**

Program guidance including program statutes and other general information about the program is posted to the Bureau of Justice Assistance (BJA) web page (https://www.bja.gov).  In addition, the BJA FY 2020 Coronavirus Emergency Supplemental Funding Program Frequently Asked Questions (FAQs) document provides guidance on allowable costs and other topics. The DOJ Financial Guide, which contains information on allowable costs, methods of payment, audit requirements, accounting systems, and financial records, is available on the Office of Justice Programs (OJP) web site at http://ojp.gov/financialguide/DOJ/index.htm.

## III.    COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee.  For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit.  When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | N | Y | N | N | Y | Y | Y | Y | N |

**A.    Activities Allowed or Unallowed**

   1.    *Activities Allowed*

          Funds awarded under the CESF program must be utilized to prevent, prepare for, or respond to the coronavirus. Allowable projects and purchases include, but are not limited to, overtime, equipment (including law enforcement and medical personal protective equipment), hiring, supplies (such as gloves, masks, and

**EXHIBIT 11 - 30**

sanitizer), training, travel expenses (particularly related to the distribution of resources to the most impacted areas), and addressing the medical needs of inmates in state, local, and tribal prisons, jails, and detention centers.

See the CESF solicitation as well as the BJA FAQs for more detailed information about activities allowed.

2.   *Activities Unallowed*

There are no specific prohibitions under the CESF program other than the unallowable costs that are identified in the DOJ Grants Financial Guide. However, individual items costing $500,000 or more and Unmanned Aerial Systems (UAS), Unmanned Aircraft (UA), and/or Unmanned Aerial Vehicles (UAV) require prior approval. In addition, funds may not be used for direct administrative costs that exceed 10 percent of the total award amount and funds may not be used to supplant state or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available.

**F.   Equipment/Real Property Management**

Recipients must follow the Property Standards section of the DOJ Grants Financial Guide, section 3.7.

**J.   Program Income**

Per the Eligible states (or SAAs) or units of local government may draw down funds either in advance or on a reimbursable basis. To draw down in advance, funds must be placed in an interest-bearing account, unless one of the exceptions BJA-2020-18553 4 in 2 CFR section 200.305(b)(8) apply. This interest-bearing account must allow for sufficient tracking and traceability of CESF Program award funds (see e.g., 2 CFR 200.302). It is not necessary that the interest-bearing account be a "trust fund."

Special Condition #40 of each award states, "Establishment of interest-bearing account. If award funds are being drawn down in advance, the recipient (or a subrecipient, with respect to a subaward) is required to establish an interest-bearing account dedicated specifically to this award. Recipients (and subrecipients) must maintain advance payments of federal awards in interest-bearing accounts unless regulatory exclusions apply (2 CFR 200.305(b)(8)). The award funds, including any interest, may not be used to pay debts or expenses incurred by other activities beyond the scope of the Coronavirus Emergency Supplemental Funding (CESF) program. The recipient also agrees to obligate the award funds in the account (including any interest earned) during the period of performance for the award and expend within 90 days thereafter. Any unobligated or unexpended funds, including interest earned, must be returned to OJP at the time of closeout.

**EXHIBIT 11 - 31**

**L.      Reporting**

    **1.      Financial Reporting**

        a.      *SF-270, Request for Advance or Reimbursement* – Not Applicable

        b.      *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

        c.      *SF-425, Federal Financial Report* – Applicable

    **2.      Performance Reporting**

        a.      Semi-annual Progress Reports - Semi-annual progress reports must be submitted through DOJ's Justice Grants System (https://justicegrants.usdoj.gov//).

    **3.      Special Reporting**

        Not Applicable

## DEPARTMENT OF TRANSPORTATION

## CFDA 20.218 MOTOR CARRIER SAFETY ASSISTANCE PROGRAM

## CFDA 20.237 HIGH PRIORITY GRANT PROGRAM

## I.     PROGRAM OBJECTIVES

The Federal Motor Carrier Safety Assistance  (FMCSA) program, Motor Carrier Safety
Assistance Program (MCSAP), and High Priority (HP) grant program share the same
objectives to support a safe and efficient surface transportation system. They include:

- Making targeted investments to promote safe commercial motor vehicle
  (CMV) transportation, including the transportation of passengers and
  hazardous materials;

- Investing in activities likely to generate maximum reductions in the number and
  severity of CMV crashes and fatalities resulting from such crashes;

- Adopting and enforcing effective motor carrier, CMV, and driver safety regulations
  and practices consistent with federal requirements; and

- Assessing and improving statewide performance by setting program goals and
  meeting performance standards, measures, and benchmarks.

While MCSAP and HP grants share the same objectives, some eligible activities and costs
differ. Chapters in the MCSAP Comprehensive Policy provide program-specific policy
(including cost eligibility) and technical assistance when administering both MCSAP and HP
grant programs. Within the HP grant program, the Fixing America's Surface Transportation
(FAST) Act established the Innovative Technology Deployment (ITD) program which has goals
and objectives that differ from traditional MCSAP activities. However, the ITD program was
integrated into HP and MCSAP (for operations and maintenance) to support activities and
information technology enhancement that complement and enhance CMV and motor carrier
enforcement activities.

## II.    PROGRAM PROCEDURES

FMCSA developed an electronic commercial vehicle safety plan (CVSP) development tool
(called eCVSP) available at eCVSP Login (dot.gov). The eCVSP software application allows a
MCSAP lead agency to create an online CVSP and track the progress of CVSP development
through to approval. Use of the eCVSP helps ensure that states satisfy the requirements in 49
CFR 350.213, expedites FMCSA's review of the document, facilitates the prompt returning of
comments or requests for clarification, and allows the MCSAP lead agency to easily resubmit
a revised document.

In accordance with 49 USC 31102(i) and grant/financial management requirements in 2 CFR
part 200, each CVSP receives a fair, equitable and objective review prior to award approval.

This review ensures that applicable statutory and regulatory requirements will be met and allowable CVSP projects and activities will succeed. The CVSP review process generally consists of a review in the following areas:

1.  *Application Review.* The FMCSA reviews the CVSP and all supplemental attachments (e.g., forms and certifications) for completeness and to ensure that the MCSAP lead agency meets the basic eligibility requirements defined in the Notice of Funding Opportunity (NOFA).

2.  *Programmatic Review.* The FMCSA review the CVSP to make sure that the information presented is reasonable and understandable and the activities proposed in the application are measurable, achievable, and consistent with program or legislative requirements.

3.  *Financial Review.* The FMCSA evaluates the fiscal integrity and financial capability of a MCSAP lead agency, and reviews the CVSP details, including the budget and budget narrative, and any other documentation to examine costs for proposed project/program activities to determine if are they appear reasonable, necessary, eligible and allowable for award. Note that approval of the CVSP is not a final approval of costs as defined in accordance with 2 CFR part 200 Subpart E.

4.  *Suitability Review.* In accordance with 2 CFR section 200.205 the suitability review is discussed in more detail in the MCSAP Comprehensive Policy. The FMCSA evaluates the CVSP against the performance-based information required in accordance with 49 CFR section 350.213.

**Source of Governing Requirements**

The MCSAP grant program is authorized by the Fixing America's Surface Transportation Act, Pub. L. No. 114-94, sections 5101(a) and 5101(c) (2015). The MCSAP is governed by 49 USC 31102 and 31104, and by 49 CFR section 350, as applicable.

The HP grant program is authorized by the Fixing America's Surface Transportation Act, Pub. L. No. 114-94, sections 5101(a) and 5101(c) (2015). HP grants are governed by 49 USC 31102(l) and 31104, and by 49 CFR section 350, as applicable.

**Availability of Other Program Information**

Additional information about the programs may be found on the FMCSA website at https://www.fmcsa.dot.gov/mission/grants. Program policy guidance for the MCSAP and HP programs may be found at https://www.fmcsa.dot.gov/mission/grants/motor-carrier-safety-assistance-program-grant-comprehensive-policy.

## III.    COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance**

**EXHIBIT 11 - 34**

requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | N | Y | Y | Y | N | Y | Y | N | N |

**A.     Activities Allowed or Unallowed**

The primary MCSAP activities eligible for reimbursement include the National Program Elements currently outlined in 49 CFR section 350.203:

1.      Driver and Vehicle Inspections

2.      Traffic Enforcement

3.      Compliance Reviews, Carrier Interventions, Investigations, and New Entrant Safety Audits

4.      Public Education and Awareness

5.      Data Collection

In addition, 49 CFR section 350.227 lists other activities eligible for reimbursement under the MCSAP. In addition, the FAST Act added other CMV safety activities that are eligible under MCSAP. These include:

a.      Border enforcement safety activities (inspections, traffic enforcement, etc.)

**EXHIBIT 11 - 35**

    b.      Performance and Registration Information Systems Management (PRISM)

    c.      Innovative Technology Deployment (ITD) (operations and maintenance only)

The state must ensure that these activities, if financed through MCSAP funds, will not diminish the effectiveness of the development and implementation of the programs to improve motor carrier, CMV, and driver safety.

These other activities also include:

- Sanitary food transportation inspections performed under 49 USC 5701.

- The following activities, when carried out in conjunction with an appropriate North American Standard (NAS) inspection of a CMV and inspection report.

- Enforcement of CMV size and weight limitations at locations, excluding fixed-weight facilities, such as near steep grades or mountainous terrains, where the weight of a CMV can significantly affect the safe operation of the vehicle, or at ports where intermodal shipping containers enter and leave the United States.

- Detection of and enforcement actions taken as a result of criminal activity; including trafficking of human beings, in a CMV or by any occupant, including the operator, of the CMV.

**F.**    **Equipment and Real Property Management**

    1.    **Equipment Management Requirements for Subrecipients of States**

Notwithstanding 2 CFR section 200.313, subrecipients of states shall follow such policies and procedures allowed by the state with respect to the use, management and disposal of equipment acquired under a DOT award (2 CFR section 1201.313).

    2.    **Matching**

The FAST Act sets minimum matching requirements for each grant program. Matching means the portion of project costs not paid by federal funds. For example, FMCSA grant programs require that FMCSA reimburse 85 percent of eligible project costs, while the recipient provides the remaining 15 percent share.

After award, recipients must document all expenditures relating to cost sharing or matching in the same manner as those for the federal grant funds. Every item must be verifiable (i.e., tracked and documented) and any claimed cost share expense can only be counted once. In addition, a cost sharing or matching requirement may not be met by costs borne by another federal grant except as provided by federal statute. The FAST Act allows FMCSA to modify the federal share of a grant program from the standard 85/15 threshold (85 percent federal, 15

**EXHIBIT 11 - 36**

percent recipient share). FMCSA may opt to offer 100 percent federal financial assistance for a specific project(s) and/or priorities within a grant program. Other projects funded at 100 percent federal share may be announced in the NOFA as a National Priority and are at the discretion of FMCSA.

The value of third party in-kind contributions may be accepted as the match. The use of third party in-kind contributions should be identified in the grant/sub-grant agreement, or amendments thereto, and approved by FMCSA. The use of in-kind contributions may not be made retroactive prior to approval of the work program or an amendment thereto. Recipient (or sub-recipients) should be aware that they are responsible for ensuring that the following additional criteria are met:

- The third-party performing the work must agree to allow the value of the work to be used as the match;

- The cost of the third-party work must not be borne by other federal funds or be used as a match for other federally funded grants/sub-grants;

- The work performed by the third party must be an eligible activity that benefits the federally funded work and must be identified in the work program;

- The third-party costs (e.g., salaries, fringe benefits) must be allowable under 2 CFR section 200, Subpart E – Cost Principles;

- The third-party work must be performed during the period to which the matching requirement applies; and

- The third party in-kind contributions must be verifiable from the records of the recipient or sub-recipient and these records must show how the value placed on third party in kind contributions was derived.

3. **Level of Effort**

The MCSAP lead agency must maintain a certain level of expenditure, in addition to the required 15 percent matching share of a MCSAP grant. This financial requirement is known as maintenance of effort (MOE) or level of effort. The purpose of the MOE is to ensure that MCSAP lead agencies are committed to maintaining their own state funded CMV safety programs, notwithstanding federal funding.

A MCSAP lead agency must maintain within each federal fiscal year a level of effort that is at least equal to the average of what the MCSAP lead agency spent on MCSAP eligible activities in Fiscal Year (FY) 2004 and FY 2005. Expenditures of other state agencies, local agencies, or sub-grantees (whether

supported by MCSAP grant funds or not), other federal funds, and MCSAP lead agency matching funds are not to be included in the MOE calculation.

A change in the MCSAP lead agency does not negate the MOE requirement because the state funding for these efforts also transitioned to the new state lead agency. The concept of "successor in interest" applies. Thus, no state may have a zero MOE simply because the MCSAP lead agency is different in a current year than it was in FYs 2004 and 2005, and the successor agency must meet the MOE requirements established by the FY 2004 and FY 2005 baseline.

Because non-CMV and CMV traffic enforcement activities without an inspection were not authorized until the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) was enacted in late FY 2005, MCSAP lead agencies are not to include these expenditures in calculating the MOE baseline. MCSAP lead agencies may, however, include documented non-CMV traffic enforcement and other new efforts and initiatives they have implemented since FYs 2004 and 2005 to meet the annual MOE obligation.

The MCSAP lead agency must retain the documentation used to calculate the MOE average for audit purposes. In the absence of records, a reasonable estimate, based upon available information should be submitted to FMCSA for review and approval. MCSAP lead agencies must self-certify (per 49 CFR sections 350.211 and 350.213) that the calculated MOE will be met each fiscal year and reflect their MOE in their CVSP. The state must annually submit its MOE substantiation document to FMCSA to support the actual expenditures during the fiscal year.

4.      **Earmarking**

        Not Applicable

## H.      Period of Performance

The notice of grant award (NGA) contains the grant agreement's period of performance. The NGA period of performance means the time during which the grant recipient may incur obligations to carry out the work authorized under the grant agreement. The FMCSA may establish a shorter, but not longer, grant agreement period of performance than what the statutory availability of funds timeframe allows. All allowable periods of performance are located in 49 USC 31104(f), as amended by the FAST Act.

**EXHIBIT 11 - 38**

**J.      Program Income**

Notwithstanding 2 CFR section 200.80, except as otherwise provided in federal statutes, regulations, or the terms and conditions of the federal award, program income also does not include taxes, special assessments, levies, and fines raised by a grantee and subgrantee, and interest earned on any of them. Please see 2 CFR 200.307 (f) 2 CFR 200.77 (period of performance) and 2 CFR 200.407 (prior written approval).

**L.      Reporting**

**1.      Financial Reporting**

The FMCSA will not reimburse recipients from a grant for an amount that is more than the government share of costs incurred as of the date of the voucher. This signifies that recipients are limited in the percentage of costs per voucher, not per grant. For example, states are limited to 85 percent reimbursement under MCSAP. Because FMCSA's reimbursement requirement is incurred by the date of each voucher, the state must meet the matching share requirement, for example 15 percent per voucher.

a.      *SF-270, Request for Advance or Reimbursement* - Applicable

b.      *SF-271, Outlay Report and Request for Reimbursement for Construction Program* -  Not Applicable

c.      *SF-425, Federal Financial Report* - Applicable

**2.      Performance Reporting**

The FMCSA requires recipients to provide performance progress and financial reports as a condition of the grant agreement. These reports help FMCSA monitor recipient progress towards the project objectives and provide an important measure of accountability for the recipient. The FMCSA has standardized the information required in the performance report; however, at a minimum, each performance report must contain the following information:

a.      An account of significant progress (findings, events, trends, etc.) made during the reporting period;

b.      A description of any technical and/or cost problem(s) encountered or anticipated that will affect completion of the grant within the time and fiscal constraints as set forth in this agreement, together with recommended solutions or corrective action plans (with dates) to such problems, or identification of specific action that is required by the FMCSA, or a statement that no problems were encountered;

**EXHIBIT 11 - 39**

    c.       An outline of work and activities planned for the next reporting period; and

    d.       Provide status update/resolution for all outstanding findings from program reviews and/or audits.

**3.**    **Special Reporting**

Not Applicable

# DEPARTMENT OF THE TREASURY

## CFDA 21.019 CORONAVIRUS RELIEF FUND

## I.      PROGRAM OBJECTIVES

The purpose of the Coronavirus Relief Fund (the Fund) is to provide direct payments to state, territorial, tribal, and certain eligible local governments to cover:

1.      Necessary expenditures incurred due to the public health emergency with respect to Coronavirus Disease 2019 (COVID–19);

2.      Costs that were not accounted for in the government's most recently approved budget as of March 27, 2020; and

3.      Costs that were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020, per section 601(d) of the Social Security Act, as added by section 5001 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

For more information on the limitation for use of payments from the Fund, please reference US Department of the Treasury's (Treasury) guidance located in the section below titled "Availability of Other Program Information."

Auditors should use Treasury's guidance and FAQs as the criteria when testing for the Fund, as well as when reporting findings.

## II.     PROGRAM PROCEDURES

## A.      Overview

The Treasury provided assistance of $150 billion from the Fund in direct payments to state, territorial, tribal, and eligible local governments with $3 billion reserved for payments to the District of Columbia, Puerto Rico, US Virgin Islands, Guam, Northern Mariana Islands, and American Samoa and $8 billion reserved for payments to tribal governments. The remaining $139 billion were allocated for payments to the 50 states and eligible local governments with each state receiving a minimum payment no less than $1.25 billion for fiscal year 2020. Payments to states were subject to reduction based on payments to eligible local governments. Amounts paid to states and eligible local governments were based on 2019 population data from the US Census Bureau.

Units of local government eligible for direct payment include counties, municipalities, towns, townships, villages, parishes, boroughs, or other units of general government below the state level with a population that exceeds 500,000. Eligible units of local government had to provide a certification to receive direct payment from the Fund. The secretary of the Treasury made a determination to allocate payments to tribal governments based on population, employment, and expenditure data.

**EXHIBIT 11 - 41**

State, territorial, tribal, and eligible local governments are required to use payments from the Fund to cover:

1.     Necessary expenditures incurred due to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19);

2.     Costs that were not accounted for in the governments' most recently approved budget as of March 27, 2020; and

3.     Costs that were incurred during the period that begins on March 1, 2020 and ends on December 30, 2020 per section 601(d) of the Social Security Act, as added by section 5001 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).

