BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon University,<br><br>                          Plaintiff,<br><br>     v.<br><br>Miguel Cardona, in his official capacity as Secretary of Education, *et al.*,<br><br>                          Defendants. | Case No. 2:21-cv-566-DLR<br><br>**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR EXTRAORDINARY INJUNCTIVE RELIEF** |

## INTRODUCTION

Under the Higher Education Act (HEA), an institution of higher education must take one of three forms. The first is defined in Section 101 as, among other things, "a public or other nonprofit institution." 20 U.S.C. § 1001(a)(4). The second is a "proprietary institution," defined in Section 102(b). *Id.* § 1002(b). And the third is a "postsecondary vocational institution," defined in Section 102(c). *Id.* § 1002(c). When Grand Canyon University was sold to a for-profit corporation in 2004, it became a proprietary institution. The school was sold again in 2018, to a non-profit corporation substantially controlled by officials from the for-profit seller. As part of that $853 million transaction, the non-profit buyer agreed to pay approximately 60% of Grand Canyon's adjusted gross revenue to the for-profit seller for the provision of various services. Grand Canyon applied to the Department of Education, seeking to change its status from a proprietary institution under Section 102(b) of the Higher Education Act to an institution under Section 101. The Department denied that application, due to the ongoing entanglements between Grand Canyon and the for-profit corporation that had recently sold it (including a substantial flow of revenue to the former owner). The denial is under review in a separate pending matter, and is not at issue here.

In two recent COVID relief bills, Congress made one pool of funds available "to each institution of higher education as defined in section 101 or section 102(c) of the HEA," and another (smaller) pool available "to institutions of higher

| | |
|---|---|
| 1 | education as defined in section 102(b) of the HEA."[1]  Because Grand Canyon is a |
| 2 | proprietary institution under Section 102(b), it is only eligible to draw from the |
| 3 | smaller pool of funds.  Yet the school now seeks a temporary restraining order |
| 4 | granting it access to the larger pool.  Grand Canyon's theory is that, despite the |
| 5 | Department's denial of its application to change status, the school is an institution |
| 6 | under Section 101 of the Higher Education Act "for emergency grant purposes." |
| 7 | Mot. at 4.  Grand Canyon arrives at this conclusion by reasoning backwards: using |
| 8 | the text of pre-existing regulations to determine the meaning of later-enacted |
| 9 | statutes.  But Grand Canyon has misunderstood those regulations, which do not |
| 10 | mean what it claims.  And even if they did, the plain language of subsequent statutes |
| 11 | obviously supersedes any earlier regulations to the contrary.  Grand Canyon is a |
| 12 | proprietary institution under Section 102(b), and it is therefore ineligible for funds |
| 13 | that Congress directed "to each institution of higher education as defined in section |
| 14 | 101 or section 102(c) of the HEA."  The school does not have a special status "for |
| 15 | emergency grant purposes." |
| 16 | But the Court need not resolve that issue on the accelerated timeline that |
| 17 | Grand Canyon suggests.  Grand Canyon slept on its claim for more than two-and-a- |

---

[1] Coronavirus Response and Relief Supplemental Appropriations Act, Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1) & (4); *see* H.R. 133 at 751, 116th Cong. (2020) (enacted). The American Rescue Plan Act appropriated additional funds (as relevant here) "in accordance with the same terms and conditions of section 314 of the Coronavirus Response and Relief Supplemental Appropriations Act." Pub. L. No. 117-2, § 2003; *see* H.R. 1319 at 20, 117th Cong. (2021) (enacted).

half months before seeking relief, which belies its suggestion of an imminent irreparable harm. And the reallocation of funds to which the school points will not be performed until July at the earliest.