Governments otherwise have broad discretion to utilize payments for expenditures ranging from COVID-19 testing including, but not limited to, reimbursing small businesses for the costs of business interruption caused by required closures. The CARES Act statutory criteria on use of payments from the Fund stated in section 601(d) of the Social Security Act, as added by section 5001 of the CARES Act and as interpreted in Treasury's guidance and FAQs, applies to prime recipients, subrecipients, and beneficiaries, as detailed in Section M. on Subrecipient Monitoring below and Treasury's FAQ No. B.13. Please note that beneficiaries are not subject to audit per 2 CFR Part 200, Subpart F.

**B.     Subprograms/Program Elements**

Not Applicable

**Source of Governing Requirements**

The Fund is authorized by the CARES Act, Pub. L. No. 116-136, Division A, Title V (2020) (codified as 42 USC 801 et seq.).

**Availability of Other Program Information**

Additional information on the Fund is available on the Treasury website at https://home.treasury.gov/policy-issues/cares/state-and-local-governments.

Treasury's guidance on the Fund can be found at: https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Guidance-for-State-Territorial-Local-and-Tribal-Governments.pdf.

Treasury's FAQs can be found at: https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Frequently-Asked-Questions.pdf.

Treasury's Office of the Inspector General guidance on reporting and record retention can be found at https://www.treasury.gov/about/organizational-structure/ig/Pages/cares-overview.aspx

**EXHIBIT 11 - 42**

and https://www.treasury.gov/about/organizational-structure/ig/Pages/CARES-Act-Reporting-and-Record-Keeping-Information.aspx.

Treasury's Office of the Inspector General Frequently Asked Questions (FAQs) can be found at https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-CA-20-028.pdf.

If there are specific questions regarding the Fund, the CARES Program Office may be contacted via telephone at (202) 622-6415 or by e-mail at CoronaVirusReliefFund@treasury.gov.

## III.   COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement, Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | N | N | N | Y | N | N | Y | Y | N |

**EXHIBIT 11 - 43**

A.    **Activities Allowed or Unallowed**

The Fund is designed to provide ready funding to address unforeseen financial needs and risks created by the COVID-19 public health emergency. Governments may use Fund payments for eligible expenses subject to the restrictions set forth in section 601(d) of the Social Security Act. Payments must be used to cover costs that are:

1.    Necessary expenditures incurred due to the public health emergency with respect to COVID–19;

2.    Not accounted for in the governments' most recently approved as of March 27, 2020; and

3.    Incurred during the period that begins on March 1, 2020 and ends on December 30, 2020.

A cost meets the requirement of "costs not accounted for in the budget most recently approved as of March 27, 2020" if either (a) the cost cannot lawfully be funded using a line item, allotment, or allocation within that budget or (b) the cost is for a substantially different use from any expected use of funds in such a line item, allotment, or allocation.

Please see Treasury's guidance on "Costs not accounted for in the budget most recently approved as of March 27, 2020" at https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Guidance-for-State-Territorial-Local-and-Tribal-Governments.pdf for additional details.

Fund payments are not required to be used as the source of funding of last resort. However, recipients may not use payments from the Fund to cover expenditures for which they will receive reimbursement from other sources. Governments are responsible for making determinations as to what expenditures are necessary due to the public health emergency with respect to COVID-19.

Please see Treasury's FAQs at https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Frequently-Asked-Questions.pdf, for more information related to the expenditures that may or may not be covered with payments from the Fund.

B.    **Allowable Cost/Cost Principles**

As a direct payment for specified use, these funds are considered federal financial assistance, but not a grant. In accordance with 2 CFR section 200.101(b) regarding applicability only certain provisions of the *Code of Federal Regulations*, Title 2, Subtitle A, Chapter II, Part 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance"– 2 CFR Part 200) apply to the Fund and these provisions include the following:

a.    Subpart A-Definitions;

b.    Subpart B-General provisions except for 2 CFR sections 200.111–113;

c.       2 CFR section 200.303 regarding internal controls;

d.       2 CFR sections 200.330–332 regarding subrecipient monitoring and management; and

e.       Subpart F – Audit Requirements

All other provisions of 2 CFR Part 200 are not applicable to the Fund.

While 2 CFR Part 200, Subpart E, cost principles do not apply to the Fund, auditors should use Treasury's guidance and FAQs as the criteria when testing the allowability of costs under the Fund. For example, while not exhaustive, in the context of real property improvements and acquisitions and equipment acquisitions (which includes vehicles) this means that the acquisition itself must be necessary due to the COVID-19 public health emergency. In particular, a government must (i) determine that it is not able to meet the need arising from the public health emergency in a cost-effective manner by leasing property or equipment or by improving property already owned and (ii) maintain documentation to support this determination. Likewise, an improvement, such as the installation of modifications to permit social distancing, would need to be determined to be necessary to address the COVID-19 public health emergency (see Treasury's FAQ No. A.58 for more detail on real property improvements and acquisitions and equipment acquisitions).

## H.       Period of Performance

Governments must use the direct payments for necessary expenditures incurred between March 1, 2020 and December 30, 2020, due to the COVID-19 public health emergency. Please see Treasury's guidance on "Costs incurred during the period that begins on March 1, 2020, and ends on December 30, 2020" for more detail at: https://home.treasury.gov/system/files/136/Coronavirus-Relief-Fund-Guidance-for-State-Territorial-Local-and-Tribal-Governments.pdf.

## L.       Reporting

### 1.       Financial Reporting

a.       *SF-270, Request for Advance or Reimbursement* – Not Applicable

b.       *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

c.       *SF-425, Federal Financial Report* – Not Applicable

**EXHIBIT 11 - 45**

2. **Special Reporting**

a.   Each prime recipient of the Fund shall provide a quarterly Financial Progress Report that contains COVID-19 related costs incurred during the covered period (the period beginning on March 1, 2020 and ending on December 30, 2020) to Treasury's Office of Inspector General. Each prime recipient shall report this quarterly information mentioned above into the GrantSolutions portal. The Prime recipient's quarterly Financial Progress Report submissions should be supported by the data in the prime recipient's accounting system. Data required to be reported includes, but is not limited to, the following:

(1)   The total amount of payments from the Fund received from Treasury;

(2)   The amount of funds received that were expended or obligated for each project or activity;

(3)   A detailed list of all projects or activities for which funds were expended or obligated, including:

(a)   The name of the project or activity (please refer to Treasury OIG guidance at https://www.treasury.gov/about/organizational-structure/ig/Audit%20Reports%20and%20Testimonies/OIG-CA-20-028.pdf)

(b)   A description of the project or activity; and

(4)   Detailed information on any loans issued; contracts and grants awarded; transfers made to other government entities; and direct payments made by the prime recipient that are greater than $50,000. For amounts less than $50,000, the prime recipient must report in the aggregate for these expenditure categories. For direct payments to individuals, aggregate reporting is required to be reported regardless of the amount.

b.   By no later than September 21, 2020,  prime recipients shall submit via the GrantSolutions portal the first detailed quarterly report, which shall cover the period March 1 through June 30, 2020 (with exception to the September 21 first quarter deadline and the October 13 second quarter reporting deadlines for those prime recipients using the GrantSolutions' upload feature, which was available December 1, 2020). Thereafter, quarterly reporting will be due no later than ten days after each calendar quarter. If the 10th calendar day falls on a weekend or a federal holiday, the due date will be the next working day. Reporting shall end with either the calendar quarter after the COVID-19 related costs and expenditures

have been liquidated and paid or the calendar quarter ending September 30, 2021, whichever comes first. The prime recipient's quarterly Financial Progress Report submission should be supported by the data in the prime recipient's accounting system.

Please reference OIG's guidance for more information at https://www.treasury.gov/about/organizational-structure/ig/Pages/CARES-Act-Reporting-and-Record-Keeping-Information.aspx.

**M.    Subrecipient Monitoring**

Applicable

For additional information on subrecipient monitoring, please reference Part 3 of the 2020 Compliance Supplement available at: https://www.whitehouse.gov/wp-content/uploads/2020/08/2020-Compliance-Supplement_FINAL_08.06.20.pdf and the pertinent section is also available at: https://www.aicpa.org/content/dam/aicpa/interestareas/governmentalauditquality/resources/singleaudit/uniformguidanceforfederalrewards/downloadabledocuments/2020-omb-comp-supp/2020cspart3.pdf.

**FEDERAL COMMUNICATIONS COMMISSION**

**CFDA 32.006 COVID-19 TELEHEALTH PROGRAM**

## I.        PROGRAM OBJECTIVES

The coronavirus disease 2019 (COVID-19) Telehealth Program (Program) provides $200 million in funding, appropriated by Congress as part of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, to help health care providers provide telehealth services in response to the COVID-19 pandemic. The Federal Communications Commission (Commission) established the Program through a Report and Order released on April 2, 2020,  available at https://docs.fcc.gov/public/attachments/FCC-20-44A1.pdf. This Program provides immediate support to eligible health care providers responding to the COVID-19 pandemic by funding the telecommunications services, information services, and devices necessary to provide telehealth services until the Program's funds have been expended or the COVID-19 pandemic has ended.

This Program is run through the Commission's Wireline Competition Bureau (WCB).

For more details regarding the Program, please visit the public website at https://www.fcc.gov/covid-19-telehealth-program.

## II.       PROGRAM PROCEDURES

Eligible health care providers must submit the "COVID-19 Telehealth Program Application and Request for Funding" application through on online application portal. In conjunction with completing an application, applicants are required to complete three steps. First, applicants are required to request and receive an eligibility determination from the Universal Service Administrative Company (USAC) for each health care provider site included in their application by filing an FCC Form 460, Eligibility and Registration Form, with USAC. Second, as entities doing business before the Commission, applicants are also required to obtain an FCC Registration Number (FRN) in the Commission Registration System (CORES). Third, applicants are required to register with the federal System for Award Management (SAM) to be able to receive Program payments if awarded funding.

While the online application portal was still in development, the Program website instructed potential applicants to download a fillable PDF application form and email the completed form and supporting documentation to TelehealthApplicationSupport@fcc.gov. All submitted program applications were also uploaded into the Commission's Electronic Comment Filing System (ECFS). Applicants must complete each required section of the application and make the required certifications at the end of the application. The information that applicants are required to submit with their application includes, but is not limited to, applicant information, filer contact information, medical services to be provided with the program funding, conditions to be treated, information on services and devices, requested funding amounts, and supporting cost documentation. WCB, in consultation with the FCC's Connect2Health Task Force, reviews the Program applications, as outlined in the Commission's Report and Order, selects participants, and makes funding awards on a rolling basis to eligible applicants based on the estimated costs of the eligible services and connected devices they intend to purchase with Program funds. Awards were made until the funding was exhausted, which occurred on July 8, 2020. Consistent

**EXHIBIT 11 - 48**

with Report and Order, applications from areas that are hardest hit by COVID-19 and where funding has the most impact on addressing the health care needs are prioritized.

In order to ensure as many applicants as possible receive available funding, the Commission did not anticipate that it would award more than $1 million to any single applicant. In addition, applicants that exhausted initially awarded funding were able to request additional support.

After paying for and receiving the eligible services and/or connected devices, funding recipients requesting reimbursement must complete a Request for Reimbursement Form and provide supporting invoice documentation sufficient to identify the items that were purchased and received, and the price paid. This documentation must be uploaded with the Request for Reimbursement Form in the US Department of Treasury's Bureau of the Fiscal Service Invoice Processing Platform (IPP). The individual submitting a Request for Reimbursement Form on behalf of the funding recipient must make, among other things, certifications on the Request for Reimbursement Form, including certifying that the eligible health care provider(s) purchased and received services or connected device(s) for which reimbursement is requested; that Program funding is used for its intended purposes; that the costs for which reimbursement is requested were incurred and paid for in accordance with Program rules and requirements; and that Program funds are to be used for their intended purpose. The Commission will reimburse invoices accompanied by supporting documentation for the cost of the eligible services and/or devices eligible health care providers have received from their applicable service providers or vendors under the Program. After the reimbursement request is approved, the Treasury payment will be issued by electronically to the funding recipient's bank account.

**Source of Governing Requirements**

The Program is governed under Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No 116-136, 134 Stat. 281 (2020) (CARES Act).
https://www.congress.gov/bill/116th-congress/house-bill/748?q=%7B%22search%22%3A%5B%22cite%3APL116-136%22%5D%7D&s=1&r=1

Pursuant to the CARES Act, the Commission adopted provisions for the Program in a Report and Order:  *Promoting Telehealth for Low-Income Consumers; COVID-19 Telehealth Program*, WC Docket nos. 18–213, 20–89, Report and Order, 35 FCC Rcd 3366, 3375–84, paras. 15–36 (2020) (Report and Order) (Note: The second section of the Report and Order implements the Connected Care Pilot Program which is a Universal Service Fund-supported program and is separate from the Program).
https://docs.fcc.gov/public/attachments/FCC-20-44A1.pdf

As a direct payment for specified use, these funds are considered federal financial assistance and are subject to only the following sections of the *Code of Federal Regulations*, Title II, Subtitle A, Chapter II, Part 200 – Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("2 CFR"):  Subpart A; Subpart B; Subpart E; and Subpart F. Recipients that meet the definition of "Hospitals" in Part 200 would be subject to Appendix IX to Part 200 and not Subpart E.
https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl

**EXHIBIT 11 - 49**

**Availability of Other Program Information**

Program information is available at https://www.fcc.gov/covid-19-telehealth-program. See "Frequently Asked Questions" section for details.

The documents listed in the "Source of Governing Requirements" and the above link serve as a guide for tests and findings.

## III.   COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | Y | N | N | Y | N | N | Y | N | Y |

## A.   Activities Allowed or Unallowed

See Eligible Services and Devices section at https://www.fcc.gov/covid-19-telehealth-program-frequently-asked-questions-faqs.

**EXHIBIT 11 - 50**

1.    *Allowed*

Telehealth services/connected devices that use broadband Internet access service-enabled technologies to deliver remote medical, diagnostic, patient-centered, and treatment-related services directly to patients.

Consistent with the Report and Order, funding recipients can seek reimbursement for eligible services and connected devices that were not included in the COVID-19 Telehealth Program Application and Request for Funding application, as well as seek reimbursement for different quantities than were included in the application. Detailed information on eligible services and devices is available at the above website.

2.    *Unallowed*

Funding will not be provided for personnel, administrative, construction, marketing, maintenance, and training activities/costs. Ineligible activities include IT services/costs for the development of new websites, systems and platforms.

The Program will not fund unconnected devices (e.g., devices that patients can use at home and then share the results with their medical professional manually), accessories or non-telehealth items (e.g., office furniture and supplies, security systems, and incidental expenses, etc.). Additionally, items purchased or implemented prior to March 13, 2020, or after September 30, 2020, are ineligible for funding.

**B.    Allowable Costs/Cost Principles**

See Eligible Services And Devices section at
https://www.fcc.gov/covid-19-telehealth-program-frequently-asked-questions-faqs.

1.    Telecommunications, information services, broadband connectivity services, and connected devices costs necessary to provide telehealth services to patients in response to COVID-19. Connected device costs for which funding is requested must be integral to patient care. Devices mentioned below in example list have been deemed to be integral to patient care.

2.    The Program will only fund devices (e.g., pulse oximetry, blood pressure monitoring devices) that are themselves connected.

3.    Program funds can be used to treat patients/patient groups at a health care facility or remotely that could free up resources and could reduce a health care professional's unnecessary exposure to COVID-19.

Examples of services and connected devices that program applicants are eligible to seek funding for include but are not limited to:

**EXHIBIT 11 - 51**

- *Telecommunications Services*: Voice services for health care providers or their patients.

- *Information Services*: Internet connectivity services for health care providers or their patients, remote patient monitoring platforms and services; patient reported outcome platforms; store and forward services, such as asynchronous transfer of patient images and data for interpretation by a physician; platforms and services to provide synchronous video consultation.

- *Internet Connected Devices/Equipment*: Tablets, smart phones, or connected devices to receive connected care services at home (e.g., broadband enabled blood pressure monitors; pulse-ox) for patient or health care provider use; telemedicine kiosks/carts for health care provider site. Connected devices that are Bluetooth or Wi-Fi enabled are eligible.

## E.    Eligibility

See Eligible Services and Devices section at
https://www.fcc.gov/covid-19-telehealth-program-frequently-asked-questions-faqs.

### 1.    Eligibility for Individuals

Nonprofit and public eligible health care providers that fall within the categories of health care providers in section 254(h)(7)(B) of the 1996 Act, located in rural or non-rural area even when operated from a temporary or mobile location:  (1) post-secondary educational institutions offering health care instruction, teaching hospitals, and medical schools; (2) community health centers or health centers providing health care to migrants; (3) local health departments or agencies; (4) community mental health centers; (5) not-for-profit hospitals; (6) rural health clinics; (7) skilled nursing facilities; or (8) consortia of health care providers consisting of one or more entities falling into the first seven categories. For purposes of the Program, which is authorized by the CARES Act, both rural and non-rural health clinics are eligible to receive funding.

### 2.    Eligibility for Group of Individuals or Area of Service Delivery

Not Applicable

### 3.    Eligibility for Subrecipients

Not Applicable

## H.    Period of Performance

See Eligible Services And Devices section at
https://www.fcc.gov/covid-19-telehealth-program-frequently-asked-questions-faqs.

**EXHIBIT 11 - 52**

1.      For eligible items, purchased on or after March 13, 2020, and by December 31, 2020, eligible health care providers may apply to receive reimbursement through the Program.

2.      For monthly recurring services (e.g., internet service), funding recipients seeking reimbursement for eligible recurring services may apply their funding commitment towards six months of eligible recurring services as long as those services are implemented on or after March 13, 2020, and by December 31, 2020.

## N.    Special Tests and Provisions

**Compliance Requirements** The Program participation is limited to nonprofit and public eligible health care providers that fall within the categories of health care providers in section 254(h)(7)(B) of the Telecommunications Act. For purposes of the Program, which is authorized by the CARES Act, both rural and non-rural health clinics are eligible to receive funding.

Program funding will provide eligible health care providers support to purchase telecommunications, information services, and connected devices. The Program does not require applicants to purchase only the eligible services and connected devices identified in their applications. They may rather use awarded support to purchase any necessary eligible services and connected devices in response to COVID-19.

**Audit Objectives** Determine whether eligible health care providers followed the terms of the award.

**Suggested Audit Procedures**

1.      Verify that the funding recipient is also not the vendor or service provider of the eligible services and/or connected devices for which they receive Program reimbursement.

2.      If the health care provider providing the services and/or connected devices is part of a consortium or a multi-site application, verify that the health care provider is eligible under Program requirements. Health care providers received their eligibility determinations from the USAC.

3.      If a funding recipient is seeking reimbursement on behalf of other eligible health care providers, check if the supporting documentation also includes a Letter of Authorization authorizing the funding recipient to receive funding on behalf of the other health care providers and to provide such funding to the health care providers to reimburse them for their respective eligible costs incurred under the Program.