## BACKGROUND

### A. Title IV and Direct Grant Programs

Under Title IV of the Higher Education Act, "Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012). "To participate in Title IV programs—*i.e.*, to be able to accept federal funds—a postsecondary institution . . . must satisfy several statutory requirements." *Id.* at 433–34. As relevant here, each school must meet one of three definitions. The principal definition, set out in Section 101 of the HEA, describes an "institution of higher education" as, among other things, "a public or other nonprofit institution." 20 U.S.C. § 1001(a)(4). Section 102(b) defines "proprietary institutions," *see id.* § 1002(b), and Section 102(c) defines "postsecondary vocational institutions," *id.* § 1002(c), both of which are also eligible to participate in Title IV programs (though on slightly different terms). *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133, 138–41 (D.D.C. 2012) (discussing the evolution of these definitions through amendments to the HEA).

The Department of Education also runs many other grant programs, some of which are "state-administered," and some of which are "direct." The difference is that state-administered programs have "a formula for allocating program funds among eligible States," while direct grant programs do not. 34 C.F.R. §§ 75.1, 76.1. The Department's direct grant programs are numerous and diverse. They include the Arts in Education National Program, 20 U.S.C. § 7292, the Fund for the Improvement of Postsecondary Education, *id.* § 1138, and the Promise Neighborhoods Program, *id.* § 7273, to name three examples among many.

Each direct grant program has its own eligibility criteria. Certain "national nonprofit organization[s]" can participate in the Arts in Education National Program. *See id.* § 7292(e)(1)(G), (e)(2). Grants from the Fund for the Improvement of Postsecondary Education are available to "institutions of higher education, combinations of such institutions, and other public and private nonprofit institutions and agencies." *Id.* § 1138(a). And one part of the Promise Neighborhoods Program is open to "institution[s] of higher education, as defined in [20 U.S.C. §] 1002" (which is Section 102 of the HEA), "Indian tribe[s] or tribal organization[s]," or "one or more nonprofit entities working in formal partnership" with other specified entities. *Id.* § 7272(1)(A). Each of these programs incorporates an applicant's "nonprofit" status into its eligibility criteria, but none of the authorizing statutes defines that term—which is commonly the case.

4

The Department's regulations for direct grant programs, codified at 34 C.F.R. part 75, govern the implementation of each such program "to the extent consistent with the authorizing statute." 34 C.F.R. § 75.1(b). Those regulations note that "[u]nder some programs, an applicant must show that it is a nonprofit organization." *Id.* § 75.51(a). Applicants can generally do so by providing "[p]roof that the Internal Revenue Service currently recognizes the applicant as an organization to which contributions are tax deductible under section 501(c)(3) of the Internal Revenue Code." *Id.* § 75.51(b)(1).

**B.    The Higher Education Emergency Relief Funds**

Each of the pandemic relief bills has included a "Higher Education Emergency Relief Fund," or "HEERF," for the Department to distribute to institutions of higher education, according to statutory criteria. The first such fund, "HEERF I," was made available on equal terms to every "institution of higher education," as that term is defined "in title I of the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.)," without regard to whether a school was an "institution of higher education" under Section 101, 102(b), or 102(c) of the HEA. Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, §§ 18004(a)(1), 18007(2), 134 Stat. 567, 569.

The second fund, "HEERF II," had different eligibility criteria. Eighty-nine percent of HEERF II funding was reserved for "institution[s] of higher education as defined in section 101 or section 102(c) of the HEA," while only three percent was

available to proprietary "institutions of higher education as defined in section 102(b) of the HEA." Coronavirus Response and Relief Supplemental Appropriations Act (CRRSAA), Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1) & (4); *see* H.R. 133 at 751, 116th Cong. (2020) (enacted). (The other eight percent of HEERF II funding was set aside for purposes not relevant here.) The authorized uses of HEERF II funds also varied based on a school's classification under the Higher Education Act. Proprietary institutions "as defined in section 102(b) of the HEA," *id.* § 314(d)(7), could only use HEERF II funds to "provide financial aid grants to students," *id.* § 314(c)(3). Other schools could use HEERF II funds for that purpose, to "defray expenses associated with coronavirus," *id.* § 314(c)(1), or to "carry out student support activities," *id.* § 314(c)(2). On January 14, 2021, the Department of Education published "allocation tables" for HEERF II, showing the eligibility of each institution of higher education under Section 101, 102(b), or 102(c) of the HEA. Declaration of Michelle Asha Cooper ("Cooper Decl.") ¶¶ 12, 14.