4.      Verify that the funding participants have not received funding from other sources for the services and devices that are funded through the Program. Participants cannot receive duplicate funding from any source (private, state, or federal) for the exact same services or devices eligible for support under the Program.

**EXHIBIT 11 - 53**

5.     Perform a walkthrough to determine that the health care provider paid for the eligible services and connected devices.

    a.     Select a sample of vendor invoices for eligible services reimbursed by the Program. Trace the actual payment/disbursement by seeking proof of payment such as cancelled checks, bank statements, proof of electronic payment, credit card statements, etc., from the health care provider.

    b.     Select a sample of vendor invoices for equipment/connected care devices reimbursed by this Program. Trace the actual payment/disbursement by seeking proof of payment such as cancelled checks, bank statements, proof of electronic payment, credit card statements, etc., from the health care provider.

6.     If at any point during the audit the auditor becomes aware of any suspected or actual fraud related to this program, the auditor should contact the FCC's Office of Inspector General and notify them. For additional information about contacting the FCC's Office of Inspector General to report suspected or actual fraud, please see: https://www.fcc.gov/inspector-general/hotline.

**EXHIBIT 11 - 54**

Case 2:21-cv-00566-DLR   Document 1-7   Filed 04/01/21   Page 56 of 119

# DEPARTMENT OF EDUCATION

## CFDA 84.425 EDUCATION STABILIZATION FUND UNDER THE CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY ACT

## PROGRAM INTRODUCTION

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act), passed March 25, 2020, includes $30.75 billion for an Education Stabilization Fund (ESF) to prevent, prepare for, and respond to coronavirus, domestically or internationally. For purposes of this document, the ESF includes the Governor's Emergency Education Relief (GEER) Fund, the Elementary and Secondary School Emergency Relief Fund (ESSER Fund), the Education Stabilization Fund–State Educational Agency (ESF-SEA), and the Education Stabilization Fund–Governors (ESF-Governor) further defined in Section 1. The CARES Act ESF also authorized the Higher Education Emergency Relief Fund (HEERF) program, which is addressed in Section 2 of the compliance supplement addendum. Each grant award type (denoted by separate CFDA alpha) has specific funding requirements, as described further below.

This program is divided into grant types or subprograms designated by letters (84.425A–84.425P). The subprograms are further grouped into two sections. Section 1 comprises those governed by the ESF and Section 2 comprises those governed by the HEERF. The table below shows the names and number of the subprograms and the respective section to which compliance guidance applies. In addition, there are three subprograms (84.425B, 84.425G, and 84.425P) for which neither fund applies. Instructions for these three programs follow the table.

| CFDA No. | Program Name |
|---|---|
| ESF | See Section 1 (ESF) for compliance requirements and auditor guidance. See also other information below this table. |
| 84.425A | Education Stabilization Fund–State Educational Agency (Outlying Areas) (ESF-SEA) |
| 84.425C | Governor's Emergency Education Relief (GEER) Fund |
| 84.425D | Elementary and Secondary School Emergency Relief (ESSER) Fund |
| 84.425H | Education Stabilization Fund–Governors (Outlying Areas) (ESF-Governors) |
| | |
| HEERF | See Section 2 (HEERF) for compliance requirements and auditor guidance. See also other information below this table. |
| 84.425E | Higher Education Emergency Relief Fund (HEERF) Student Aid Portion |
| 84.425F | HEERF Institutional Portion |
| 84.425J | HEERF Historically Black Colleges and Universities (HBCUs) |
| 84.425K | HEERF Tribally Controlled Colleges and Universities (TCCUs) |
| 84.425L | HEERF Minority Serving Institutions (MSIs) |
| 84.425M | HEERF Strengthening Institutions Program (SIP) |
| 84.425N | HEERF Fund for the Improvement of Postsecondary Education (FIPSE) Formula Grant |
| | |
| Not Applicable | Neither Section 1 nor Section 2 include discussion of this program. See other information below this table. |
| 84.425B | Discretionary Grants:  Rethink K-12 Education Models Grants |
| 84.425G | Discretionary Grants:  Reimagining Workforce Preparation Grants |
| 84.425P | Institutional Resilience and Expanded Postsecondary Opportunity |

**EXHIBIT 11 - 55**

## IV.    Other Information

Funds under the ESF were distributed using an alpha character at the end of the CFDA number to delineate the specific program(s) being provided to recipients and compliance requirements vary among programs. Some recipients will have received and expended funds under multiple programs. For major program purposes, auditors must evaluate 84.425 in its entirety. However, this ESF portion of the Supplement addendum is broken down into two sections. For testing purposes, auditors must consider the guidance in Section 1 for CFDA numbers 84.425 A, C, D, and H and Section 2 for CFDA numbers 84.425 E, F, J, K, L, M, and N.

Expenditures under CFDA 84.425 B and G are not subject to audit this year.

When there are expenditures under CFDA 84.425 P, auditors must refer to Part 7 of this Supplement, "Guidance for Auditing Programs Not Included In This Compliance Supplement" and the "Notice Inviting Applications" for this program and grant documents.

When these suffixes or programs are not clearly identified, the auditor will need to determine which program funds were expended through review of grant documents and inquiry of the auditee or grant/subgrant source agency.

While for major program determination purposes 84.425 is evaluated based on the total amount of ESF expenditures, for purposes of SEFA reporting recipients should identify the individual program(s) the funds were expended under, including each separate CFDA with the applicable alpha character. A total for the ESF in its entirety should also be provided.

## SECTION 1 – EDUCATION STABLIZATION FUND (ESF)

**CFDA 84.425A EDUCATION STABILIZATION FUND – STATE EDUCATIONAL AGENCY (OUTLYING AREAS)**

**CFDA 84.425C GOVERNOR'S EMERGENCY EDUCATION RELIEF FUND**

**CFDA 84.425D ELEMENTARY AND SECONDARY SCHOOL EMERGENCY RELIEF FUND**

**CFDA 84.425H EDUCATION STABILIZATION FUND – GOVERNORS (OUTLYING AREAS)**

## I.     PROGRAM OBJECTIVES

For each of these ESF programs, a recipient submitted a unique application in the form of a Certification and Agreement for Funding applicable to the program (see "Source of Governing Requirements"). ESF grant awards were made in late spring and early summer 2020; accordingly, this compliance supplement addendum covers only a brief period for most recipients.

The objective of the GEER Fund is to provide local educational agencies (LEAs), institutions of higher education (IHEs), and other education-related entities with emergency assistance as a result of Novel Coronavirus Disease 2019 (COVID-19).

The objective of the ESSER Fund is to provide state educational agencies (SEAs) and LEAs, including charter schools that are LEAs, with emergency relief funds to address the impact that COVID-19 has had, and continues to have, on elementary and secondary schools across the nation.

The objective of the ESF-SEA and ESF-Governor Funds is to allocate funds to the Outlying Areas—American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, and the Virgin Islands—for the purpose of providing SEAs, LEAs, IHEs, and other education-related entities with emergency assistance to address the impact of COVID-19.

## II.    PROGRAM PROCEDURES

Under the GEER Fund, the US Department of Education (ED) allocates funds to governors as well as the mayor of the District of Columbia of 60 percent based on each state's population of individuals ages 5 through 24 and 40 percent based on the number of children counted under section 1124(c) (indicators of poverty) of the Elementary and Secondary Education Act of 1965 (ESEA). The governor uses GEER funds to (1) provide emergency support through grants to LEAs that the SEA deems to have been most significantly impacted by COVID-19; (2) provide emergency support through grants to IHEs serving students within the state that the governor determines have been most significantly impacted by COVID-19; and (3) provide support to any other IHE, LEA, or education-related entity within the state that the governor deems essential for carrying out emergency educational services. In order to receive GEER funds, a governor must submit to ED a completed "Certification and Agreement."

Under the ESSER Fund, ED allocates funds to an SEA by a formula based on the state's fiscal year (FY) 2019 share of Title I, Part A (84.010) funds under the ESEA. An SEA, in turn, allocates ESSER funds to LEAs by formula based on FY 2019 Title I, Part A allocations. In order to receive ESSER funds, an SEA must submit to ED a completed "Certification and Agreement."

Under the ESF-SEA Fund, ED allocates funds to SEAs in the Outlying Areas based on the same proportion that each Outlying Area received under Title I, Part A in the most recent fiscal year. By statute, ED used this same formula to make allocations to states under the ESSER Fund. In order to receive ESF-SEA funds, an SEA must submit to ED a completed "Certification and Agreement."

Under the ESF-Governor Fund, ED allocates funds to governors in the Outlying Areas of 60 percent based on population ages 5 to 24 and 40 percent based on the relative number of children counted under section 1124(c) (indicators of poverty) of the ESEA. By statute, ED used this same formula to make allocations to governors under the GEER Fund. In order to receive ESF-Governor funds, a governor must submit to ED a completed "Certification and Agreement."

**Source of Governing Requirements**

These programs are authorized by the CARES Act, Pub. L. 116-136, 134 Stat. 281 (Mar. 27, 2020). The regulations in 34 CFR Part 76 (State-Administered Programs), 2 CFR Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards), and 31 CFR Part 205 (Cash Management Improvement Act) apply to these programs.

Additionally, the certification and agreements each SEA or governor completed and signed prior to receiving a grant award also form the basis of the governing requirements for this program:

1.  Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund) (https://oese.ed.gov/files/2020/04/ESSERF-Certification-and-Agreement-2.pdf)

2.  Certification and Agreement for Funding under the Education Stabilization Fund Program Governor's Emergency Education Relief Fund (GEER Fund) (https://oese.ed.gov/files/2020/04/GEER-Certification-and-Agreement.pdf)

3.  Certification and Agreement for Funding under the Education Stabilization Fund-State Educational Agency Fund (ESF-SEA) (https://oese.ed.gov/files/2020/05/SEA-ESF-OA-Certification-and-Agreement.pdf)

4.  Certification and Agreement for Funding under the Education Stabilization Fund-Governors Fund (ESF-Governor Fund) (https://oese.ed.gov/files/2020/05/Governors-ESF-OA-Certification-and-Agreement.pdf)

**EXHIBIT 11 - 58**

December 2020                           CARES Act - ESF                                      ED

**Availability of Other Program Information**

A number of documents posted on ED's website provide clarity regarding the GEER Fund, ESSER Fund, ESF-SEA Fund, and ESF-Governor Fund requirements in this Compliance Supplement. They include:

1.      Frequently Asked Questions about the Governor's Emergency Education Relief Fund (GEER Fund) (https://oese.ed.gov/files/2020/05/FAQs-GEER-Fund.pdf)

2.      Frequently Asked Questions about the Elementary and Secondary School Emergency Relief Fund (ESSER Fund) (https://oese.ed.gov/files/2020/05/ESSER-Fund-Frequently-Asked-Questions.pdf)

3.      Frequently Asked Questions – Education Stabilization Fund-State Educational Agency (ESF-SEA) (https://oese.ed.gov/files/2020/09/ESF-SEA-Final-FAQs.pdf)

4.      Frequently Asked Questions – Education Stabilization Fund-Governors (ESF-Governor) (https://oese.ed.gov/files/2020/09/ESF-Governor-Final-FAQs.pdf)

**III.    COMPLIANCE REQUIREMENTS**

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N." See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | N | Y | Y | N | N | N | Y | Y | N |

**EXHIBIT 11 - 59**

## A.      Activities Allowed or Unallowed

See Part 3, Section A, "Activities Allowed or Unallowed" for a general description of the compliance requirements, the related audit objectives, and suggested audit procedures.

Governors and SEAs must demonstrate that costs incurred by governors, SEAs, and subrecipients are allowable under the relevant statutory provisions and Certification and Agreement, and consistent with the purpose of the ESF, which is "to prevent, prepare for, and respond to COVID-19." The Outlying Areas must ensure that expenditures under ESF-SEA and ESF-Governor are consistent with the allowable uses of funds set forth in the signed Certification and Agreement.

### GEER Fund

Under section 18002(c) of the CARES Act, GEER funds may be used to:

1.     Provide emergency support through grants to LEAs that the SEA deems have been most significantly impacted by coronavirus to support the ability of such LEAs to continue to provide educational services to their students and to support the on-going functionality of the LEA;

2.     Provide emergency support through grants to IHEs serving students within the state that the governor determines have been most significantly impacted by coronavirus to support the ability of such institutions to continue to provide educational services and support the on-going functionality of the institution; and

3.     Provide support to any other institution of higher education, LEA, or education-related entity within the state that the governor deems essential for carrying out emergency educational services to students for authorized activities described in section 18003(d)(1) of the CARES Act or the HEA, the provision of child care and early childhood education, social and emotional support, and the protection of education-related jobs.

### ESSER Fund

As described in the Earmarking section, each state must allocate not less than 90 percent of ESSER grant funds section as subgrants to LEAs (including charter schools that are LEAs).

Under section 18003(d), LEAs may use ESSER funds to support:

1.     Any activity authorized by the ESEA of 1965, including the Native Hawaiian Education Act and the Alaska Native Educational Equity, Support, and Assistance Act (20 USC 6301 et seq.), the Individuals with Disabilities Education Act (20 USC 1400 et seq.) (''IDEA''), the Adult Education and Family Literacy Act (20 USC 1400 et seq.), the Carl D. Perkins Career and Technical Education Act of 2006 (20 USC 2301 et seq.) (''the Perkins Act''), or subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 USC 11431 et seq.).

2.    Coordination of preparedness and response efforts of LEAs with state, local, tribal, and territorial public health departments and other relevant agencies to improve coordinated responses among such entities to prevent, prepare for, and respond to coronavirus.

3.    Providing principals and others school leaders with the resources necessary to address the needs of their individual schools.

4.    Activities to address the unique needs of low-income children or students, children with disabilities, English learners, racial and ethnic minorities, students experiencing homelessness, and foster care youth, including how outreach and service delivery will meet the needs of each population.

5.    Developing and implementing procedures and systems to improve the preparedness and response efforts of LEAs.

6.    Training and professional development for staff of the LEA on sanitation and minimizing the spread of infectious diseases.

7.    Purchasing supplies to sanitize and clean the facilities of an LEA, including buildings operated by such agency.

8.    Planning for and coordinating during long-term closures, including for how to provide meals to eligible students, how to provide technology for online learning to all students, how to provide guidance for carrying out requirements under the IDEA (20 USC 1401 et seq.), and how to ensure other educational services can continue to be provided consistent with all federal, state, and local requirements.

9.    Purchasing educational technology (including hardware, software, and connectivity) for students who are served by the LEA that aids in regular and substantive educational interaction between students and their classroom instructors, including low-income students and students with disabilities, which may include assistive technology or adaptive equipment.

10.   Providing mental health services and supports.

11.   Planning and implementing activities related to summer learning and supplemental afterschool programs, including providing classroom instruction or online learning during the summer months and addressing the needs of low-income students, students with disabilities, English learners, migrant students, students experiencing homelessness, and children in foster care.

12.   Other activities that are necessary to maintain the operation of and continuity of services in LEAs and continuing to employ existing staff of the LEA.

**B.     Allowable Costs/Cost Principles**

See Part 3, Section B, "Allowable Costs/Cost Principles" for a general description of the compliance requirements, the related audit objectives, and suggested audit procedures.

1.      For ESSER and ESF-SEA, auditors should refer to the Cost Principles for States, Local Governments, and Indian Tribes.

2.      For GEER and ESF-Governor Funds auditors will be required to examine how each respective governor allocated the funds to subrecipients to determine which cost principles apply for each subrecipient, as governors may award funds to states, local governments and Indian tribes, educational institutions or nonprofits.

3.      For all ESF funds, auditors should note that SEAs, LEAs, IHEs, and other subrecipients will not need to maintain time distribution records. The requirements in the Uniform Guidance apply to expenditures of ESSER funds, including the requirements related to documenting personnel expenses in 2 CFR section 200.430(i). This would mean, for example, that an LEA maintains the records it generally maintains for salaries and wages, including for employees in leave status as permitted under CARES Act Section 18003(d)(12), except that an LEA must maintain time distribution records (sometimes called "time and effort" reporting) if an individual employee is splitting their time between activities that may be funded under ESSER or GEER and activities that are not allowable under ESSER or GEER. However, there are very few situations when an employee of an LEA would perform multiple activities that are not allowable under ESSER or GEER, and thus would be required to maintain time distribution records, given that an LEA is authorized to use funds on "activities that are necessary to maintain the operation of and continuity of services in [an LEA] and continuing to employ existing staff of the [LEA]" in order to "prevent, prepare for, and respond to" the COVID-19 pandemic (Section 18003(d)(12)).

CARES Act Section 18003(d)(12) authorizes grantees to continue to pay employees and Section 18002(c)(3) allows LEAs, SEAs, IHEs, and other subrecipients to use funds to protect education-related jobs; the authority includes paying staff who are on leave because schools are closed due to COVID-19. Accordingly, ESSER and GEER funds may be used for that purpose even in the absence of a policy that specifically addresses these circumstances.

**C.     Cash Management**

See Part 3, Section C, "Cash Management" for any ED program in which the entity being audited is a subrecipient (i.e., federal funds are received through a pass-through grant from a grantee).

See Part 3, Section C, "Cash Management" and this section when the entity being audited is a governor and his or her designated state agency or an SEA (this includes the Outlying Areas).

**EXHIBIT 11 - 62**

US Department of the Treasury (Treasury) regulations at 31 CFR Part 205 implement the Cash Management Improvement Act of 1990 (CMIA), as amended (Pub. L. No. 101-453; 31 USC 6501 et seq.). Subpart A of those regulations requires state recipients to enter into Treasury-state agreements that prescribe specific methods of drawing down federal funds (funding techniques) for federal programs listed in the Catalog of Federal Domestic Assistance that meet the funding threshold for a major federal assistance program under the CMIA. Treasury-state agreements also specify the terms and conditions under which an interest liability would be incurred. It is unlikely that these Education CARES Act programs will have been incorporated into Treasury-state agreements for the time period covered by this addendum. Programs not covered by a Treasury-state agreement are subject to procedures prescribed by Treasury in Subpart B of 31 CFR Part 205, which at 31 CFR section 205.33(a) include the requirement for a state to minimize the time between the drawdown of federal funds and their disbursement for federal program purposes, described in greater detail below.