The third fund, "HEERF III," maintained the same distinction between proprietary institutions and other institutions of higher education. *See* American Rescue Plan Act, Pub. L. No. 117-2, § 2003 (appropriating additional funds, as relevant here, "in accordance with the same terms and conditions of section 314 of the Coronavirus Response and Relief Supplemental Appropriations Act"); *see* H.R. 1319 at 20, 117th Cong. (2021) (enacted). Ninety-one percent of HEERF III funding was reserved for institutions of higher education as defined in Sections 101 or 102(c)

of the Higher Education Act, *id.* § 2003(1), while only one percent was available to proprietary institutions as defined in Section 102(b), *id.* § 2003(4).

**C.     Grand Canyon University**

Grand Canyon University was founded in 1949, and sold to a for-profit corporation in 2004. *See* Compl. ¶ 1, *Grand Canyon Univ. v. Cardona*, No. 2:21-cv-177-SRB (D. Ariz.). Since that time, it has participated in Title IV funding programs as a proprietary institution, as defined in Section 102(b) of the Higher Education Act, 20 U.S.C. § 1002(b). In 2018, Grand Canyon was sold again—this time to a 501(c)(3) charitable organization, for approximately $853 million. Cooper Decl., Ex. A at 2. As part of that sale, the non-profit buyer agreed to pay approximately 60% of Grand Canyon's adjusted gross revenue to the for-profit seller for the provision of various services. *Id.* at 3.

Grand Canyon then applied to the Department of Education for a change in status from a proprietary institution under Section 102(b) to a nonprofit institution under Section 101 of the Higher Education Act, 20 U.S.C. § 1001. Cooper Decl., Ex. A at 1. The Department denied that application, for two reasons. First, the Department examined the services agreement that was part of the change-in-ownership transaction, and concluded that it would cause a substantial portion of Grand Canyon's net earnings to benefit the for-profit seller on an ongoing basis. And second, the Department concluded that significant overlap between the management of the for-profit seller and the non-profit buyer—notably including the

fact that the seller's CEO would serve as the buyer's President—indicated that Grand Canyon would still be effectively operated for the benefit of the for-profit seller. *Id.* at 14–16. *See* 20 U.S.C. § 1003(13). Grand Canyon sought reconsideration, and the Department affirmed its denial. Cooper Decl., Ex. B. On February 2, Grand Canyon brought suit to challenge the denial. *See Grand Canyon Univ. v. Cardona*, No. 2:21-cv-177-SRB (D. Ariz.).

By that time, Grand Canyon knew that it would be eligible for HEERF II funds as a proprietary institution, because it had been identified as such in the allocation tables published on January 14. Cooper Decl. ¶¶ 12, 14. Grand Canyon acknowledged that issue in its complaint. Compl. ¶ 11 n.1, *Grand Canyon Univ. v. Cardona*, No. 2:21-cv-177-SRB (D. Ariz.) (explaining that "the Department's definition of [Grand Canyon] as a proprietary institution was applied for the purposes of Coronavirus Response and Relief Supplemental Appropriations Act" in allocating HEERF II funds). And then on March 2, Grand Canyon identified itself as a proprietary institution in applying for HEERF II funds. Cooper Decl. ¶ 16. It was awarded $18 million the following week. *Id.*

On March 17, Grand Canyon sent a letter to the Department suggesting (for the first time) that it should instead have been eligible for HEERF II funds as an "institution of higher education as defined in section 101 . . . of the HEA," despite its classification as a proprietary institution for other purposes. Cooper Decl. ¶ 18 & Ex. I; *see* CRRSAA, Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1). The

1  Department responded on March 26, explaining that the plain language of the statute
2  was to the contrary. Cooper Decl. ¶ 18 & Ex. J. Grand Canyon brought this suit on
3  April 1, and applied for a temporary restraining order the next day.