A state must minimize the time between the drawdown of federal funds from the federal government and their disbursement for federal program purposes. A federal program agency must limit a funds transfer to a state to the minimum amounts needed by the state and must time the disbursement to be in accord with the actual, immediate cash requirements of the state in carrying out a federal assistance program or project. The timing and amount of funds transfers must be as close as is administratively feasible to a state's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

## F.    Equipment/Real Property Management

See Part 3, Section F, "Equipment/Real Property Management" for a general description of the compliance requirements, the related audit objectives, and suggested audit procedures.

Consistent with 2 CFR section 200.311 (real property), section 200.313 (equipment), and section 200.439 (equipment and other capital expenditures) ESF funds may be used to purchase equipment. Capital expenditures for general and special purpose equipment purchases are subject to prior approval by ED or the pass-through entity. In addition, with prior approval by the ED or the pass-through entity, recipients and subrecipients may use GEER or ESSER funds to purchase real property and perform construction for improvements to land, buildings, or equipment that meet the overall purpose of the ESF program, which is "to prevent, prepare for, and respond to" the COVID-19 pandemic.

If governors, SEAs, and or subrecipients propose to use GEER or ESSER ESF funds for construction they must also comply with applicable requirements in 34 CFR section 76.600 and 34 CFR sections 75.600–617. Approved construction projects must comply with all other applicable Uniform Guidance requirements, as well as the ED's regulations regarding construction, as applicable, at 34 CFR section 76.600. As is the case with all construction contracts using laborers and mechanics financed by federal education funds, recipients and subrecipients that use ESSER or GEER funds for construction contracts over $2,000 must meet Davis-Bacon prevailing wage requirements. For information

**EXHIBIT 11 - 63**

about the prevailing wages in the applicable region, see the Department of Labor (DOL) regional office: https://www.dol.gov/agencies/whd/government-contracts/construction/regions.

Any purchases with ESF funds in this category are subject to applicable inventory control, log maintenance, and disposition requirements consistent with Part 3, Section F, "Equipment/Real Property Management" of the August 2020 Compliance Supplement.

Auditors should determine whether governors, SEAs, and/or subrecipients received prior approval for capital expenditures for equipment acquisition or improvements to land, buildings, or equipment.

1.      For capital equipment or improvements to land, buildings, or equipment that were purchased with grant funds, the governor or SEA must receive prior approval from ED.

2.      For capital equipment or improvements to land, buildings, or equipment that were purchased with grant funds, the governor or SEA pass-through agency must provide prior approval to subrecipients.

3.      For construction, the pass-through entity must have considered applicable ED construction requirements as part of the pass-through entity's prior approval process for construction. For example, if an LEA proposed renovating a school building to increase the filters or ventilation to its HVAC system, did the pass-through entity appropriately ensure compliance with applicable construction regulations (such as 34 CFR 75.609 (Safety and Health standards) and 75.616 (Energy Conservation))?

G.      **Matching, Level of Effort, Earmarking**

   1.      **Matching**

           Not Applicable

   2.      **Level of Effort**

           Not Applicable

   3.      **Earmarking**

           *Program in this Supplement to which this section applies is ESSER Fund (84.425D)*

           An SEA must allocate at least 90 percent of the ESSER funds it receives to LEAs in proportion to the amount of funds such LEAs received under Title I, Part A (84.010) of the ESEA during the 2019–2020 school year. An SEA may reserve no more than half of one percent of its total allocation for administrative costs. It may reserve the remaining funds not allocated to LEAs or reserved for

**EXHIBIT 11 - 64**

administrative costs for emergency needs as determined by the SEA to address
issues responding to COVID-19 (Section 18003(c), (e) of the CARES Act).

**L.   Reporting**

**1.   Financial Reporting**

Not Applicable

**2.   Performance Reporting**

Not Applicable

**3.   Special Reporting**

a.   *Federal Funding Accountability and Transparency Act (FFATA)*

Under the requirements of the FFATA (Pub. L. No. 109-282)
(Transparency Act) that are codified in 2 CFR Part 170, recipients (i.e.,
direct recipients) of grants or cooperative agreements who make first-tier
subawards of $30,000 or more are required to register in the Federal
Funding Accountability and Transparency Act Subaward Reporting
System (FSRS) and report subaward data through FSRS. Information
input to FSRS is available at USASpending.gov as the publicly available
website for viewing this information
(https://www.usaspending.gov/search).

Auditors are to review the compliance of the recipient with the reporting
requirements of 2 CFR part 170 and the accuracy of the amount reported
by the recipient in FSRS against data in the recipient's accounting system.

b.   *Annual Reporting*

Not Applicable

**M.   Subrecipient Monitoring**

See Part 3, Section M, "Subrecipient Monitoring" for a general description of the
compliance requirements, the related audit objectives, and suggested audit procedures.

**EXHIBIT 11 - 65**

Case 2:21-cv-00566-DLR   Document 1-7   Filed 04/01/21   Page 67 of 119

### SECTION 2 – HIGHER EDUCATION EMERGENCY RELIEF FUND (HEERF)

**CFDA 84.425E HIGHER EDUCATION EMERGENCY RELIEF FUND (HEERF) STUDENT AID PORTION**

**CFDA 84.425F HEERF INSTITUTIONAL PORTION**

**CFDA 84.425J HEERF HISTORICALLY BLACK COLLEGES AND UNIVERSITIES (HBCUs)**

**CFDA 84.425K HEERF TRIBALLY CONTROLLED COLLEGES AND UNIVERSITIES (TCCUs)**

**CFDA 84.425L HEERF MINORITY SERVING INSTITUTIONS (MSIs)**

**CFDA 84.425M HEERF STRENGTHENING INSTITUTIONS PROGRAM (SIP)**

**CFDA 84.425N HEERF FUND FOR THE IMPROVEMENT OF POSTSECONDARY EDUCATION (FIPSE) FORMULA GRANT**

**I.      PROGRAM OBJECTIVES**

The objective of the Higher Education Emergency Relief Fund (HEERF) program is to use HEERF grant funds to "prevent, prepare for, and respond to coronavirus" through grants to eligible institutions. Each grant award type (denoted by separate CFDA alpha) has specific funding requirements, as described below.

**II.     PROGRAM PROCEDURES**

**Overview**

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) appropriated $2.2 trillion to provide economic aid to the American people negatively impacted by the COVID-19 pandemic. Of that money, approximately $14 billion was given to the Office of Postsecondary Education as the HEERF.

The HEERF program has several different methods for the distribution of the approximately $14 billion in funds to eligible IHEs based on a student enrollment formula and institution status:

- Ninety percent ($12.56 billion) under Section 18004(a)(1) of the CARES Act to institutions using a formula based on student enrollment, in which at least 50 percent must be reserved to provide students with emergency financial aid grants to help cover expenses related to the disruption of campus operations due to coronavirus (the "Student Aid Portion," CFDA 84.425E) and the remainder of which may be used to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus (the "Institutional Portion"; CFDA 84.425F). Of this 90 percent, the funds are distributed to eligible institutions as follows:

**EXHIBIT 11 - 66**

- 75 percent according to the relative share of full-time equivalent enrollment of Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency; and

- 25 percent according to the relative share of full-time equivalent enrollment of students who were not Federal Pell Grant recipients who are not exclusively enrolled in distance education courses prior to the coronavirus emergency.

- A total of 7.5 percent ($1.05 billion) under Section 18004(a)(2) of the CARES Act for grants for Historically Black Colleges and Universities (HBCUs), Tribally Controlled Colleges and Universities (TCCUs), and other Minority Serving Institutions (MSIs) as well as other institutions eligible for the Strengthening Institutions Program (SIP) under parts A and B of title III, parts A and B of title V, and subpart 4 of part A of title VII of the Higher Education Act of 1965, as amended (HEA), to address needs directly related to the coronavirus (CFDAs 84.425J, 84.425K, 84.425L, and 84.425M). This 7.5 percent is distributed based on the relative share of funding appropriated under the Further Consolidated Appropriations Act, 2020 (Pub. L. 116-94).

- A total of 2.5 percent ($349 million) under Section 18004(a)(3) of the CARES Act for additional funds for institutions under Part B of title VII of the HEA, through the Fund for the Improvement of Postsecondary Education (FIPSE), to prioritize schools that received less than $500,000 under other parts of Section 18004 by distributing funds in an amount that, when added to funds received under Section 18004(a)(1) and Section 18004(a)(2), brings each institution eligible to receive funds through the FIPSE program to an award amount of $500,000 (CFDA 84.425N).

In order to notify each institution of the eligibility for funding, and the allocation amount they could apply for under each CFDA, the US Department of Education (ED) published lists of eligible institutions and their allocation amounts based on the formulas provided in each HEERF program. While, generally, all institutions were eligible to receive funding under the Student Aid Portion (CFDA 84.425E) and the Institutional Portion (CFDA 84.425F), some institutions also received awards under the funding streams in sections 18004(a)(2) and 18004(a)(3), depending on their eligibility under other HEA grant programs, the composition of their student body, and whether the total amount of HEERF funding received by the institution would otherwise have been less than $500,000.

Finally, ED also anticipates that institutions have applied under Section 18004(a)(1) will also later receive a redistribution of unclaimed Section 18004(a)(1) funds in October 2020 as a supplement to their existing HEERF grants. For more information regarding the Reserve redistribution, please see ED's Section 18004(a)(1) reserve website here: https://www2.ed.gov/about/offices/list/ope/heerfreserve.html.

**Source of Governing Requirements**

The main source of governing requirements is the CARES Act statute, Pub. L. No. 116-136 (March 27, 2020).

**EXHIBIT 11 - 67**

In addition to the required SF-424 form, a completed Certification and Agreement was the application used to award HEERF funds under each CFDA alpha. The certification and agreements also help form the basis of the governing requirements for this program:

1.  (a)(1) Student Aid Portion Certification and Agreement (CFDA 84.425E)

2.  (a)(1) Institutional Portion Certification and Agreement (CFDA 84.425F)

3.  (a)(2) Programs Certification and Agreement (used for all (a)(2) programs; CFDAs 84.425J, 84.425K, 84.425L, and 84.425M)

4.  (a)(3) FIPSE Formula Certification and Agreement (CFDA 84.425N)

5.  (a)(1) Reserve redistribution:

    a.  Student Certification and Agreement (CFDA 88.425E)

    b.  Institutional Certification and Agreement (CFDA 84.425F)

Furthermore, the regulations in the Education Department General Administrative Regulations (EDGAR) 34 CFR parts 75, 77, 79, 81, 82, 84, 86, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (non-procurement) in 2 CFR Part 180, as adopted and amended as regulations of ED in 2 CFR Part 3485; and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 CFR Part 200, as adopted and amended as regulations of ED in 2 CFR Part 3474 (Uniform Guidance) also apply.

**Availability of Other Program Information**

*Rulemaking*

On June 17, 2020, ED published its Interim Final Rule (IFR) regarding Eligibility of Students at Institutions of Higher Education for Funds Under the CARES Act. The IFR constitutes ED's binding final rule regarding student eligibility for HEERF assistance and carries the force of law except as enjoined with respect to certain entities based on on-going litigation. Please see ED's litigation updates website for more information: https://www2.ed.gov/about/offices/list/ope/heerfupdates.html.

*Frequently Asked Questions (FAQs) and Other Guidance*

Additionally, a number of documents posted on ED's HEERF website contain information pertinent to the compliance requirements described in this compliance supplement. ED strongly encourages auditors to regularly check the HEERF website for updated FAQs and other pertinent guidance and reporting information. The information below is current as of October 19, 2020.

1.     CARES Act HEERF Rollup FAQs (Compilation of all five previously-released HEERF FAQ documents in one document) (October 14, 2020) (these are the following five FAQ documents listed below)

2.     CARES Act HEERF Round 3 FAQs (October 2, 2020)

3.     CARES Act HEERF Supplemental FAQs (Issued June 30, 2020 and Revised September 8, 2020)

4.     CARES Act HEERF Student FAQs (May 15, 2020)

5.     CARES Act HEERF Emergency Financial Aid Grants to Students under Section 18004(a)(1) and 18004(c) FAQs (April 9, 2020)

6.     CARES Act HEERF Institutional Portion under Section 18004(a)(1) and 18004(c) FAQs (April 9, 2020)

7.     HEERF Reporting Requirements & Lost Revenue Discussion Webinar (October 14, 2020)

       a.     Webinar Recording

       b.     Slides used in the Presentation

*Reporting and Data Collection Requirements*

There are three components to reporting for HEERF: (1) public reporting on the (a)(1) Student Aid Portion; (2) public reporting on the (a)(1) Institutional Portion, (a)(2) and (a)(3) programs, as applicable; and the (3) the annual report, which is currently being developed.

1.     HEERF Student Portion Public Reporting Requirement (Aug 31, 2020; *Federal Register* Notice revising the original May 6, 2020 Electronic Announcement)

2.     HEERF Institution Portion, (a)(2), and (a)(3) Funds Public Reporting Forms (October 13, 2020)

       a.     Word Document | PDF Document

       b.     Email to Grantees Regarding HEERF Reporting Requirements (September 23, 2020)

3.     Annual Report (the HEERF Annual Report Form is being developed for use and submission in early 2021 by all HEERF grantees via a portal)

## III.    COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N." See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | N | N | Y | Y | Y | N | Y | N | N |

### A.    Activities Allowed or Unallowed

Institutions must demonstrate that costs incurred are allowable under the relevant statutory provisions and consistent with the purpose of the ESF "to prevent, prepare for, and respond to coronavirus." In general, the CARES Act authorizes broad uses of HEERF funds, with specific standards for the different funding streams described below. Auditors are strongly encouraged to review the aforementioned FAQ documents and guidance materials which provide specific examples that help interpret these statutory standards.

- For the (a)(1) Student Aid Portion (CFDA 84.425E), disbursements made under the Student Aid Portion are required to be made directly to students. Allowable expenditures must be "for expenses related to the disruption of campus operations due to coronavirus (including eligible expenses under a student's cost of attendance, such as food, housing, course materials, technology, health care, and child care)" (CARES Act Section 18004(c)).

**EXHIBIT 11 - 70**

As it relates to expenditures under the (a)(1) Student Aid Portion, auditors should determine (1) the institution had a documented plan to distribute funds to students, (2) that the institution did not place any restrictions on the expenditure of those funds beyond what is in the statute, above, and (3) the institution expended the entirety of the Student Aid Portion grant on emergency financial aid grants to students and that the institution did not reimburse itself for any costs or expenses previously issued to students.

- For the (a)(1) Institutional Portion (CFDA 84.425F), allowable expenditures must be "to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus, so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship" (CARES Act Section 18004(c)).

  Generally, lost revenue is not a permissible expenditure (such as replacing lost revenue due to reduced enrollment; replacing lost revenue from non-tuition sources (e.g., cancelled ancillary events; disruption of food service, dorms, childcare or other facilities; cancellation of use of campus venues by other organizations; lost parking revenue). Other allowable expenditures under the Institutional Portion include *additional* emergency grants made to students (in accordance with the requirements of the Student Portion). Additionally, institutions also may reimburse themselves for refunds previously made to students on or after March 13, 2020, if those refunds were necessitated by significant changes to the delivery of instruction, including interruptions in instruction, due to the coronavirus. Please see questions 31 and 44 from the Rollup FAQs for more information.

- For the (a)(2) programs, (CFDAs 84.425J, 84.425K, 84.425L, and 84.425M), funds "may be used to defray expenses, including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll incurred by IHEs and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the HEA), including food, housing, course materials, technology, health care, and child care" (CARES Act Section 18004(a)(2)).

- For the (a)(3) FIPSE Formula Grant (CFDA 84.425N), funds "may be used to defray expenses, lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, payroll incurred by IHEs and for grants to students for any component of the student's cost of attendance (as defined under section 472 of the HEA), including food, housing, course materials, technology, health care, and child care." This is the same standard as applied to the (a)(2) programs (CARES Act Section 18004(a)(3)).

B.      **Allowable Costs/Cost Principles**

See Part 3, Section B, "Allowable Costs/Cost Principles" for a general description of the compliance requirements, the related audit objectives, and suggested audit procedures.

The Uniform Guidance Cost Principles described in 2 CFR Part 200, Subpart E, apply to the HEERF program. As described earlier, for the HEERF programs covered in this section, institutions generally have broad uses of funds. Some items of cost in Subpart E of the Uniform Guidance require prior approval under 2 CFR section 200.407 by ED.

The 34 CFR section 75.533 generally prohibits grantees from using grant funds for the acquisition of real property or for construction "unless specifically permitted by the authorizing statute or implementing regulations for the program."

In the context of the HEERF program, the CARES Act contains no specific language authorizing HEERF funds to be used for the acquisition of real property or for construction. However, the general prohibition against construction and acquisition of real property would not prevent HEERF funds from being used for minor remodeling to prevent the spread of COVID-19, where such alterations occur within the confines of a previously completed building and meet the other characteristics of minor remodeling under 34 CFR section 77.1.

G.      **Matching, Level of Effort, Earmarking**

1.      **Matching**

Not Applicable

2.      **Level of Effort**

Not Applicable

3.      **Earmarking**

Institutions must use no less than 50 percent of funds received under Section 18004(a)(1) of the CARES Act to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus. Conversely, institutions may use up to 50 percent of the funds they receive under Section 18004(a)(1) to "cover any costs associated with significant changes to the delivery of instruction due to the coronavirus so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities, including marketing and advertising; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship." See (a)(1) Institutional Portion Certification and Agreement.

**EXHIBIT 11 - 72**

The 50 percent division of the (a)(1) funds into the Student Aid Portion and Institutional Portion was made by ED. Each were given as separate grant awards, the Student Aid Portion under CFDA 84.425E and the Institutional Portion under CFDA 84.425F.

The order of incurring costs which will be attributed to the Student Aid and Institutional portions is not relevant to the earmarking requirement but, rather, the relationships between these two portions must be met and measured by the end of the period of performance. Therefore, testing this requirement is only applicable at the end of the period of performance.

## H.    Period of Performance

All institutions were given one calendar year (365 days) from the date of award in their HEERF Grant Award Notification (GAN) to complete the performance of their HEERF grant. Therefore, for example, if a grantee received a GAN on April 7, 2020, the one calendar year period of performance for their HEERF grant would be through April 6, 2021.

Institutions were allowed to incur pre-award costs consistent with 2 CFR section 200.458 and 34 CFR section 75.263 from March 13, 2020, the declaration of the national emergency due to the coronavirus, to the date of their HEERF grant award for their (a)(1) Institutional Portion, (a)(2), and (a)(3) funds as long as those expenditures would have been allowable if incurred after the date of the HEERF grant award. For the (a)(1) Student Aid Portion, institutions were only able to refund themselves for institutionally-funded emergency grants to students that were made (1) for authorized expenses related to the disruption of campus operations due to coronavirus as set forth in Section 18004(c) of the CARES Act; (2) to students eligible to receive emergency financial aid grants under the CARES Act; and (3) on or after March 27, 2020, the date the CARES Act was enacted.