## LEGAL STANDARD

4  A temporary restraining order or preliminary injunction "is an extraordinary
5  and drastic remedy, one that should not be granted unless the movant, by a clear
6  showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968,
7  972 (1997) (per curiam) (cleaned up). It is "never awarded as of right," *Winter v.*
8  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and a plaintiff
9  "must establish that he is likely to succeed on the merits, that he is likely to suffer
10 irreparable harm in" its absence, "that the balance of equities tips in his favor, and
11 that an injunction is in the public interest," *id.* at 20, 24.

## ARGUMENT

**A. Because Grand Canyon University is not an institution of higher education as defined in Section 101 of the Higher Education Act, it is unlikely to succeed on the merits of its claim.**

12 In the second COVID relief bill, Congress made one pool of funds available
13 "to each institution of higher education as defined in section 101 or section 102(c)"
14 of the Higher Education Act, and another pool available to proprietary "institutions
15 of higher education as defined in section 102(b)." CRRSAA, Pub. L. No. 116-260,
16 div. M, tit. III, § 314(a)(1) & (4); *see* H.R. 133 at 751, 116th Cong. (2020) (enacted).
17 In the third relief bill, Congress appropriated funds (as relevant here) "in accordance

with the same terms and conditions of section 314 of the Coronavirus Response and Relief Supplemental Appropriations Act." American Rescue Plan Act, Pub. L. No. 117-2, § 2003; *see* H.R. 1319 at 20, 117th Cong. (2021) (enacted).

Grand Canyon University is a proprietary institution under Section 102(b) of the Higher Education Act, and it is therefore ineligible for funds that Congress directed "to each institution of higher education as defined in section 101 or section 102(c)." That is all of the analysis needed to resolve this case.

In a separate proceeding, Grand Canyon is arguing that the Department of Education wrongly denied its application to become an institution of higher education as defined in Section 101. *See Grand Canyon Univ. v. Cardona*, No. 2:21-cv-177-SRB (D. Ariz. filed Feb. 2, 2021). The school has chosen not to bring this claim in that case, nor to make that argument here. Instead, Grand Canyon argues here that, even if the Department properly denied its change-in-status application, it is nonetheless a Section 101 school "for emergency grant purposes." Mot. at 4; *see* Mot. at 17 (arguing that Grand Canyon is not a proprietary institution "for direct grant purposes"). But a school only has one status under the Higher Education Act; it does not have different statuses for different purposes.

Grand Canyon arrives at its counterintuitive conclusion—that it is a Section 101 school for some purposes and a proprietary institution for others—by misreading the Department's regulations for the administration of direct grant programs. The regulations at 34 C.F.R. part 75 interpret a wide range of statutes,

and they only apply "to the extent consistent with the authorizing statute" for each individual program. 34 C.F.R. § 75.1(b); *see id.* § 75.50 ("Eligibility to apply for a grant under a program of the Department is governed by the authorizing statute . . . for that program."). Those regulations include a provision entitled "How to prove nonprofit status," 34 C.F.R. § 75.51, which notes that "[u]nder some programs," but not others, "an applicant must show that it is a nonprofit organization," *id.* § 75.51(a).

For example, the Arts in Education National Program is open to certain "national nonprofit organization[s]," 20 U.S.C. § 7292(e)(1)(G), the Fund for the Improvement of Postsecondary Education accepts applications from "private nonprofit institutions," *id.* § 1138(a), and the Promise Neighborhoods Program makes eligible "one or more nonprofit entities working in formal partnership" with other specified entities, *id.* § 7272(1)(A). Because the authorizing statutes for these programs do not provide otherwise, an applicant can demonstrate its nonprofit status consistent with the Department's general regulations, by providing "[p]roof that the Internal Revenue Service currently recognizes the applicant as an organization to which contributions are tax deductible under section 501(c)(3) of the Internal Revenue Code." 34 C.F.R. § 75.51(b)(1). Such applicants need not be institutions of higher education, or even schools of any kind.[2]