Auditors should determine if the institution correctly expended funds during the allowable period, if any costs were charged as pre-award costs, and if the institution incurred costs during its calendar year period of performance (unless it obtained a no-cost extension from ED).

## I.    Procurement, Suspension, and Debarment

See Part 3, Section I, "Procurement, Suspension, and Debarment."

For those procurements supported by HEERF grant funds, auditors should determine if institutions sufficiently documented rationales and determinations in making any sole-source awards during the time of national emergency due to the coronavirus. Exceptions from the competitive procurement requirements of the Uniform Guidance may be accepted if institutions have documented that the public exigency or emergency would not permit a delay, in accordance with 2 CFR section 200.320(f)(2). A circumstance that may influence this determination is the length of time between the procurements and the

emergency at issue. Specifically, exceptions are more likely to be acceptable the closer the procurement occurred to the March 13, 2020 declaration of the national emergency.

**L.    Reporting**

There are three components to reporting for HEERF: 1) public reporting on the (a)(1) Student Aid Portion; 2) public reporting on the (a)(1) Institutional Portion (a)(2) and (a)(3) programs (Quarterly Reporting Form), as applicable; and the 3) the annual report, which is currently being developed.

There was no public reporting on the Quarterly Reporting Form or the annual reporting requirements as of the year-that ended June 30, 2020. Auditors should consult ED's HEERF Reporting and Data Collection webpage to gain an understanding of the reporting requirements in place for fiscal years ending after June 30, 2020.

**1.    Financial Reporting**

a.    *SF-270, Request for Advance or Reimbursement* – Not Applicable

b.    *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

c.    *SF-425, Federal Financial Report* – Not Applicable

**2.    Performance Reporting**

Not Applicable

**3.    Special Reporting**

a.    *Annual Reporting (all HEERF grantees)*

The HEERF Annual Report form is being developed for use and submission in early 2021 by all HEERF grantees via a portal. Depending on the time the audit is conducted, auditors should examine the annual report and reconcile that reported amounts with underlying documentation and the public quarterly reporting amounts to ensure accuracy.

b.    *Sections 18004(a)(1) Institutional Portion, (a)(2), and (a)(3) Quarterly Public Reporting (CFDAs 84.425F, 84.425J, 84.425K, 84.425L, 84.425M, 84.425N, as applicable)*

This form, available in PDF and Microsoft Word versions, must be conspicuously posted on the institution's primary website on the same page the reports of the IHE's activities as to the emergency financial aid grants to students made with funds from the IHE's allocation under Section 18004(a)(1) of the CARES Act (Student Aid Portion) are posted.

A new, separate form must be posted covering each quarterly reporting period (September 30, December 31, March 31, June 30), concluding after either (1) posting the quarterly report ending September 30, 2022, or (2) when an institution has expended and liquidated all (a)(1) Institutional Portion, (a)(2), and (a)(3) funds and checks the "final report" box. IHEs must post this quarterly report form no later than 10 days after the end of each calendar quarter (October 10, January 10, April 10, July 10) apart from the first report, which is due October 30, 2020.

Please see the form instructions (located on page three of the document) for more information regarding compliance.

Auditors should determine if an institution was both timely and accurate in posting in publicly posting its Quarterly Reporting Form from October 30, 2020, onward and sample these quarterly public reports and reconcile the publicly reported amounts with underlying documentation to ensure accuracy.

c.    *Section 18004(a)(1) Student Aid Portion Quarterly Public Reporting (CFDA 84.425E)*

Beginning on May 6, 2020, ED required institutions that received a HEERF 18004(a)(1) Student Aid Portion award to publicly post certain information on their website no later than 30 days after award, and update that information every 45 days thereafter (by posting a new report). This was announced through an electronic announcement (EA).

On August 31, 2020, ED revised the EA by decreasing the frequency of reporting after the initial 30-day period from every 45 days thereafter to every calendar quarter. Grantees posting a 45-day report on or after August 31, 2020, should instead post a report every calendar quarter, with the first calendar quarter report due by October 10, 2020, and covering the period from after their last 45-day or 30-day report through the end of the calendar quarter on September 30, 2020.

Auditors should determine if an institution was both timely and accurate in publicly posting its Section 18004(a)(1) Student Aid Portion Reports from May 6, 2020 onward and sample these public reports and reconcile the publicly reported amounts with underlying documentation to ensure accuracy.

*Key Line Items* – The following are identified as critical information:

•     Item #3: The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES

Act as of the date of submission (i.e., as of the initial report and every calendar quarter thereafter).

- Item #4: The estimated total number of students at the institution eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to Students under Section 18004(a)(1) of the CARES Act.

  Auditors should consult the August 31, 2020 *Federal Register* notice that provides more information about how institutions may calculate this number.

- Item #5: The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act.

- Item #6: The method(s) used by the institution to determine which students receive Emergency Financial Aid Grants and how much they would receive under Section 18004(a)(1) of the CARES Act.

  In particular, auditors should examine whether the method(s) of distribution reported here are consistent with the method(s) that were actually employed by the institution to distribute emergency financial aid grants to students.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**CFDA 93.153 COORDINATED SERVICES AND ACCESS TO RESEARCH FOR
WOMEN, INFANTS, CHILDREN, AND YOUTH (Ryan White
HIV/AIDS Program Part D Women, Infants, Children, and Youth (WICY)
Program)**

## I.      PROGRAM OBJECTIVES

The objective of this program is to provide family-centered care in an outpatient or ambulatory care setting (directly or through contracts or memoranda of understanding) for low income, uninsured, and medically underserved women, infants, children, and youth with HIV.

## II.     PROGRAM PROCEDURES

The Department of Health and Human Services (HHS) administers the Ryan White HIV/AIDS Program (RWHAP) Part D Coordinated Services for Women, Infants, Children, and Youth (WICY) through the Health Resources and Services Administration (HRSA)'s HIV/AIDS Bureau (HAB). The RWHAP Part D WICY programs provide family-centered outpatient or ambulatory care setting (directly or through contracts or memoranda of understanding) for low income, uninsured and medically underserved women, infants, children, and youth with HIV. Recipients can also provide additional support services to patients and affected family members.

Grants under the RWHAP Part D WICY are awarded to public and non-profit private entities, including health facilities operated by or pursuant to a contract with the Indian Health Service (42 USC 300ff-71(a)). Services may be provided directly by the recipient or through contractual agreements or memoranda of understanding with other service providers.

**Source of Governing Requirements**

The RWHAP Part D WICY is authorized under Section 2671 of Title XXVI of the PHS Act, as amended by the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Pub. L. No. 111-87) and is codified at 42 USC 300ff-71. The Minority AIDS Initiative (MAI) is authorized under Section 2693(b)(2)(D) of the PHS Act (42 USC 300ff-121(b)(2)(D)).

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. No. 116- 136, 134 Stat. 562) provided one-time funding to help current Ryan White HIV/AIDS Program (RWHAP) recipients prevent, prepare for, and respond to the novel coronavirus disease 2019 (COVID-19).

The RWHAP Part D WICY has no program-specific program regulations.

**Availability of Other Program Information**

Further information about the RWHAP Part D WICY is available at http://www.hab.hrsa.gov/.

Additional information on allowable uses of funds under the RWHAP Part D WICY
is contained in policy notices and standards found at

**EXHIBIT 11 - 77**

http://www.hab.hrsa.gov/manageyourgrant/policiesletters.html.

CARES Act information is available at
https://hab.hrsa.gov/program-grants-management/coronavirus-covid-19-response.

## III.      COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | N | N | N | N | Y | Y | Y | N | N |

## A.      Activities Allowed or Unallowed

    1.     *Activities Allowed*

        a.     Funds may be used for family-centered care involving outpatient or ambulatory care, directly or through contracts or memoranda of understanding, for women, infants, children, and youth with HIV. This includes provision of professional, diagnostic, and therapeutic services by a primary care provider, or a referral to and provision of specialty care; and services that sustain program activity and contribute to or help improve those services (42 USC 300ff-71(a) and (h)(3)).

Funds are not required to be used for primary care services when payments are available for such services from other sources (including Titles XVIII, XIX and XXI of the Social Security Act) (42 USC 300ff-71(i)).

b.      Funds may be used for the following support services for patients: (1) family-centered care, including case management; (2) referrals for additional services, including inpatient hospital services, treatment for substance abuse and mental health services, and other social and support services as appropriate; (3) additional services necessary to enable the patient to participate in the RWHAP Part D WICY, including services to recruit and retain youth with HIV; and (4) provision of information and education on opportunities to participate in HIV/AIDS-related clinical research (42 USC 300ff-71(b)). Affected family members (people not identified with HIV) may be eligible for RWHAP support services in limited situations, but these services for affected individuals must always benefit people with HIV. Examples include, but are not limited to, mental health services, and respite care. Services to non-affected family members who meet these criteria may not continue subsequent to the death of the RWHAP client. Refer to HAB Policy Clarification Notice #16-02: Ryan White HIV/AIDS Program Services: Eligible Individuals & Allowable Uses of Funds for further information on circumstances in which affected family members may be eligible to receive RWHAP funded support services.

c.      Funds must be used for the establishment of a clinical quality management program to assess the extent to which HIV health services are consistent with the most recent Public Health Service guidelines for the treatment of HIV/AIDS and related opportunistic infections, and, as applicable, to develop strategies for ensuring that such services are consistent with the guidelines for improvement in the access to and quality of HIV health services (42 USC 300ff-71(f)(2)). Policy Clarification Notice #15-02 https://hab.hrsa.gov/sites/default/files/hab/Global/HAB-PCN-15-02-CQM.pdf.

d.      Funds may be used for administrative expenses, which are defined as funds used by recipients for grant management and monitoring activities, including costs related to any staff or activity other than provision of services. Indirect costs included in a federally negotiated indirect rate are considered part of administrative costs (see III.G.3, "Matching, Level of Effort, Earmarking – Earmarking," for a limitation on expenditures for administrative costs) (42 USC 300ff-71(f)(1), (h)(1), and (h)(2)). Funds may be used for administrative expenses; no more than 10 percent on administrative expenses.

**EXHIBIT 11 - 79**

2. *Activities Unallowed*

a. Funds may not be used for AIDS programs or to develop materials, designed to promote or encourage, directly, intravenous drug abuse or sexual activity, whether homosexual or heterosexual (42 USC 300ff-84).

b. Funds may not be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug (Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113), Division H, Title V, Section 520, and subsequent appropriations, as applicable). Other elements of syringe services programs may be allowable if in compliance with applicable HHS and HRSA-specific guidance.

c. Funds may not be used to purchase or improve land or to purchase, construct, or make permanent improvement to any building (Funding Opportunity Announcement, Section IV.6).

d. Funds may not be used to make cash payments to intended recipients of RWHAP services (Policy Clarification Notice #16-02, Ryan White HIV/AIDS Program Services: Eligible Individuals and Allowable Uses of Funds https://hab.hrsa.gov/sites/default/files/hab/program-grants-management/ServiceCategoryPCN_16-02Final.pdf).

e. Charges that are billable to third party payors (e.g., private health insurance, prepaid health plans, Medicaid, Medicare, HUD, other RWHAP funding including ADAP).

f. To directly provide housing or health care services (e.g., HIV care, counseling, and testing) that duplicate existing services.

g. PrEP or non-occupational Post-Exposure Prophylaxis (nPEP) medications or the related medical services. As outlined in the June 22, 2016 RWHAP and PrEP program letter, the RWHAP legislation provides grant funds to be used for the care and treatment of PLWH, thus prohibiting the use of RWHAP funds for PrEP medications or related medical services, such as physician visits and laboratory costs. RWHAP Part D funds can be used toward Psychosocial Support Services, a component of family-centered care, which may include counseling and testing and information on PrEP to eligible clients' partners and affected family members, within the context of a comprehensive PrEP program.

h. Fundraising expenses.

i. Lobbying activities and expenses.

j. International travel.

**EXHIBIT 11 - 80**

**J.**     **Program Income**

The Notice of Award provides guidance on the use of program income. The addition method is used for the Ryan White HIV/AIDS Program Part D. Program income must be used for activities described in III.A.1, "Activities Allowed."

**L.**     **Reporting**

    **1.**     **Financial Reporting**

        a.     *SF-270, Request for Advance or Reimbursement* – Applicable

        b.     *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

        c.     *SF-425, Federal Financial Report* – Applicable

    **2.**     **Performance Reporting**

    Not Applicable

    **3.**     **Special Reporting**

    Not Applicable

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CFDA 93.461 COVID-19 TESTING FOR THE UNINSURED

### I.      PROGRAM OBJECTIVES

The COVID-19 Testing for the Uninsured program is also referred to as the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing and Treatment of the Uninsured program. This program is administered by the Health Resources and Services Administration to provide claims reimbursements to health care providers for conducting COVID-19 testing for the uninsured and to support healthcare related expenses attributable to the treatment of uninsured individuals with COVID-19.

### II.     PROGRAM PROCEDURES

This program is administered as a claims reimbursement program for health care providers. Health care providers who have conducted COVID-19 testing or provided treatment for uninsured individuals with a COVID-19 diagnosis on or after February 4, 2020, can electronically request claims reimbursement through the program and will be reimbursed generally at Medicare rates, subject to available funding. Steps involve enrolling as a provider participant (recipient), signing the terms and conditions of the program, checking patient eligibility, submitting patient information, submitting claims electronically, and receiving payment via direct deposit.

This program does not provide coding guidance to providers. Rather, the program provides billing guidance to allow providers to identify and submit only claims eligible for reimbursement under this program, which is exclusively for reimbursing providers for COVID-19 testing of uninsured individuals and treatment for uninsured individuals when COVID-19 is the primary reason for treatment.

**Source of Governing Requirements**

This program has the following two components:

1.      Testing – The reimbursement for COVID-19 testing services is authorized via:

   •      Families First Coronavirus Response Act (Pub. L. No. 116-127) (FFCRA) [Division A, Title V, Office of the Secretary, Public Health and Social Service Emergency Fund 134 Stat. 182].

   •      Paycheck Protection Program and Health Care Enhancement Act (Pub. L. No. 116-139) [134 Stat. 626] (PPPHCA).

2.      Treatment – The reimbursement for COVID-19 treatment services is authorized via:

   •      The Coronavirus Aid, Relief, and Economic Security Act (CARES) (Pub. L. No. 116-136, 134 Stat. 563).

**EXHIBIT 11 - 82**

- Paycheck Protection Program and Health Care Enhancement Act (Pub. L. No. 116-139).

**Availability of Other Program Information**

The following websites provide additional information about COVID Uninsured Claims.

Overview:
https://www.hrsa.gov/CovidUninsuredClaim

Frequently Asked Questions:
https://www.hrsa.gov/coviduninsuredclaim/frequently-asked-questions
https://coviduninsuredclaim.linkhealth.com/frequently-asked-questions.html

Claims Reimbursement Procedures:
https://coviduninsuredclaim.linkhealth.com/

Testing – Terms and Conditions of the award:
https://www.hhs.gov/sites/default/files/terms-and-conditions-ffcra-relief-fund.pdf

Treatment – Terms and Conditions of the award:
https://www.hhs.gov/sites/default/files/terms-and-conditions-uninsured-relief-fund.pdf

## III.    COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | Y | N | N | N | N | N | N | N | N |

## A.    Activities Allowed or Unallowed

1.    *Activities Allowed*

Required primary health services as described in the terms and conditions of the award for uninsured individuals:

a.    Reimbursement of payments for COVID-19 testing and testing-related items for individuals who do not have coverage through an individual or employer-sponsored plan, a federal healthcare program, or the Federal Employees Health Benefits Program at the time the services were rendered.

b.    Reimbursements of payments for COVID-19 treatment as determined by the program for individuals who do not have any health care coverage at the time the services were rendered.

2.    *Activities Unallowed*

As described in the terms and conditions of the award.

a.    Funds provided will not be used to reimburse expenses that have been reimbursed from other sources or that other sources are obligated to reimburse. The recipient will not include costs for which payment was received in cost reports or otherwise seek uncompensated care reimbursement through federal or state programs for items or services for which payment was received.

b.    The recipient will not engage in "balance billing" or charge any type of cost sharing for any COVID-19 testing, testing-related items and services provided, or treatment for which the recipient receives a payment from this program. The recipient shall consider payment received under this program to be payment in full for such care or treatment.

**EXHIBIT 11 - 84**

     c.     If the recipient, prior to signing these terms and conditions, charged any uninsured individuals a fee for COVID-19 testing, testing-related items and services, or treatment for which the recipient subsequently received a payment from this program, the recipient will communicate to the uninsured individuals they do not owe recipient any money for that care or treatment. If an uninsured individual paid the recipient for any portion of such care or treatment, the recipient must return the payment to the uninsured individual in a timely manner.

## E.    Eligibility

Services must be for individuals who at the time the services were provided were uninsured as described in the terms and conditions of the award.

## IV.    Other Information

Guidance documents on HRSA webpages on the HHS.gov website, such as those listed under "Availability of Other Program Information," are provided only to clarify the applicable laws, regulations, and terms and conditions of the award. Such guidance documents do not create new compliance requirements. However, non-federal entities in substantial compliance with the guidance applicable in these guidance documents at the time of a transaction are considered in compliance with the underlying compliance requirements.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CFDA 93.498 PROVIDER RELIEF FUND

**Note:** As discussed in "IV. Other Information, 2. *Schedule of Expenditures of Federal Awards (SEFA) Reporting*," for fiscal years ending in 2020 on or before December 30, 2020, the entity reports no PRF expenditures (including no lost revenue). Therefore, this program's expenditures will first be reported in the SEFA and audited under the Uniform Guidance in a fiscal year ending on or after December 31, 2020.

## I.     PROGRAM OBJECTIVES

The Provider Relief Fund (PRF) is administered by the Health Resources and Services Administration (HRSA) and provides relief funds to hospitals and other healthcare providers, including those on the front lines of the coronavirus response. The funding supports healthcare-related expenses or lost revenue attributable to COVID-19 and ensures that uninsured Americans can get treatment for COVID-19.

## II.    PROGRAM PROCEDURES

The PRF includes the following components and may include additional components established after the date of this Supplement:

General Distribution – The first round of Phase 1 funds was distributed to providers based on their portion of 2019 Medicare-Fee-For-Service (MFFS) payments. These distributions included $30 billion distributed April 10, 2020 and April 17, 2020. The second round of Phase 1 funds of $20 billion were distributed to providers beginning on April 24, 2020, and were based on revenues from CMS cost report data and submissions to the provider portal.