---

[2] For example, the John F. Kennedy Center for the Performing Arts has been funded through the Arts in Education National Program. Cooper Decl. ¶ 6. The Brooklyn Historical Society received a grant from the Fund for the Improvement of

Although HEERF II and III are direct grant programs—because they are not state-administered, *see* 34 C.F.R. § 76.1—they do not make eligibility dependent on an organization's "nonprofit status" within the meaning of 34 C.F.R. § 75.51. Instead, the authorizing statutes make one portion of these funds available "to each institution of higher education as defined in section 101 or section 102(c)" of the Higher Education Act, and another portion available to proprietary "institutions of higher education as defined in section 102(b)." CRRSAA, Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1) & (4); *see* American Rescue Plan Act, Pub. L. No. 117-2, § 2003. To demonstrate eligibility for HEERF II or III, therefore, an institution must prove its status under the Higher Education Act—and not its "nonprofit status" more generally. Only "institutions of higher education as defined in . . . the HEA" can draw from the Higher Education Emergency Relief Funds. *See* CRRSAA, Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1) & (4).

The Department's regulations at 34 C.F.R. part 75 do not purport to determine a school's status under the Higher Education Act. And they explicitly defer to each program's authorizing statute—in this case, the recent COVID relief bills. *See* 34 C.F.R. § 75.1(b) (regulations apply "to the extent consistent with the authorizing statute" for the direct grant program); *id.* § 75.50 ("Eligibility to apply for a grant

---

Postsecondary Education. *Id.* And South Bay Community Services has participated in the Promise Neighborhoods Program. *Id.* None of these entities is a school, much less an institution of higher education, but each is a nonprofit organization within the meaning of 34 C.F.R. § 75.51 and the relevant program's authorizing statute.

12

under a program of the Department is governed by the authorizing statute . . . for that program."); *id*. § 75.51 (regulation on "How to prove nonprofit status" only applies to "some programs"); *id*. § 77.1(c) (definitions only apply "[u]nless a statute or regulation provides otherwise").

Grand Canyon University is a proprietary institution under Section 102(b) of the Higher Education Act; it is eligible to participate in HEERF II and III as such. Yet Grand Canyon argues that, because it is owned by a charitable organization under section 501(c)(3) of the tax code, it must be allowed to participate in HEERF II and III as though it were an institution under Section 101 of the Higher Education Act—that, in fact, it *is* such an institution "for emergency grant purposes." Mot. at 4. Ultimately, Grand Canyon's eligibility for HEERF II and III is a question of congressional intent. To the extent that the Department's regulations are inconsistent with the later-enacted statutes (which they are not), it is of course the statutory text that governs. *United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008) ("[A] regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides.").

Congress made one pool of funds available "to each institution of higher education as defined in section 101 or section 102(c)" of the Higher Education Act, and another pool available to proprietary "institutions of higher education as defined in section 102(b)." CRRSAA, Pub. L. No. 116-260, div. M, tit. III, § 314(a)(1) & (4); *see* American Rescue Plan Act, Pub. L. No. 117-2, § 2003. When defining that

first pool, did Congress intend to incorporate each school's current status under the Higher Education Act, as the Department understands it to have meant? Or, as Grand Canyon argues, did Congress mean that the funds designated for "each institution of higher education as defined in section 101 . . . of the HEA" should also be available to proprietary institutions as defined in Section 102(b), so long as those schools were owned by charitable organizations under section 501(c)(3) of the tax code? There is simply no reason to believe that Congress intended what Grand Canyon suggests. And to the extent that there is any ambiguity in these statutes, or in the Department's direct grant regulations as applied to them—and really, there is none—then the Department's interpretations are plainly reasonable and entitled to deference here. *See Kisor v. Wilkie*, 139 S. Ct. 2400 (2019); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

Grand Canyon University is a proprietary institution under Section 102(b) of the Higher Education Act, and so it is ineligible for funds that Congress directed "to each institution of higher education as defined in section 101 or section 102(c)." Grand Canyon's motion for an extraordinary injunction should therefore be denied.