In June 2020, Phase 2 General Distribution funds of $18 billion were made available to Medicaid, CHIP, Dental providers, and providers who missed the Phase 1 distribution.

Targeted Distributions – Funds were allocated for targeted distribution to providers in areas particularly impacted by the COVID-19 outbreak: rural providers, providers of services with lower shares of Medicare reimbursement, or providers who predominantly serve the Medicaid population. Distributions were made in the following areas:

High Impact Area Distribution

Skilled Nursing Facility Distribution

Skilled Nursing Facility Infection Control Distribution

Safety Net Hospital Distribution

Indian Health Service Distribution

Rural Distribution

**EXHIBIT 11 - 86**

Most payments were sent out to providers without application, with requirement for recipients to accept the terms and conditions through an online portal or return funds. Recipients were required to either accept the terms and conditions or return the funds. The CFDA numbers were not provided at time of payments or included in initial terms and conditions.

**Source of Governing Requirements**

Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. No. 116-136, 134 Stat. 563)

Paycheck Protection Program and Health Care Enhancement Act (Pub. L. No. 116-139, 134 Stat. 622)

**Availability of Other Program Information**

The following HHS.gov webpages provide additional information:

CARES Act Provider Relief Fund
https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/index.html

CARES Act Provider Relief Fund General Information
https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/general-information/index.html

CARES Act Provider Relief Fund: For Providers which includes copies of terms and conditions.
https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/for-providers/index.html

CARES Act Provider Relief Fund Frequently Asked Questions
https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/faqs/index.html

The following HHS.gov webpages provide the applicable terms and conditions:

General Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-30-b.pdf
https://www.hhs.gov/sites/default/files/terms-and-conditions-provider-relief-20-b.pdf

Medicaid, CHIP, and Dental Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-phase-2-general-distribution-relief-fund.pdf

High Impact Area Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-high-impact-relief-fund.pdf

Skilled Nursing Facility Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-skilled-nursing-facility-relief-fund.pdf

Skilled Nursing Facility Infection Control Distribution
https://www.hhs.gov/sites/default/files/provider-relief-fund-nf-infection-control-payment-terms-and-conditions.pdf

Safety Net Hospital Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-safety-net-relief-fund.pdf

Indian Health Service Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-indian-health-service-relief-fund.pdf

Rural Distribution
https://www.hhs.gov/sites/default/files/terms-and-conditions-rural-relief-fund.pdf

## III.    COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | N | N | N | N | N | N | N | Y | N | N |

**EXHIBIT 11 - 88**

## A.      Activities Allowed or Unallowed

1.      *Activities Allowed (All distributions except Skilled Nursing Facility Infection Control Distribution)*

Law (HR 748-283 and Pub. L. No. 116-139, 134 Stat. 622)

To prevent, prepare for, and respond to coronavirus, domestically or internationally, for necessary expenses to reimburse, through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus.

That funds appropriated under this paragraph in this Act shall be available for building or construction of temporary structures, leasing of properties, medical supplies and equipment, including personal protective equipment and testing supplies, increased workforce and trainings, emergency operation centers, retrofitting facilities, and surge capacity.

Payment means a pre-payment, prospective payment, or retrospective payment.

*Terms and Conditions*

a.      The recipient certifies that the payment will only be used to prevent, prepare for, and respond to coronavirus, and that the payment shall reimburse the recipient only for health care related expenses or lost revenues that are attributable to coronavirus.

b.      The secretary has concluded that the COVID-19 public health emergency has caused many healthcare providers to have capacity constraints. As a result, patients that would ordinarily be able to choose to receive all care from in-network healthcare providers may no longer be able to receive such care in-network. Accordingly, for all care for a presumptive or actual case of COVID-19, recipient certifies that it will not seek to collect from the patient out-of-pocket expenses in an amount greater than what the patient would have otherwise been required to pay if the care had been provided by an in-network recipient.

c.      The recipient certifies that retaining the payment for at least 90 days without contacting HHS regarding remittance of those funds, is deemed to have accepted the Terms and Conditions.

d.      The recipient must provide or have provided after January 31, 2020, diagnoses, testing, or care for individuals with possible or actual cases of COVID-19 or prevented in the spread of COVID-19. The Department of Health and Human Services (HHS) broadly views every patient as a possible case of COVID-19.

**EXHIBIT 11 - 89**

2.      *Activities Unallowed* (**All distributions**)

Law (HR 748-283 and Pub. L. No. 116-139, 134 Stat. 622)

That these funds may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.

*Terms and Conditions*

Payments may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse.

3.      *Activities Allowed (Skilled Nursing Facility Infection Control Distribution)*

*Terms and Conditions*

Funds may only be used to reimburse the recipient for costs associated with the following items and services ("Infection Control Expenses"):

a.      Costs associated with administering COVID-19 testing, which means an in vitro diagnostic test defined in section 809.3 of title 21, *Code of Federal Regulations* (or successor regulations) for the detection of SARS-CoV-2 or the diagnosis of the virus that causes COVID-19, and the administration of such a test, that:

- Is approved, cleared, or authorized under section 510(k), 513, 515, or 564 of the Federal Food, Drug, and Cosmetic Act (21 USC 360(k), 360c, 360e, 360bbb-3);

- The developer has requested, or intends to request, emergency use authorization under section 564 of the Federal Food, Drug, and Cosmetic Act (21 USC 360bbb-3), unless and until the emergency use authorization request under such section 564 has been denied or the developer of such test does not submit a request under such section within a reasonable timeframe;

- Is developed in and authorized by a state that has notified the secretary of HHS of its intention to review tests intended to diagnose COVID-19; or

- Other test that the secretary determines appropriate in guidance.

b.      Reporting COVID-19 test results to local, state, or federal governments.

c.      Hiring staff, whether employees or independent contractors, to provide patient care or administrative support.

**EXHIBIT 11 - 90**

    d.      Expenses incurred to improve infection control, including activities such as implementing infection control "mentorship" programs with subject matter experts or changes made to physical facilities.

    e.      Providing additional services to residents, such as technology that permits residents to connect with their families if the families are not able to visit in person.

## L.    Reporting

### 1.    Financial Reporting

    a.      *SF-270, Request for Advance or Reimbursement* – Not Applicable

    b.      *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

    c.      *SF-425, Federal Financial Report* – Not Applicable

### 2.    Performance Reporting

Not Applicable

### 3.    Special Reporting – Applicable only to audits of fiscal years ending on or after December 31, 2020

Recipients must report for the calendar year ending December 31, 2020, and the six months ending June 30, 2021, as described in the General and Targeted Distribution Post-Payment Notice of Reporting Requirements issued September 19, 2020 (https://www.hhs.gov/coronavirus/cares-act-provider-relief-fund/reporting-auditing/index.html) and guidance issued by HRSA subsequent to the date of this Supplement.

At the time of issuance of this addendum, the report and reporting portal were under development and not expected to be available before January 15, 2021. By February 1, 2021, a notice will be placed on OMB's Office of Federal Financial Management website (https://www.whitehouse.gov/omb/management/office-federal-financial-management/) providing key line items and other information from the report that are subject to audit for audits of fiscal years ending on or after December 31, 2020. Auditors performing audits of December 31, 2020 year-ends are expected to test this special reporting even though it will not be able to be submitted by recipients until early in the next fiscal year.

## IV.    Other Information

1.    *Webpage Guidance*

Guidance documents accessed by links on the HHS.gov website such as those listed under "Availability of Other Program Information" are provided only to clarify the applicable laws,

**EXHIBIT 11 - 91**

regulations, and terms and conditions of the award and do not create new compliance requirements. However, non-federal entities in substantial compliance with the guidance applicable in these guidance documents in effect at the time of the activity or transaction are considered in compliance with the underlying compliance requirements.

2.      *Schedule of Expenditures of Federal Awards (SEFA) Reporting*

SEFA reporting for this program (including lost revenue) is based upon the PRF report in "L.3 Special Reporting – Applicable only to audits of fiscal years ending on or after December 31, 2020."

For fiscal years ending (FYE) in 2020 on or before December 30, 2020, the entity reports no PRF expenditures (including no lost revenue).

For a FYE December 31, 2020, the entity reports on the SEFA as expenditures (including lost revenue) based upon the PRF report for calendar year ending December 31, 2020, and discloses in the footnotes to the SEFA that the amount included on the SEFA is based upon the December 31, 2020 PRF report.

For fiscal years ending in 2021 on or before June 29, 2021, the entity reports on the SEFA as expenditures (including lost revenue) based upon the PRF report for calendar year ending December 31, 2020, and discloses in the footnotes to the SEFA that the amount included on the SEFA is based upon the December 31, 2020 PRF report.

SEFA reporting guidance for fiscal years ending on or after June 30, 2021, will be provided in the 2021 Compliance Supplement.

**EXHIBIT 11 - 92**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CFDA 93.914 HIV EMERGENCY RELIEF PROJECT GRANTS (RYAN WHITE HIV/AIDS PROGRAM PART A)

## I.   PROGRAM OBJECTIVES

The objective of this program is to improve access to a comprehensive continuum of high-quality, community-based primary medical care and support services in metropolitan areas that are disproportionately affected by the incidence of Human Immunodeficiency Virus (HIV)/Acquired Immune Deficiency Syndrome (AIDS). The statute refers to both people with HIV and those who have AIDS (as reported to and confirmed by the Centers for Disease Control and Prevention (CDC)). These terms are used interchangeably in this compliance supplement but refer to this total universe of eligible individuals.

Emergency financial assistance in the form of formula-based funding, supplemental project-based funding, and formula-based Minority AIDS Initiative (MAI) funding is provided to eligible metropolitan areas (EMAs) and transitional grant areas (TGAs) to develop, organize, and operate health and support services programs for people with HIV and their care givers.

The supplemental grants are discretionary awards and are awarded, following competition, to EMAs and TGAs that demonstrate need beyond that met through the formula award. They must also demonstrate the ability to use the supplemental amounts quickly and cost effectively. Other criteria contained in annual application guidance documents may also apply. All EMAs and TGAs that are receiving formula assistance are also receiving supplemental assistance and will continue to receive such assistance unless they fail to meet the legislative requirements related to unobligated balances.

## II.   PROGRAM PROCEDURES

The Health Resources and Services Administration (HRSA), a component of the Department of Health and Human Services (HHS), administers the HIV emergency relief programs. Eligibility for Ryan White HIV/AIDS Program (RWHAP) Part A grants depends, in part, on the number of confirmed AIDS cases within a statutorily specified "metropolitan area." The secretary of HHS uses the Office of Management and Budget's (OMB) census-based definitions of a Metropolitan Statistical Area (MSA) in determining the geographic boundaries of a RWHAP metropolitan area. HHS relies on the OMB geographic boundaries in effect when a jurisdiction was or is (if newly eligible) initially funded under RWHAP Part A. A metropolitan area is not eligible if it does not have an overall population of 50,000 or more.

HRSA uses data reported to and confirmed by CDC to determine eligibility. An EMA is a metropolitan area for which there has been reported to, and confirmed by, the director of the CDC a cumulative total of more than 2,000 cases of AIDS for the most recent five calendar-year periods for which data are available. A TGA is a metropolitan area for which there has been reported to, and confirmed by, the director of the CDC a cumulative total of at least 1000, but fewer than 2000, cases of AIDS during the most recent period of five calendar years for which data are available. MAI funding is awarded using a formula that is based on the distribution of HIV/AIDS cases among racial and ethnic minorities.

After subtracting the amount available for MAI project assistance, HRSA must make at least two-thirds (66 2/3 percent) of the appropriated amount available for the EMAs' and TGAs' formula allocation and award the remainder as supplemental funding on the basis of demonstrated need and other factors. EMAs and TGAs are funded from the formula, supplemental, and MAI allocation on the basis of a single application and a combined award.

Funds are made available to the chief elected official of the EMA or TGA in accordance with statutory requirements and program guidelines. Day-to-day responsibility for the grant is ordinarily delegated to the jurisdiction's public health department, and some administrative functions may be outsourced to a private entity. The chief elected official of the jurisdiction is also required to establish or designate an HIV health services planning council, which carries out a planning process, coordinating with other state, local, and private planning and service organizations, and establishes the priorities for allocating funds. Newly eligible areas designated as TGAs in fiscal year (FY) 2007 and beyond are exempt from the requirement to establish and use an HIV health services planning council but must provide a process for obtaining community input as prescribed in the RWHAP Part A legislation.

Consistent with funding and service priorities established through the public planning process, the receiving jurisdiction uses the funds to provide assistance to public entities or private non-profit or for-profit entities to deliver or enhance HIV/AIDS-related core medical and support services and, within established limits, for associated administrative and clinical quality management activities. Administrative activities include EMA or TGA oversight of service provider performance and adherence to their subrecipient obligations. Most of these service providers are non-profit organizations.

**Source of Governing Requirements**

This program is authorized under sections 2601–2610 of Title XXVI of the Public Health Service Act, as amended by the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Pub. L. No. 111-87), and is codified at 42 USC 300ff-11 through 300ff-20. The MAI is authorized under Section 2693(b)(2)(A) of the Public Health Service Act, 42 USC 300ff- 121(b)(2)(A).

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. No. 116-136, 134 Stat. 562) provided one-time funding to help current RWHAP recipients prevent, prepare for, and respond to the novel coronavirus disease 2019 (COVID-19).

All HRSA awards are subject to the Uniform Administrative Requirements, Cost Principles, and Audit Requirements at 45 CFR part 75. As per 45 CFR part 75.201 and 301, recipients may use a fixed-award instrument to obtain services based on a reasonable estimate of actual cost and based on performance and results related to improvement of program outcomes.

There are no program regulations specific to this program.

**Availability of Other Program Information**

Additional information about this program is available at http://hab.hrsa.gov/.

Additional information on allowable uses of funds under this program is contained in policy notices and standards found at http://www.hab.hrsa.gov/manageyourgrant/policiesletters.html and http://hab.hrsa.gov/manageyourgrant/files/fiscalmonitoringparta.pdf.

CARES Act information is available at https://hab.hrsa.gov/program-grants-management/coronavirus-covid-19-response.

## III.   COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N." See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | Y | N | N | N | N | Y | N | Y | N |

## A.   Activities Allowed or Unallowed

   1.   *Activities Allowed*

         Funds may be used only for core medical services, support services, clinical quality management, and administrative expenses (42 USC 300ff-14(a)).

         a.   Core medical services with respect to people with HIV (including co-occurring conditions, i.e., one or more adverse health conditions of an individual with HIV, without regard to whether the individual has AIDS or whether the conditions arise from HIV) means (1) outpatient and

**EXHIBIT 11 - 95**

ambulatory health services; (2) AIDS Drug Assistance Program treatments; (3) AIDS pharmaceutical assistance; (4) oral health care; (5) early intervention services meeting the requirements of 42 USC 300ff-14(e); (6) health insurance premium and cost sharing assistance for low-income individuals; (7) home health care; (8) medical nutrition therapy; (9) hospice services; (10) home and community-based health services; (11) mental health services; (12) substance abuse outpatient care; and (13) medical case management, including treatment adherence services (42 USC 300ff-14(c)(3)).

b.   Support services means services that are needed for people with HIV to achieve their medical outcomes (those outcomes affecting the HIV-related clinical status of an individual with HIV) (for example, respite care for persons caring for people with HIV, outreach services, medical transportation, linguistic services, referrals for health care and support services, and such other services specified by HRSA) (42 USC 300ff-14(d)).

c.   Clinical quality management means assessing the extent to which HIV health services provided to patients under the grant are consistent with the most recent Public Health Service guidelines for the treatment of HIV/AIDS and related opportunistic infections, and as applicable, developing strategies for ensuring that such services are consistent with the guidelines for improvement in the access to and quality of HIV health services (42 USC 300ff-14(h)(5)(A)). Policy Clarification Notice #15-02 https://hab.hrsa.gov/sites/default/files/hab/Global/CQM-PCN-15-02.pdf.

d.   Administrative expenses at the recipient level include (1) activities related to routine grant administration and monitoring (for example, development of applications, receipt and disbursal of program funds, development and establishment of reimbursement and accounting systems, development of a clinical quality management program, preparation of routine programmatic and financial reports, and compliance with grant conditions and audit requirements); (2) contract development, solicitation review, award, monitoring, and reporting; and (3) activities carried out by the HIV health services planning council (42 USC 300ff-14(h)(3) and 300ff-12(b)).

e.   Subrecipient administrative expenses include usual and recognized overhead activities, including those that are reimbursed through approved indirect cost rates; management oversight of funded activities; and other types of program support such as quality assurance, quality control, and related activities (42 USC 300ff-14(h)(4)).

2.   *Activities Unallowed*

a.   Funds may not be used to make payment for any item or service if payment has already been made or can reasonably be expected to be made

**EXHIBIT 11 - 96**

under any state compensation program, under an insurance policy or any federal or state health benefits program, or by an entity that provides health services on a pre-paid basis except for programs administered by or providing the services of the Indian Health Service (42 USC 300ff-15(a)(6)).

b.       Funds may not be used to purchase or improve land or to purchase, construct, or make permanent improvement to any building. Minor remodeling is allowed (42 USC 300ff-14(i)).

c.       Funds may not be used to make cash payments to intended recipients of RWHAP services (42 USC 300ff-14(i)) and Ryan White HIV/AIDS Program Services: Eligible Individuals and Allowable Uses of Funds, Policy Clarification Notice #16-02 https://hab.hrsa.gov/sites/default/files/hab/program-grants-management/ServiceCategoryPCN_16-02Final.pdf.

d.       Funds may not be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug (Consolidated Appropriations Act, 2016, Division H, Title V, Section 520 (Pub. L. No. 114-113) and subsequent appropriations, as applicable). Other elements of syringe services programs may be allowable if in compliance with applicable HHS and HRSA-specific guidance.

e.       Funds may not be used for AIDS programs or to develop materials, designed to promote or encourage, directly, intravenous drug use or sexual activity, whether homosexual or heterosexual (42 USC 300ff-84).

E.     **Eligibility**

1.     **Eligibility for Individuals**

Eligible beneficiaries are low-income individuals or families of people with HIV. To the maximum extent practicable, services are to be provided to eligible individuals regardless of their ability to pay for the services and their current or past health condition (42 USC 300ff-15(a)(7)(A)).

The requirement related to people with HIV is waived for the COVID-19 CARES Act funding only in the extremely limited instances of household members living with RWHAP clients, and only for COVID-19 testing and the provision of personal protective equipment (PPE). Part D recipients are able to use funds for this purpose in the absence of a waiver (section 2683 of the PHS Act).