**B.   Grand Canyon, which sat on its claim for more than two-and-a-half months before seeking injunctive relief, has not shown a likelihood of irreparable harm.**

To win extraordinary injunctive relief, Grand Canyon must show that the school "is likely to suffer irreparable harm" in its absence. *Winter*, 555 U.S. at 20. And a "long delay before seeking" a temporary restraining order or "preliminary

injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g*, 762 F.2d 1374, 1377 (9th Cir. 1985); *see Feldman v. Ariz. Sec'y of State's Office*, 2016 WL 5900127, at *8 (D. Ariz. Oct. 11, 2016) (Rayes, J.) (quoting *Oakland Tribune*).

On January 14, the Department published a table entitled "HEERF II Allocations for Proprietary Institutions under CRRSAA section 314(a)(4)." Cooper Decl. ¶ 14. Grand Canyon was the very first institution listed.[3] On that date, if not sooner, Grand Canyon knew (or should have known) that it would be treated as a proprietary institution for purposes of HEERF II funding. The school certainly knew as much by February 2, when it filed suit in *Grand Canyon University v. Cardona*, No. 2:21-cv-177-SRB (D. Ariz.). Grand Canyon acknowledged the issue in that complaint. *See* Compl. ¶ 11 n.1. On March 2, Grand Canyon applied for HEERF II funding *as a proprietary institution* under CRRSAA section 314(a)(4). Cooper Decl. ¶ 16. (Despite the claims it is presenting here, the school has never applied for funding under section 314(a)(1) of that Act.) Then on March 17, Grand Canyon contacted the Department, claiming (for the first time) that it should be considered a Section 101 school under the Higher Education Act for purposes of HEERF II and III, despite its classification as a proprietary institution for other purposes. Cooper Decl. ¶ 18. Grand Canyon filed this suit on April 1, eleven weeks after the

---

[3] This table remains available at: https://www2.ed.gov/about/offices/list/ope/314a4allocationtableheerfii.pdf.

Department published its HEERF II allocation tables, having sat on its claim for more than two-and-a-half months.

Grand Canyon now insists that it must receive relief by April 15, but its course of conduct "implies a lack of urgency and irreparable harm," and its motion should be denied for that reason. *Oakland Tribune*, 762 F.2d at 1377. Nor does April 15 have the significance that Grand Canyon suggests. The school argues that "any HEERF II funds not claimed by . . . April 15, 2021 will be reallocated" to other institutions of higher education. Mot. at 22. But as explained in the Cooper Declaration, the Department will not perform that reallocation until July at the earliest. *See* Cooper Decl. ¶ 19 (explaining that funds will not be reallocated until 90 days after an event that has yet to occur).

Grand Canyon has not shown that it "is likely to suffer irreparable harm" absent extraordinary injunctive relief, *Winter*, 555 U.S. at 20, and its motion must therefore be denied.

**C.   Grand Canyon has not shown that the balance of the equities favor the entry of an extraordinary injunction.**

The equities do not weigh in favor of an injunction. The additional funding sought by Grand Canyon will be allocated for the purposes of HEERF II and III no matter who prevails. If Grand Canyon receives it, then other schools will not—and if Grand Canyon does not receive that funding, then other schools will. Grand Canyon cannot show "that the balance of equities tips in [its] favor, [nor] that an injunction is in the public interest," *Winter*, 555 U.S. at 24, and for that additional

reason its motion should be denied. In arguing the contrary, Grand Canyon briefly suggests that the equities tip in its favor because the school is correct on the merits of its claim, which is both wrong and beside the point of this separate inquiry. *See* Mot. at 25–26.

## CONCLUSION

For the reasons set forth above, Grand Canyon's motion for extraordinary injunctive relief should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

*/s/ James Bickford*
JAMES BICKFORD
Trial Attorney (N.Y. Bar No. 5163498)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
James.Bickford@usdoj.gov
Telephone: (202) 305-7632
Facsimile: (202) 616-8470

*Counsel for Defendants*

Date: April 8, 2021