2.     **Eligibility for Group of Individuals or Area of Service Delivery**

Not Applicable

3.      **Eligibility for Subrecipients**

The EMA or TGA may make funds available to public or private non-profit
entities or to private for-profit entities if they are the only available providers of
quality HIV care in the area (42 USC 300ff-14(b)(2)).

**J.      Program Income**

The Notice of Award provides guidance on the use of program income. The addition
method is used for this program. Program income must be used for activities described in
III.A.1, "Activities Allowed."

**M.      Subrecipient Monitoring**

1.      The HHS Uniform Administrative Requirements, Cost Principles, and Audit
        Requirements for HHS Awards *(*45 CFR Part 75) requires pass-through entities:
        (1) to evaluate each subrecipient's risk of noncompliance in order to determine the
        appropriate monitoring level; (2) to monitor the activities of subrecipient
        organizations to ensure that the subaward is in compliance with applicable federal
        statutes and regulations and terms of the subaward; and (3) to verify that
        subrecipients are audited as required under this guidance. Specifically, the grantee
        must conduct monitoring activities in accordance with sections 75.351 through
        75.353 of Subpart D of 45 CFR Part 75.

2.      Grantees must ensure that all requirements imposed by the federal government are
        passed down to subrecipients so that the HHS award is used in accordance with
        federal statutes, regulations, and the terms and conditions of the award.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CFDA 93.917 HIV CARE FORMULA GRANTS (RYAN WHITE HIV/AIDS PROGRAM PART B)

## I.      PROGRAM OBJECTIVES

The objective of this program is to assist states and territories in improving the quality, availability, and organization of healthcare and support services for low-income, uninsured, and underinsured people with Human Immunodeficiency Virus (HIV).

## II.     PROGRAM PROCEDURES

The Department of Health and Human Services (HHS) administers the Ryan White HIV/AIDS Program (RWHAP) Part B through the Health Resources and Services Administration's (HRSA) HIV/AIDS Bureau (HAB). Grants are awarded annually, on a formula basis, to all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, the Republic of Palau, the Federated States of Micronesia, and the Republic of the Marshall Islands following submission of an application to, and approval by, HAB. The responsible state agency, usually the state health department, is designated by the governor.

The application addresses how the state plans to address each of the six specified program components: (1) HIV care consortia, (2) home and community-based care, (3) health insurance continuation program, (4) provision of treatments, (5) state direct services, and (6) Minority AIDS Initiative (MAI). This includes the state's plans for the AIDS Drug Assistance Program (ADAP). ADAP funding is provided to the state as a separate formula amount in addition to the base formula grant amount and can only be used for ADAP services.

States may use a variety of service delivery mechanisms. States may provide some or all services directly or may enter into subawards with local HIV care consortia, associations of public and non-profit healthcare and support service providers, and community-based organizations that plan, develop, and deliver services for low-income, uninsured, and underinsured people with HIV. The state also may delegate some of its authority to monitor provider agreements to a "lead agency" (fiscal agent), with specific responsibilities contained in a formal agreement between the state and that agency. Finally, the state may provide subawards to healthcare or other service providers.

**Source of Governing Requirements**

The RWHAP Part B formula grant program is authorized under Sections 2611-2623 of Title XXVI of the Public Health Service Act as amended by the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Pub. L. No. 111-87) and codified at 42 USC 300ff-21 through 300ff-31b. The MAI is authorized under Section 2693(b)(2)(B) of the Public Health Service Act, 42 USC 300ff-121(b)(2)(B).

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. No. 116- 136, 134 Stat. 562) provided one-time funding to help current RWHAP recipients prevent, prepare for, and respond to the novel coronavirus disease 2019 (COVID-19).

There are no regulations specific to the RWHAP Part B.

**Availability of Other Program Information**

Further information about the RWHAP Part B is available at http://www.hab.hrsa.gov.

Additional information on allowable uses of funds under this program is contained in policy notices and standards found at http://hab.hrsa.gov/program-grants-management/policy-notices-and-program-letters and http://hab.hrsa.gov/sites/default/files/hab/Global/fiscalmonitoringpartb.pdf.

CARES Act information is available at https://hab.hrsa.gov/program-grants-management/coronavirus-covid-19-response.

## III. COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | Y | N | Y | N | N | Y | N | Y | N |

**EXHIBIT 11 - 100**

**A.**     **Activities Allowed or Unallowed**

    1.     *Activities Allowed*

        a.     Grant funds (and required matching funds) may be used for core medical services, support services, planning and evaluation, clinical quality management, and administrative expenses (42 USC 300ff-22(a); 42 USC 300ff-28(b)).

            (1)     Core medical services with respect to people with HIV (including the co-occurring conditions of the individual) means (1) outpatient and ambulatory health services; (2) AIDS Drug Assistance Program treatments; (3) AIDS pharmaceutical assistance; (4) oral healthcare; (5) early intervention services meeting the requirements of 42 USC 300ff-22(d); (6) health insurance premium and cost sharing assistance for low-income individuals; (7) home healthcare; (8) medical nutrition therapy; (9) hospice services; (10) home and community-based health services; (11) mental health services; (12) substance abuse outpatient care; and (13) medical case management, including treatment adherence services (42 USC 300ff-22(b)(3)).

            (2)     Support services means services that are needed for people with HIV to achieve their medical outcomes (those outcomes affecting the HIV-related clinical status of people with HIV) (for example, respite care for persons caring for people with HIV, outreach services, medical transportation, linguistic services, referrals for healthcare and support services, and such other services specified by HRSA). Expenditures for or through consortia are considered support services (42 USC 300ff-22(c); 42 USC 300ff-23(f)).

            (3)     Clinical quality management means assessing the extent to which HIV health services provided to patients under the grant are consistent with the most recent Public Health Service guidelines for the treatment of HIV/AIDS and related opportunistic infections, and as applicable, developing strategies for ensuring that such services are consistent with the guidelines for improvement in the access to and quality of HIV health services (42 USC 300ff-28(b)(3)(E)(i)). Policy Clarification Notice #15-02 https://hab.hrsa.gov/sites/default/files/hab/Global/HAB-PCN-15-02-CQM.pdf.

            (4)     Administrative expenses at the recipient level include activities related to (1) routine grant administration and monitoring (for example, development of applications, receipt and disbursal of program funds, development and establishment of reimbursement and accounting systems, development of a clinical quality

**EXHIBIT 11 - 101**

management program, preparation of routine programmatic and financial reports, and compliance with grant conditions and audit requirements); (2) contract development, solicitation review, award, monitoring, and reporting; and (3) planning and evaluation activities (42 USC 300ff-28(b)(3)(C)).

(5)     Subrecipient administrative expenses include usual and recognized overhead activities, including those that are reimbursed through approved indirect cost rates; management oversight of funded activities; and other types of program support, such as quality assurance, quality control, and related activities (42 USC 300ff-28(b)(3)(D)).

b.     Any drug rebates received on drugs purchased from funds provided to establish a program of therapeutics must be used to support the types of activities otherwise eligible for funding under RWHAP Part B, with priority given to activities related to providing therapeutics (42 USC 300ff-26(g)). To assess whether a state or subrecipient is giving priority to activities related to providing therapeutics, the state (or subrecipient) should be able to demonstrate, that, before undertaking any type of activities other than ADAP purchases for medications or insurance that are allowed under paragraph 1.a. above it (1) has no waiting list for ADAP services; (2) the ADAP formulary includes the required classes of HIV antiretroviral medications and opportunistic infection-related medications; and (3) the financial eligibility to access the ADAP is established at no less than 200 percent of the federal poverty level (the poverty guidelines are available at https://aspe.hhs.gov/poverty-guidelines and are also published each year in the *Federal Register*).

c.     Rebates may be used for allowable RWHAP Part B services that exceed the recipient's RWHAP Part B implementation work plan. Rebates are not part of the recipient's RWHAP Part B award, and, therefore, are not subject to the 10 percent administrative cost cap nor to the requirement to spend 75 percent on core medical services (see III.G.3.b and h, "Matching, Level of Effort, and Earmarking – Earmarking" below). Rebates can be used to meet both a recipient's state matching and maintenance of effort (MOE) requirements (42 USC 300ff-26(g) and Policy Clarification Notice #15-04, Utilization and Reporting of Pharmaceutical Rebates, https://hab.hrsa.gov/sites/default/files/hab/Global/pcn_15-04_pharmaceutical_rebates.pdf).

2.     *Activities Unallowed*

a.     Funds may not be used to purchase or improve land, or to purchase, construct, or permanently improve (other than minor remodeling) any building or other facility (42 USC 300ff-28(b)(6)).

b.    Funds may not be used to make cash payments to intended recipients of RWHAP services. Where direct provision of the service is not possible or effective; store gift cards, vouchers, coupons, or tickets that can be exchanged for a specific service or commodity (e.g., food or transportation) must be used. Recipients are advised to administer voucher and store gift card programs in a manner which assures that vouchers and store gift cards cannot be exchanged for cash or used for anything other than the allowable goods or services, and that systems are in place to account for disbursed vouchers and store gift cards (42 USC 300ff-28(b)(6)) and Ryan White HIV/AIDS Program Services: Eligible Individuals and Allowable Uses of Funds, Policy Clarification Notice #16-02, https://hab.hrsa.gov/sites/default/files/hab/program-grants-management/ServiceCategoryPCN_16-02Final.pdf).

c.    Funds may not be used to make payments for any item or service to the extent that payment has been made or can reasonably be expected to be made for that item or service under any state/territory compensation program, under an insurance policy, or under any federal or state health benefits program or by an entity that provides health services on a prepaid basis except for a program administered by or providing the services of the Indian Health Service (42 USC 300ff-27(b)(7)(F)).

d.    Funds may not be used for inpatient hospital services, or nursing home or other long-term care facilities (42 USC 300ff-24(c)(3)).

e.    Funds may not be used to pay any costs associated with creation, capitalization, or administration of a liability risk pool (other than those costs paid on behalf of individuals as part of premium contributions to existing liability risk pools) or to pay any amount expended by a state/territory under Title XIX of the Social Security Act (Medicaid) (42 USC 300ff- 25(b)).

f.    Funds may not be used to develop materials designed to promote or encourage, directly, intravenous drug use or sexual activity, whether homosexual or heterosexual (42 USC 300ff-84).

g.    Funds may not be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug (Consolidated Appropriations Act (Pub. L. No. 114-113), 2016, Division H, Title V, Section 520 and subsequent appropriations, as applicable). Other elements of syringe services programs may be allowable if in compliance with applicable HHS and HRSA-specific guidance.

h.    ADAP rebates cannot be shared with other entities including, but not limited to, RWHAP Part A recipients, high-risk insurance pools, Marketplace plans, Medicaid, or any other state or federal program (42 USC 300ff- 31(b)).

**EXHIBIT 11 - 103**

    i.    International travel.

E.    **Eligibility**

   1.    **Eligibility for Individuals**

      a.    To be eligible to receive assistance in the form of therapeutics, an individual must have a medical diagnosis of HIV/AIDS and be (a) a low-income individual (as defined by the state), (b) a resident of the state, and (c) uninsured or underinsured (42 USC 300ff-26(b)).

      b.    The requirement to serve only people with HIV is waived for the COVID-19 CARES Act funding only in the extremely limited instances of household members living with Ryan White HIV/AIDS Program clients, and only for COVID-19 testing and the provision of personal protective equipment (PPE). Part D recipients are able to use funds for this purpose in the absence of a waiver (42 USC 300ff-83).

   2.    **Eligibility for Group of Individuals or Area of Service Delivery**

      A state must use Emerging Communities funding in the geographic area specified as an Emerging Community, as defined in 42 USC 300ff-30(d)—a metropolitan area for which there has been reported to and confirmed by the Centers for Disease Control and Prevention a cumulative total of at least 500, but fewer than 1,000, cases of AIDS during the most recent period of five calendar years for which such data are available (42 USC 300ff-32(b)(1) and 300ff-30).

   3.    **Eligibility for Subrecipients**

      a.    To receive funding from the state under a consortium agreement, an applicant consortium must agree to provide, directly or through agreements with other service providers, essential health services, and essential support services, and must meet specified application and assurance requirements. These include conducting a needs assessment within the geographic area served and developing a plan (consistent with the state's comprehensive plan required by 42 USC 300ff-27(b)(5)) to meet identified service needs following a consultation process (42 USC 300ff-23(c)(2)).

      b.    For consortia otherwise meeting these requirements, the state shall give priority first to consortia that are receiving assistance from HRSA for adult and pediatric HIV-related care demonstration projects and then to any other existing HIV care consortia (42 USC 300ff-23(e)).

**G.     Matching, Level of Effort, Earmarking**

    **1.     Matching**

        a.     States and territories (excluding Puerto Rico) with greater than one percent of the aggregate number of national cases of HIV/AIDS in the two-year period preceding the federal fiscal year in which the state is applying for a grant must, depending on the number of years in which this threshold requirement has been met, provide matching funds as follows (42 USC 300ff-27(d)):

| Year(s) in Which Matching Required | Minimum Percentage of Non-Federal Matching | Ratio of Non-Federal to Federal Expenditures |
|---|---|---|
| First | 16 2/3 | $1 non-Federal/$5 Federal |
| Second | 20 | $1 non-Federal/$4 Federal |
| Third | 25 | $1 non-Federal/$3 Federal |
| Fourth and subsequent | 33 1/3 | $1 non-Federal/$2 Federal |

        b.     All recipients are subject to a matching requirement for ADAP supplemental funds in an amount equal to $1 for every $4 of federal funds (42 USC 300ff-28(a)(2)(F)(ii)(III)). Those recipients that are required to match the base formula funds may request and receive a waiver from this additional matching requirement.

        c.     Activities Waived (specific to fiscal year (FY) 2020 CARES Act (Pub. L. No. 116- 136)).

        The requirements that recipients with more than one percent of national HIV cases must match the award, and that recipients match the ADAP supplemental award are waived for the COVID-19 CARES Act funding. 42 USC 300ff-83.

    **2.     Level of Effort**

        **2.1     Level of Effort –** *Maintenance of Effort*

        The state/territory will maintain HIV-related activities at a level that is equal to not less than the level of such expenditures by the state/territory for the 1-year period preceding the fiscal year for which the state/territory is applying for RWHAP Part B funds (42 USC 300ff-27(b)(7)(E)).

        The requirement that the recipient must maintain expenditures for HIV-related activities at a level which is not less than the level of expenditures for such activities during the one-year period preceding the fiscal year for which the applicant is applying to receive the grant is waived for the COVID-19 CARES Act funding (42 USC 300ff-83).

**EXHIBIT 11 - 105**

### 2.2    Level of Effort – *Supplement Not Supplant*

Funds awarded under a grant must supplement and not supplant other funds available to the entity for the provision of early intervention services for the fiscal year involved (42 USC 300ff-22(d)(2)(B)).

## 3.    Earmarking

a.    The state may not use more than 10 percent of the amounts received under the grant for planning and evaluation activities (42 USC 300ff-28(b)(2)).

b.    The state may not use more than 10 percent of the amounts received under the grant for administration (42 USC 300ff-28(b)(3)(A)).

c.    A state may not use more than a total of 15 percent of the amounts received for the combined costs for administration, planning and evaluation and clinical quality management (42 USC 300ff-28(b)(4)). States and territories that receive a minimum allotment (between $50,000 and $500,000) may expend up to the amount required to support one full-time equivalent employee for any or all of these purposes (42 USC 300ff-28(b)(5)).

d.    The aggregate of expenditures for administrative expenses by subrecipients may not exceed 10 percent of the total amount of grant funds subawarded by the state (without regard to whether particular entities spend more than 10 percent for such purposes) (42 USC 300ff-28(b)(3)(B)).

e.    Unless waived by the secretary, for the purpose of providing health and support services to women, youth, infants, and children with HIV, including treatment measures to prevent the perinatal transmission of HIV, a state shall use for each of these populations not less than the percentage of RWHAP Part B funds in a fiscal year constituted by the ratio of the population involved (women, youth, infants, or children) in the state with AIDS to the general population in the state of individuals with AIDS (42 USC 300ff-22(e)). This information is provided to the state by HRSA with reporting requirements (i.e., annual progress report) as listed on the Notice of Award (NoA). Recipients demonstrate compliance with the WICY expenditure requirement in their annual progress report and may request a waiver as part of the annual progress report.

The requirement that the recipient must allocate funding in accordance with WICY ratios is waived for the COVID-19 CARES Act funding (42 USC 300ff-83).

f.    A state shall use a portion of the funds awarded to establish a program to provide therapeutics to treat HIV/AIDS or prevent the serious

**EXHIBIT 11 - 106**

deterioration of health arising from HIV/AIDS in eligible individuals, including measures for the prevention and treatment of opportunistic infections. The specific amount for ADAP will be provided in the grant agreement. Of the specific amount in the grant agreement for this purpose, the state may use not more than 5 percent to encourage, support, and enhance adherence to, and compliance with, treatment regimens (including related medical monitoring) unless the secretary (or designee) approves a 10 percent limit (42 USC 300ff-26(c)).

The statutory limitation on the use of ADAP funds to 5 percent for access, adherence, and monitoring is waived for the COVID-19 CARES Act funding, permitting allocations for these activities (42 USC 300ff-83).

g.    A state shall establish a clinical quality management program to determine whether the services provided under the grant are consistent with the most recent Public Health Service guidelines for the treatment of HIV disease and related opportunistic infection and, as applicable, to develop strategies for bringing these services into conformity with the guidelines. Funds used for this purpose may not exceed the lesser of 5 percent of the amount received under the grant or $3,000,000 and are not considered administrative expenses for purposes of the limitation under paragraph 3.b above (42 USC 300ff-28(b)(3)(E)).

h.    Unless waived by the secretary, HHS (or designee), not less than 75 percent of the amount remaining after reserving amounts for state administration and a clinical quality management program shall be used to provide core medical services to eligible people with HIV (including services regarding the co-occurring conditions of those individuals) (42 USC 300ff-22(b)).

The requirement that the recipient must spend at least 75 percent of the amount remaining after reserving amounts for administration, planning and evaluation, and/or clinical quality management on core medical services is waived for the COVID-19 CARES Act funding (42 USC 300ff-83).

**J.    Program Income**

1.    The NoA provides guidance on the use of program income. Generally, the addition method is used for this program; program income may also be used to satisfy all or part of the state matching requirements. Program income must be used for activities described in III.A.1, "Activities Allowed."

2.    The terms and conditions of award under the RWHAP Part B regarding program income do not apply to drug rebates. Rather, drug rebates must be used as specified in III.A.1.b and c, "Activities Allowed or Unallowed – Activities Allowed."

**M.**     **Subrecipient Monitoring**

1.      HHS Uniform Administrative Requirements, Cost Principles, and Audit
        Requirements for HHS Awards (45 CFR Part 75) requires pass-through entities:
        (1) to evaluate each subrecipient's risk of noncompliance in order to determine the
        appropriate monitoring level; (2) monitor the activities of subrecipient
        organizations to ensure that the subaward is in compliance with applicable federal
        statutes and regulations and terms of the subaward; and (3) verify that
        subrecipients are audited as required under this guidance. Specifically, the grantee
        must conduct monitoring activities in accordance with sections 75.351 through
        75.353 of Subpart D of 45 CFR Part 75.

2.      Grantees must ensure that all requirements imposed by the federal
        government are passed down to subrecipients so that the HHS award is used
        in accordance with federal statutes, regulations, and the terms and conditions
        of the award.

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CFDA 93.918 GRANTS TO PROVIDE OUTPATIENT EARLY INTERVENTION SERVICES WITH RESPECT TO HIV DISEASE (RYAN WHITE HIV/AIDS PROGRAM PART C)

### I.    PROGRAM OBJECTIVES

The objective of the Ryan White HIV/AIDS Program (RWHAP) Part C Early Intervention Services (EIS) is to provide outpatient, high-quality, early intervention services and primary care related to the Human Immunodeficiency Virus (HIV) and the Acquired Immune Deficiency Syndrome (AIDS).

### II.    PROGRAM PROCEDURES

The Department of Health and Human Services (HHS) administers the RWHAP Part C EIS through the Health Resources and Services Administration's (HRSA) HIV/AIDS Bureau (HAB). Grants are awarded to public and non-profit private entities, including federally qualified health centers under Section 1905(1)(2)(B) of the Social Security Act (42 USC 1396d (l)(2)(B)).

Grants also are awarded to (1) grantees under Section 1001 (regarding family planning) other than states, (2) comprehensive hemophilia diagnostic and treatment centers, (3) rural health clinics, (4) health facilities operated by or pursuant to a contract with the Indian Health Service, (5) community-based organizations, clinics, hospitals, and other health facilities that provide early intervention services to those people with HIV, or (6) non-profit private entities that provide comprehensive primary care services to populations at risk for HIV/AIDS, including faith-based and community-based organizations. Providers must be qualified Medicaid-participating providers unless an exception is granted by HRSA (42 USC 300ff-52(a)(1)(A) through (G) and 42 USC 300ff-52(b)).

The RWHAP Part C EIS enables provision of a comprehensive primary health care and support services in an outpatient setting, including (1) HIV counseling and testing, (2) periodic medical evaluation, clinical, and diagnostic services, (3) provision of therapeutic measures for preventing and treating the deterioration of the immune system and for preventing and treating conditions arising with HIV/AIDS; and (4) referrals to appropriate providers of health care and support services. RWHAP Part C EIS recipients work with their community and public health partners to improve outcomes across the HIV care continuum so that individuals diagnosed with HIV are linked and engaged in care and started on ART as early as possible.

Minority AIDS Initiative (MAI) funds are provided to recipients based on the percentage of the RWHAP Part C EIS populations served within racial/ethnic minority communities.

Services may be provided directly by the recipient or through contractual agreements with other service providers/subrecipients.

**Source of Governing Requirements**

The RWHAP Part C EIS is authorized under sections 2651–2667 of Title XXVI of the Public Health Service (PHS) Act, as amended by the Ryan White HIV/AIDS Treatment Extension Act of 2009 (Pub. L. No. 111-87) and is codified at 42 USC 300ff-51 through 300ff-67. The MAI is authorized under Section 2693(b)(2)(C) of the Public Health Service Act (42 USC 300ff-121(b)(2)(C)).

The Coronavirus Aid, Relief, and Economic Security Act (Pub. L. No. 116-136, Division B, Title VIII) (CARES Act) provided one-time funding to help current RWHAP recipients prevent, prepare for, and respond to the novel coronavirus disease 2019 (COVID-19).

The RWHAP Part C EIS has no specific program regulations.

**Availability of Other Program Information**

Further information about the RWHAP Part C EIS is available at http://www.hab.hrsa.gov/.

Additional information on allowable uses of funds under the RWHAP Part C EIS is contained in policy notices and standards found at http://www.hab.hrsa.gov/manageyourgrant/policiesletters.html.

CARES Act information is available at https://hab.hrsa.gov/program-grants-management/coronavirus-covid-19-response.

## III.   COMPLIANCE REQUIREMENTS

**In developing the audit procedures to test compliance with the requirements for this federal program, the auditor must determine, from the following summary (also included in Part 2, "Matrix of Compliance Requirements"), which of the 12 types of compliance requirements have been identified as subject to the audit (noted with a "Y" in the summary matrix below), and then determine which of the compliance requirements that are subject to the audit are likely to have a direct and material effect on the federal program at the auditee. For each such compliance requirement subject to the audit, the auditor must use Part 3 (which includes generic details about each compliance requirement other than Special Tests and Provisions) and this program supplement (which includes any program-specific requirements) to perform the audit. When a compliance requirement is shown in the summary below as "N," it has been identified as not being subject to the audit. Auditors are not expected to test requirements that have been noted with an "N."  See the Safe Harbor Status discussion in Part 1 for additional information.**

**EXHIBIT 11 - 110**

| A | B | C | E | F | G | H | I | J | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Activities Allowed or Unallowed | Allowable Costs/Cost Principles | Cash Management | Eligibility | Equipment/ Real Property Management | Matching, Level of Effort, Earmarking | Period Of Performance | Procurement Suspension & Debarment | Program Income | Reporting | Subrecipient Monitoring | Special Tests and Provisions |
| Y | Y | Y | N | N | N | Y | Y | Y | Y | N | N |

## A.      Activities Allowed or Unallowed

1.   *Activities Allowed*

   a.    Funds may be used for counseling (whether or not associated with HIV testing) and testing for HIV (42 USC 300ff-51(e)(1)(A) and (B) and 42 USC 300ff-62(f)).

   b.    Funds may be used to provide clinical and diagnostic services regarding HIV/AIDS and periodic medical evaluations of individuals with HIV. Funds also may be used for providing therapeutic measures for preventing and treating the deterioration of the immune system and related conditions (including STD, hepatitis C, and tuberculosis) (42 USC 300ff- 51(e)(1)(D) and (E)).

   c.    Funds may be used to refer people with HIV to providers of health and support services, as appropriate. This includes recipients of funding under the RWHAP Part A and Part B for the provision of health and support services; biomedical research facilities of institutions of higher education that offer experimental treatment for such disease; community-based organizations or other entities that provide such treatment; and, in the case of pregnant women, recipients of funding under RWHAP Part D (42 USC 300ff-51(e)(1)(C) and -51(e)(2)(A-C)).

   d.    At least 75 percent of funds must be used for core medical services for an individual with HIV, including the co-occurring conditions of the individual. Core medical services encompass the following services: (1) outpatient and ambulatory health services; (2) AIDS Drug Assistance Program treatments defined under 42 USC 300ff-26; (3) AIDS pharmaceutical assistance; (4) oral healthcare; (5) early intervention services described in 42 USC 300ff-51(e); (6) health insurance premium and cost sharing assistance for low-income individuals in accordance with 42 USC 300ff-15; (7) home healthcare; (8) medical nutrition therapy; (9) hospice services; (10) home and community-based health services as

**EXHIBIT 11 - 111**

defined under 42 USC 300ff-14(c); (11) mental health services; (12) substance abuse outpatient care; and (13) medical case management, including treatment adherence services (42 USC 300ff-51(b)(1)(A) and 51(c)).

The requirement that the recipient must spend at least 75 percent of the amount remaining after reserving amounts for administration, planning and evaluation, and/or clinical quality management on core medical services is waived for the COVID-19 CARES Act funding. Sections 2604(c), 2612(b), and 2651(c) of the PHS Act.

e.    Funds may be used to pay the costs of providing support services that are needed for people with HIV to achieve their medical outcomes. These services include, but are not limited to, outreach services, non-medical case management, medical transportation, translation, and referrals for healthcare and support services. Support services are subject to approval of the secretary of HHS or designee (42 USC 300ff-51(b)(1)(B) and 51(d)).

f.    Funds may be used for the establishment of a clinical quality management program to assess the extent to which medical services that are provided to patients are consistent with the most recent Public Health Service guidelines for the treatment of HIV/AIDS and related opportunistic infections, and, as applicable, to develop strategies for ensuring that such services are consistent with the guidelines, and to ensure that improvements in the access to and quality of HIV health services are addressed (42 USC 300ff-64 (g)(5)). Policy Clarification Notice #15-02 https://hab.hrsa.gov/sites/default/files/hab/Global/HAB-PCN-15-02-CQM.pdf.

g.    Funds may be used for administrative expenses; no more than 10 percent on administrative expenses (42 USC 300ff-51(b)(1)(C)).

2.    *Activities Unallowed*

a.    Funds may not be used to make payments for any item or service to the extent that payment has been made or can reasonably be expected to be made for that item or service under any state compensation program, under an insurance policy (except for a program administered by or providing the services of the Indian Health Service), or under any federal or state health benefits program or by an entity that provides health services on a prepaid basis (42 USC 300ff-64(f)(1)).

b.    Funds may not be awarded to for-profit entities to carry out required early intervention services unless they are the only available providers of quality HIV care in the area (42 USC 300ff-51(e)(3)(A)).

c.   Funds may not be used to fund AIDS programs or to develop materials, designed to promote or encourage, directly, intravenous drug abuse or sexual activity, whether homosexual or heterosexual (42 USC 300ff-84).

d.   Funds may not be used to purchase sterile needles or syringes for the hypodermic injection of any illegal drug (Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113), Division H, Title V, Section 520 and subsequent appropriations, as applicable). Other elements of syringe services programs may be allowable if in compliance with applicable HHS and HRSA-specific guidance.

e.   Funds received under this grant will not be expended for any purpose other than the purposes for which the grant was awarded (42 USC 300ff-64(g)(1)).

f.   Funds may not be used to purchase or improve land or to purchase, construct, or make permanent improvement to any building (42 USC 300ff-64(g)(1).

g.   Payments for clinical research.

h.   Payments for nursing home care.

i.   PrEP or nPEP medications or medical services. As outlined in the June 22, 2016 RWHAP and PrEP program letter, the RWHAP legislation provides grant funds to be used for the care and treatment of PLWH, thus prohibiting the use of RWHAP funds for PrEP medications or related medical services, such as physician visits and laboratory costs. However, RWHAP Part C recipients and subrecipients may provide prevention counseling and information, which should be part of a comprehensive PrEP program.

j.   International travel.

k.   Funds may not be used to make cash payments to intended recipients of RWHAP services (42 USC 300ff-28(b)(6) and Ryan White HIV/AIDS Program Services: Eligible Individuals and Allowable Uses of Funds, Policy Clarification Notice #16-02 https://hab.hrsa.gov/sites/default/files/hab/program-grants-management/ServiceCategoryPCN_16-02Final.pdf.

## B.   Allowable Costs/Cost Principles

Costs charged to federal funds under this program must comply with the cost principles at 45 CFR Part 75, Subpart E, and any other requirements or restrictions on the use of federal funding.

**EXHIBIT 11 - 113**

**J.     Program Income**

The Notice of Award provides guidance on the use of program income. The additional method is used for RWHAP Part C EIS. Program income must be used for activities described in III.A.1, "Activities Allowed."

**L.     Reporting**

    **1.     Financial Reporting**

        a.     *SF-270, Request for Advance or Reimbursement* – Not Applicable

        b.     *SF-271, Outlay Report and Request for Reimbursement for Construction Programs* – Not Applicable

        c.     *SF-425, Federal Financial Report* – Applicable

    **2.     Performance Reporting**

    Not Applicable

    **3.     Special Reporting**

    Not Applicable

## STUDENT FINANCIAL ASSISTANCE PROGRAMS

### Department of Education

### Department of Health and Human Services

**CFDA 84.007 FEDERAL SUPPLEMENTAL EDUCATIONAL OPPORTUNITY GRANTS (FSEOG)**

**CFDA 84.033 FEDERAL WORK-STUDY PROGRAM**

**CFDA 84.038 FEDERAL PERKINS LOAN PROGRAM**

**CFDA 84.063 FEDERAL PELL GRANT PROGRAM**

**CFDA 84.268 FEDERAL DIRECT STUDENT LOANS**

**CFDA 84.379 TEACHER EDUCATION ASSISTANCE FOR COLLEGE AND HIGHER EDUCATION GRANTS (TEACH Grants)**

**CFDA 84.408 POSTSECONDARY EDUCATION SCHOLARSHIPS FOR VETERAN'S DEPENDENTS (Iraq and Afghanistan Service Grant (IASG))**

**CFDA 93.264 NURSE FACULTY LOAN PROGRAM (NFLP)**

**CFDA 93.342 HEALTH PROFESSIONS STUDENT LOANS, INCLUDING PRIMARY CARE LOANS AND LOANS FOR DISADVANTAGED STUDENTS (HPSL/PCL/LDS)**

**CFDA 93.364 NURSING STUDENT LOANS (NSL)**

**CFDA 93.925 SCHOLARSHIPS FOR HEALTH PROFESSIONS STUDENTS FROM DISADVANTAGED BACKGROUNDS – SCHOLARSHIPS FOR DISADVANTAGED STUDENTS (SDS)**

**COVID-19 Requirements**

As a result of COVID-19, there may be requirements in the 2020 Compliance Supplement for the SFA Cluster that may have been waived or changed for certain institutions. In fulfilling their audit responsibilities under 2 CFR section 200.514(d)(3), auditors should familiarize themselves with these changes and determine appropriate audit steps to test for compliance. The department has developed a comprehensive website for COVID-19 issues that auditors should use as a resource in developing their audit testing. This website is at https://www.ed.gov/coronavirus?src=feature.

The government provided training at the Federal Student Aid Training Conference (FSATC) December 1–4, 2020, which presented the waivers and other flexibilities in a clear and consolidated manner. All training sessions will be made available online. Please check our website at https://fsaconferences.ed.gov/2020buffer.html for additional information on FSATC. In addition, the Department is working on a written resource that will be made available at or

**EXHIBIT 11 - 115**

around the time of the FSATC. Auditors, please send questions on how the department can be helpful to: COVID-19@ed.gov.

EXHIBIT 11 - 116

<div align="center">

**APPENDIX VII**

**OTHER AUDIT ADVISORIES**

</div>

**I.      Novel Coronavirus (COVID-19)**

This section of the addendum is provided in addition to the section of the same title in the 2020 Supplement. This advisory highlights the following areas affecting single audits arising due to COVID-19:

- Single audit due dates – Additional Extension

- Treatment of donated personal protective equipment (PPE) on the Schedule of Expenditures of Federal Awards (SEFA)

- Agency Guidance Document References

*Single Audit Due Dates – Additional Extension*

Due to the large size of the COVID-19 programs and the federal government dependency on single audit reports to assist with proper oversight over these funds, we strongly encourage the auditees and auditors to complete and submit their relevant portions of single audit reporting packages for fiscal year ends, subject to the provisions of the extension described herein, as early as possible prior to the normal due dates of the earlier of thirty days after the receipt of the auditor's reports or nine months after the fiscal year end date.

In light of the late issuance of audit guidance for the COVID-19 programs contained in this addendum, awarding agencies, in their capacity as cognizant or oversight agencies for audit, must allow recipients and subrecipients that received COVID-19 funding with original due dates from October 1, 2020, through June 30, 2021, an extension for up to three (3) months beyond the normal due date in the completion and submission of the Single Audit reporting package. No further action by awarding agencies is required to enact this extension.

This extension is in addition to the changes in due dates discussed in the 2020 Compliance Supplement on page 8-VII-4 under *"COVID-19 Related OMB memoranda"* and page 8-VII-5 under *"Single Audit due dates."*

This extension does not require individual recipients and subrecipients to seek approval for the extension by the cognizant or oversight agency for audit; however, recipients and subrecipients should maintain documentation of the reason for the delayed filing. Recipients and subrecipients taking advantage of this extension would still qualify as a "low-risk auditee" under the criteria of 2 CFR section 200.520(a) – *Criteria for a low-risk auditee.*

*Donated Personal Protective Equipment (PPE)*

During the emergency period of COVID-19 pandemic and as allowed under OMB Memorandum M-20-20 (April 9, 2020), federal agencies and recipients can donate PPE purchased with federal

**EXHIBIT 11 - 117**

assistance funds to various entities for the COVID-19 response. The donated PPE were mostly
provided without any compliance or reporting requirements or assistance listing (CFDA)
information from the donors. As such, the non-federal entities that received donated PPE should
provide the fair market value of the PPE at the time of receipt as a stand-alone footnote
accompanying their SEFA. The amount of donated PPE should not be counted for purposes of
determining the threshold for a single audit or determining the type A/B threshold for major
programs, and is not required to be audited as a major program. Because donated PPE has no
bearing on the single audit, the donated PPE footnote may be marked "unaudited."

*Agency Guidance Document References for Programs in the Addendum*

The COVID-19 pandemic has led many federal agencies to issue implementing guidance (e.g.,
frequently asked questions, memos) outside of the normal regulatory process for new and
existing programs receiving COVID-19 funding. Such guidance is issued to communicate an
agency's understanding of how the relevant statutes, regulations, or the terms and conditions of
the federal awards to the extent they exist and apply to a particular circumstance, but it does not
create new compliance requirements. Due to the evolving nature of the pandemic environment, it
has been common for federal agencies to update, change, or delete their specific guidance over
time.

The programs sections in this addendum often refer auditors to agency guidance documents to
obtain a better understanding of statutory and regulatory compliance requirements subject to
audit. When evaluating a non-federal entity's compliance, auditors must consider provisions of
federal statutes, regulations, and the terms and conditions of federal awards. However, auditors
may also consider guidance documents in effect during the period to understand the program
requirements. An auditor may conclude whether the non-federal entity is in compliance with a
type of compliance requirement based on consideration of applicable implementing guidance in
effect at the time of the activity or transaction.

When citing criteria for audit findings, 2 CFR 200.516(b)(2) indicates the following information
must be included in finding detail: "The criteria or specific requirement upon which the finding
is based, including the Federal statutes, regulations, or the terms and conditions of the Federal
awards."  Therefore, auditors should refer to a statute, regulation, or term and condition as
criteria for the audit finding.

**EXHIBIT 11 - 118**